## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**Joshua M. Ambush**
1726 Reisterstown Road
Suite 206
Baltimore, Maryland 21208

**Plaintiff,**

**v.**

**Michael Engelberg,**
75 Woodmere Boulevard
Woodmere, New York  11598

**Eliezer Perr** a/k/a **Elie Perr**
16 Cactus Drive
Lakewood, New Jersey  08701

**Yedidiah Perr** a/k/a **Jed Perr**
a/k/a **Yedi Perr**
23 Fern Street
Lakewood, New Jersey  08701

**American Center for Civil Justice, Inc.**
a/k/a **American Center for Civil Justice**
c/o Eliezer Perr
16 Cactus Drive
Lakewood, New Jersey 08701

**American Center for Civil Justice, Inc.**
**(N.J.)**
c/o  Shlomo Perr
1620 Kresson Road
Cherry Hill, NJ 08003

**American Center for Civil Justice,**
**Religious Liberty and Tolerance, Inc.**
c/o Yedidiah Perr
23 Fern Street
Lakewood, New Jersey  08701

**Civil No.: 15-1237**

**Re: Breach of Contract, RICO Act**

**New York Center for Civil Justice**
c/o Michael Engelberg
75 Woodmere Boulevard
Woodmere, New York 11598

**New York Center for Civil Justice,**
**Regligious Tolerance & Values, Inc.**
c/o Michael Engelberg
75 Woodmere Boulevard
Woodmere, New York 11598

**American Center for Recovery, LLC**
a/k/a **American Recovery Center, LLC**
a/k/a **ARC**
c/o Yedidiah Perr
23 Fern Street
Lakewood, New Jersey  08701

**American Center for Freedom of**
**Religion** a/k/a **Freedom Of Religion, Inc.**
c/o Yedidiah Perr
23 Fern Street
Lakewood, New Jersey  08701

and

**Neal M. Sher**
280 Madison Avenue
Suite 912
New York, NY 10016

**Defendants.**

<u>**COMPLAINT**</u>

**TO THE HONORABLE COURT:**

**COMES NOW,** plaintiff Joshua M. Ambush, Esq. ("Ambush"), through the undersigned

counsel, and respectfully states, alleges and prays as follows:

## I.  <u>INTRODUCTION</u>

This complaint presents two distinct but related causes of action.  The first cause of action is

based on the breach of a settlement agreement (the "Settlement Agreement") that put an end to a related case before this Court.  After clearly agreeing not to interfere with Plaintiff's claims for fees in relation to legal services provided and concluded in other proceedings, several defendants directly interfered with Plaintiff's claims.   Since the filing of the related case of <u>ACCJ v. Ambush</u> (as defined below), all defendants have committed a host of tortious conduct against Plaintiff.   The very purpose of the Settlement Agreement was to put an end to the Settling Defendants campaign to defame Plaintiff and their efforts to steal his clients and turn them against him.   Since the execution of the Settlement Agreement, despite the clear language prohibiting such action, all defendants have committed and continue to commit additional tortious conduct against Plaintiff.

The second cause of action arises out of facts and events closely related to the first cause of action.   Several defendants engaged in an illegal enterprise whose activities affect interstate commerce, through a pattern of racketeering activity, which has caused serious economic losses and damages to Plaintiff.

## II.  <u>JURISDICTION</u>

1.  This Honorable Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as this is an action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Ambush brings claims against the defendants under the civil Racketeering and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

## III. <u>VENUE</u>

2.  Venue is proper in the judicial district for the District of Columbia pursuant to 28 U.S.C. §

1391(b)(2), because a substantial part of the events and omissions giving rise to the claim occurred within this district.

3. According to the Settlement Agreement, the parties agreed that any action for breach and enforcement of the Settlement Agreement would be filed in this district.

4. The parties also agreed to request that this case be assigned to the same judge who presided over the case of <u>ACCJ v. Ambush</u> (as defined below), the Honorable Paul L. Friedman.

## IV. <u>RELATED CASE</u>

5. Pursuant to LCvR 40.5(a)(4), this case is a "related case."

6. The related case is <u>American Center for Civil Justice v. Ambush</u>, Civil No. 09-233 (PLF) (D.D.C.) (<u>ACCJ v. Ambush</u>).  That case was dismissed on October 5, 2012, by stipulation of the parties pursuant to the Settlement Agreement.

7. Ambush is filing and will be serving along with this Complaint, the Notice of Related Case required by LCvR 40.5(b)(2).

8. Ambush requests that, pursuant to LCvR 40.5(c)(1), this case be assigned to the Honorable Paul L. Friedman, the judge who presided over the related case of <u>ACCJ v. Ambush</u>.

9. In addition, the Settlement Agreement stipulates that the parties to the Settlement Agreement request that any action for breach and enforcement of the Settlement Agreement be brought before the judge who presided over <u>ACCJ v. Ambush</u>, the Honorable Paul L. Friedman.

## V. <u>PARTIES AND RELEVANT NON-PARTIES</u>

### Plaintiff

10. Ambush is an attorney and managing member of the Law Offices of Joshua M. Ambush, LLC.  Ambush is admitted to the practice of law before this Honorable Court and before the state and federal courts of the State of Maryland.  His  USDC-DC Bar Number is MD27025.

Ambush is a party to the Settlement Agreement.

## Settling Defendants

11. Defendant **Michael Engelberg** (hereinafter "Engelberg"), at all times relevant, has represented himself to be president of the ACCJ (as defined below), the New York Center for Civil Justice, and of the New York Center for Civil Justice, Religious Tolerance & Values, Inc.  Engelberg is a pediatrician and not a lawyer.  His address is 75 Woodmere Blvd., Woodmere, New York 11598.  Engelberg is a party to the Settlement Agreement.  See Exhibit 1, Settlement Agreement.  Engelberg is also a RICO Defendant.

12. Defendant **Eliezer Perr**, (hereinafter "Perr"), at all times relevant, has represented himself to be a member of the Boards of Directors of the ACCJ (as defined below), the New York Center for Civil Justice, and the New York Center for Civil Justice, Religious Tolerance & Values, Inc.  His current address is 16 Cactus Drive, Lakewood, New Jersey  08701.  An alternative address is 63 Hedge Dr., Lakewood, New Jersey 08701. At all relevant times, Perr operated ACCJ from his home at 1646 41st Street, Brooklyn, New York  11218.  Perr is not a lawyer.  He is a party to the Settlement Agreement.  Perr is also a RICO Defendant.

13. Defendant **American Center for Civil Justice, Inc., a/k/a American Center for Civil Justice ("ACCJ" or the "Center")**, is purportedly a not-for-profit corporation organized under the laws of the State of New York.  Its tax identification number is 13-3960556.  As further detailed below, its identity and true purpose is elusive because its principals operate numerous entities with similar names and similar mission statements.  The current address of ACCJ is purportedly 1014 E. 21st Street, Brooklyn, New York 11210.  However, upon information and belief, that address is merely a mail drop.  Upon information and belief, ACCJ operates from Perr's home address, which is currently 16 Cactus Drive, Lakewood,

New Jersey, 08701.  In addition, ACCJ uses numerous other addresses, including: 63 Hedge Drive, Lakewood, NJ 0870; 1331 55th Street, Brooklyn, NY 11219; c/o Neal Sher, 280 Madison Avenue, Suite 912, New York, NY 10016; 1014 E. 21st Street, Brooklyn, NY 11210; 4912 14th Avenue, Brooklyn, NY 11219; 1646 41st Street, Brooklyn, NY 11218; and c/o Roth & Company LLP, 1428 36th Street, Brooklyn, New York 11218.  The ACCJ is not a law firm and its principals are not lawyers.  The ACCJ is a party to the Settlement Agreement.  ACCJ is also a RICO Defendant.

## RICO Defendants

The following list includes all of the parties against which Plaintiff is making claims under the RICO Act.   These defendants are named the "RICO Defendants."   All of the Settling Defendants described above, are also RICO Defendants.

14. RICO Defendant **Yedidiah Perr, a/k/a Jed Perr, a/k/a Yedi Perr** at all times relevant,  was a member of the Boards of Directors of the following: American Center for Civil Justice, Religious Liberty and Tolerance, Inc.; American Center for Recovery, LLC, a/k/a American Recovery Center, a/k/a ARC; American Center for Freedom of Religion, a/k/a Freedom of Religion, Inc.; Hamerkaz NJ, Inc.; Hamerkaz (NJ); Yeshiva Hamerkaz; and Hamerkaz Rivka Ross Children's Foundation For Life, a/k/a Rivka Ross Children's Foundation For Life.  His current address is 23 Fern Street, Lakewood, New Jersey 08701. Additional addresses he uses are: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701; 209 2nd Street, Lakewood, New Jersey 08701; and 4593 Route 9 North, Howell, New Jersey 07731. Yedidiah Perr is not a lawyer.  He is not a party to the Settlement Agreement.

15. RICO Defendant **Neal M. Sher**, is an attorney whose address is 280 Madison Avenue, Suite 912, New York, NY 10016.

16. RICO Defendant **American Center for Civil Justice, Inc. (NJ) ("ACCJ-NJ"),** is purportedly a not-for-profit corporation organized under the laws of the New Jersey.  Its tax identification number is 26-0018649.  It was reportedly directed previously by Shlomo Perr and currently by Yedidiah Perr, both of whom are sons of Perr.  Its address is Shlomo Perr's home address: 1620 Kresson Road, Cherry Hill, NJ 08003.

17. RICO Defendant **American Center for Civil Justice, Religious Liberty and Tolerance, Inc. ("ACCJRLT"),** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey.  Its tax identification number is identical to that of ACCJ-NJ: 26-0018649.  Defendant Yedidiah Perr, a son of Eliezer Perr, is registered as its director.  Its address is his home address: 23 Fern Street, Lakewood, New Jersey 08701. An additional address that is frequently used is: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701; and Shlomo Perr's  home address: 1620 Kresson Road, Cherry Hill, NJ 08003.

18. RICO Defendant **New York Center for Civil Justice, a/k/a NYCCJ ("NYCCJ"),** is purportedly a not-for-profit corporation organized under the laws of the State of New York.  Its tax identification number is unknown.  Upon information and belief, NYCCJ operates from Engelberg's home address, which is 75 Woodmere Boulevard, Woodmere, New York 11598. Engelberg is its purported Director but upon information and belief, Perr also asserts control.

19. RICO Defendant **New York Center for Civil Justice, Religious Tolerance & Values, Inc. ("NYCCJRTV"),** is purportedly a not-for-profit corporation organized under the laws of the State of New York.  Its tax identification number is 01-0701804.  NYCCJRTV operates from Engelberg's home address, which is 75 Woodmere Boulevard, Woodmere, New York 11598. Engelberg is its purported Director but upon information and belief, Perr also asserts control.

20. RICO Defendant **American Center for Freedom of Religion, a/k/a Freedom Of Religion, Inc. ("ACFR"),** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey.  Its tax identification number is 22-3771873.  Defendant Yedidiah Perr, a son of Eliezer Perr, is registered as its director.  Its address is his home address: 23 Fern Street, Lakewood, New Jersey 08701. Additional addresses that are frequently used are: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701; 209 2nd Street, Lakewood, New Jersey 08701; and 4593 Route 9 North, Howell, New Jersey  07731.

21. RICO Defendant **American Center for Recovery, LLC, a/k/a, American Recovery Center, LLC., a/k/a ARC** ("ARC"), is purportedly a for profit limited liability company organized under the laws of the State of New Jersey.  Its New Jersey State entity number is 0400487353.  Defendant Yedidiah Perr, a son of Eliezer Perr, is registered as its director.  Its address is his home address: 23 Fern Street, Lakewood, New Jersey 08701. An additional address that is frequently used is: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701.

## RICO Enterprise Members, Non-Party Actors

The following are members of the RICO Enterprise but not defendants:

22. RICO Enterprise Member **Javier López-Pérez**, is an attorney whose address is 13058 Weddington St., Sherman Oaks, CA 91041.  He is currently living and practicing in California but has maintained a law practice in Puerto Rico.

23. RICO Enterprise Member **David Efron**, is an attorney whose address is 221 Plaza, 6th Floor, 221 Ponce de Leon Avenue, San Juan, Puerto Rico.  Efron was hired by ACCJ in 2010 to replace Javier López-Pérez as its counsel.

24. RICO Enterprise Member **Jonathan Tendler**, whose address is 3829 Nautilus Avenue,

Brooklyn, New York 11224, is a nephew of Eliezer Perr.  He is the director of RICO Enterprise Member Hamerkaz (NY) and a board member of ACCJ.

25. RICO Enterprise Member Shlomo Perr, whose address is 1620 Kresson Road, Cherry Hill, NJ 08003, is a son of Eliezer Perr.  He is the director of RICO Defendants ACCJ-NJ and RICO Enterprise Member Hamerkaz Cherry Hill (NJ).

26. RICO Enterprise Member Shalva Perr Blum, whose address is 209 2nd Street, #42, Lakewood, New Jersey  08701, is a daughter of Eliezer Perr.  She is the director of  RICO Enterprise Member Hamerkaz NJ and of RICO Enterprise Member Hamerkaz Rivka Ross Children Foundation for Life.

27. RICO Enterprise Member **Hamerkaz NJ, Inc.,** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey.  Its tax identification number is unknown. Its New Jersey State entity number is 0400018093. Its current address is Yedidiah Perr's home address: 23 Fern Street, Lakewood, New Jersey  08701; and Shalva Perr Blum's home address: 209 2nd Street, #42, Lakewood, New Jersey 08701. Additional addresses that are frequently used are: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701; 525 Oberlin Avenue, Lakewood, New Jersey 08701; 12 Hazelwood Lane, Lakewood, New Jersey 08701; 2 Forest Park Circle, Lakewood, New Jersey  08701; and 4593 Route 9 North, Howell, New Jersey  07731.

28. RICO Enterprise Member **Hamerkaz (NJ)** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey.  Its tax identification number is 11-3162832.  Defendant Yedidiah Perr, a son of Eliezer Perr, is registered as its director. Its address is his home address: 23 Fern Street, Lakewood, New Jersey 08701. Additional addresses that are frequently used are: 422 Martin Luther King Boulevard, Lakewood, New

Jersey 08701; 209 2nd Street, Lakewood, New Jersey 08701; 525 Oberlin Avenue, Lakewood, New Jersey 08701; and 4593 Route 9 North, Howell, New Jersey 07731.

29. RICO Enterprise Member **Yeshiva Hamerkaz (NJ)** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey. Its tax identification number is unknown. Defendant Yedidiah Perr, a son of Eliezer Perr, is registered as its director. Its address is his home address: 23 Fern Street, Lakewood, New Jersey 08701. Additional addresses that are frequently used are: 422 Martin Luther King Boulevard, Lakewood, New Jersey 08701; 209 2nd Street, Lakewood, New Jersey 08701; 525 Oberlin Avenue, Lakewood, New Jersey 08701; and 4593 Route 9 North, Howell, New Jersey 07731.

30. RICO Enterprise Member **Hamerkaz (NY)** is purportedly a not-for-profit corporation organized under the laws of the State of New York. Its tax identification number is unknown. RICO Enterprise Member Jonathan Tendler, a nephew of Eliezer Perr, is registered as its director. Its address is his home address: 3829 Nautilus Avenue, Brooklyn, New York 11224-1203.

31. RICO Enterprise Member **Hamerkaz Rivka Ross Children's Foundation for Life, a/k/a Rivka Ross Children's Foundation for Life** is purportedly a not-for-profit corporation organized under the laws of the State of New Jersey. Its tax identification number is unknown. Defendant Shalva Perr Blum, a daughter of Eliezer Perr, is registered as its director. Its address is her home address: 209 2nd Street, #42, Lakewood, New Jersey 0870.

32. RICO Enterprise Member **Hamerkaz Cherry Hill** is purportedly a not-for-profit corporation organized under the laws of the New Jersey. Its tax identification number is unknown. Defendant Shlomo Perr, a son of Eliezer Perr, is registered as its director. Its address is his

home address: 1620 Kresson Road, Cherry Hill, NJ 08003.

## VI.  COMMON FACTUAL ALLEGATIONS AGAINST DEFENDANTS

### Background: ACCJ is a Sham Corporation

33. ACCJ purports to be a legitimate altruistic non-profit organization.  Its purported mission is to advocate for individuals who have been victims of foreign terrorist attacks.   In reality, ACCJ is a pseudonym used to refer to three interrelated entities that are directed by Perr and Engelberg, in concert and in partnership with each other, and at times in concert and partnership with Perr's sons Yedidiah Perr and Shlomo Perr, as well as other of their family members and associates.

34. The underlying contract purportedly entered into by the plaintiffs in the Vega-Franqui case (as defined below), was with an entity known as "The American Center for Civil Justice, Inc."  That should have been the name used in the caption of the case of ACCJ v. Ambush and is the name of the entity that is party to the Settlement Agreement.

35. However, in ACCJ v. Ambush,  Perr and Engelberg so styled the case name in that fashion to hide the true identity and other information of the actual entity bringing suit against Ambush.  Throughout the case, the corporate identifier, "Inc." was intentionally omitted wherever the name "American Center for Civil Justice" appeared.  In reality, the name "American Center for Civil Justice" is a fictitious name.  No such entity by that name exists.

36. There are, however, three entities with similar names.  The first is the "American Center for Civil Justice, Inc.," which is registered in the State of New York, and directed by Perr and Engelberg.  The second is the "American Center for Civil Justice, Inc.," which is registered in New Jersey, and is directed by Perr's son, Shlomo Perr.  The third is the "American Center

for Civil Justice, Religious Liberty & Tolerance, Inc.," which is registered in New Jersey and directed by Perr's son, Yedidiah Perr.

37. Upon information and belief, the entity known as the "American Center for Civil Justice, Inc.," which is registered in the State of New York, is the true entity that purportedly contracted with the <u>Vega-Franqui</u> plaintiffs, the true entity that filed suit against Ambush, and the true entity that entered into the Settlement Agreement with Ambush.

38. Upon information and belief, the entity known as the "American Center for Civil Justice, Inc.," which is registered in the State of New Jersey, is a sub-entity, alter ego, or foreign (New York State) corporation registered to do business in New Jersey, and is one and the same as the American Center for Civil Justice, Inc., that is registered in the State of New York, but is doing business in New Jersey under a pseudonym.

39. Alternatively, the American Center for Civil Justice, Inc., which is registered in the State of New Jersey, is a separate and distinct but closely related corporate entity to the corporate entity of the same name that is registered in New York.

40. Upon information and belief, the entity known as the "American Center for Civil Justice, Religious Liberty & Tolerance Inc.," which is registered in the State of New Jersey, is a sub-entity, alter ego, or foreign (New York State) corporation registered to do business in New Jersey, and is one and the same as American Center for Civil Justice, Inc., that is registered in the State of New York.

41. Alternatively, the American Center for Civil Justice, Religious Liberty & Tolerance, Inc., which is registered in the State of New Jersey, is a separate and distinct but closely related corporate entity to the American Center for Civil Justice, Inc., that is registered in New York.

42. By maintaining three separate entities that all use the pseudonym, "American Center for Civil

Justice," and deliberately hiding the true identity of the plaintiff in the <u>ACCJ v. Ambush</u> case, ACCJ was able to cast false and defamatory accusations against Ambush while thwarting Ambush's efforts to even identify, let alone hold ACCJ and its principals accountable in his counter-claim.   Accordingly, all three entities along with Perr and Engelberg are named as defendants in this case.

43. Upon information and belief, the Board of Directors of all three "American Centers" are dummy boards.  The purported addresses of these "American Centers" are not linked to a true office, and their financial statements, including numerous sworn statements to the Internal Revenue Service, are fraudulent.  Furthermore, these "American Centers" have no contemporaneous corporate minutes or records.  Any minutes or records they have prepared were created post hoc and are fraudulent.

44. Regardless of their true corporate status, at all times relevant herein, all three entities using the pseudonym "American Center for Civil Justice" have been directed by Perr, Engelberg, Yedidiah Perr or Shlomo Perr.  At all times relevant herein, these three entities have been inextricably intertwined and used interchangeably and treated as one and the same entity by their principals and presented to the public as a single legitimate entity.  In reality, however, all three entities are part and parcel of a fraudulent scheme to steal Ambush's clients and ruin his reputation in violation of the Settlement Agreement and in violation of the law.

45. Accordingly, Plaintiff's use of the terms "ACCJ" and the "Center" throughout this Complaint is intended to include all entities that use the name "American Center for Civil Justice," but refers to them collectively as a single entity.  When necessary, Plaintiff shall refer to the individual entities by their specific name.

46. As a sham entity, ACCJ's entire purported non-profit mission of funding litigation in

exchange for a percentage of the litigation proceeds, is exposed as an illegal form of champerty that should not be permitted.

## Defendants' Pattern of Misconduct

47. ACCJ is not a law firm and neither Perr, Engelberg, or Yedidiah Perr, are attorneys. Nevertheless, ACCJ, Perr, Engelberg and Yedidiah Perr solicit victims of terrorism as plaintiffs for lawsuits.

48. Defendants ACCJ, Perr, Engelberg, and Yedidiah Perr's *modus operandi* is to entice victims of terrorism to enter into agreements by proposing to sponsor litigation, including the payment of attorney fees and expenses, on behalf of the victim in exchange for a contingency fee lower than what an attorney would charge.  This agreement was known as the "Claimant and Center Agreement" (the "Claimant and Center Agreement").   Under the Claimant and Center Agreement, the claimants agree to pay ACCJ 20% of the recovery **net** of expenses as compensation to ACCJ for the payment of all expenses, including attorney fees.

49. In addition, Defendants persuade the victim of terrorism to execute broad open-ended powers of attorney ("Powers of Attorney") to one of its principals, usually Engelberg, purportedly ceding total control over the victims' claims.  As a matter of law, these Powers of Attorney are null and void *ab initio* and are not legally valid or enforceable.[1]

50. Nevertheless, the victims of terrorism, believing ACCJ's promises that it will fully prosecute the victims' legal claims, at no expense to them, are lulled into complacency and remain uninformed of ACCJ's true intentions or activities.

---

[1] In the cases of <u>Vega-Franqui</u>, the Powers of Attorney were executed by residents of Puerto Rico in Puerto Rico. Under Puerto Rico laws a "general power of attorney to institute lawsuits and the special powers of attorney to be presented in suits" must be executed by way of a public deed before a notary.  <u>See</u> Civil Code of P.R., Art. 1232(5), P.R. Laws. Ann., Tit. 31, § 3453(5).  These documents did not comply with those legal requirements.

51. Meanwhile, ACCJ, Perr, Engelberg and Yedidiah Perr and their proxies, including attorneys Sher, López-Pérez and Efron, utilized the illicit Powers of Attorney to assert authority and control over all aspects of the victims' claims.

52. Unbeknownst to the claimants who contracted with ACCJ, Defendants Engelberg, Perr and Yedidiah Perr, while maintaining an appearance of operating ACCJ as a single, legitimate non-profit organization, secretly operated a vast enterprise of entrepreneurial entities that drained the resources of ACCJ that were supposed to be used to fund litigation for victims of terrorism.

**The Underlying Case of <u>Vega-Franqui v. Syria</u>**

53. The instant case arises from the dispute between Ambush, on one side, and Defendants, including ACCJ, Engelberg and Perr, and Yedidiah Perr on the other side, over legal fees that were due to Ambush from the original set of plaintiffs in the case of <u>Vega-Franqui, et al., v. Syrian Arab Republic, et al.</u>, Civil No. 06-734-RBW (D.D.C. 2006) ("<u>Vega-Franqui</u>").

54. In <u>Vega-Franqui</u>, five estates were claiming damages for wrongful death, and five injured individuals were also claiming damages for their injuries suffered as a result of a terrorist attack at the Lod Airport, in Israel, on May 30, 1972.  Some of these claimants entered into various Claimant and Center Agreements with ACCJ.

55. The <u>Vega-Franqui</u> case was filed by Ambush, acting as the legal representative for the five estates and the five injured individuals, on April 21, 2006.

56. At that time, both the claimants and Ambush were under the belief that ACCJ would pay for Ambush's attorney fees, as it agreed with the claimants under the Claimant and Center Agreement.

57. One of those five estates was the Estate of Guzmán ("Estate of Guzmán"), whose members inherited a claim for the wrongful death of Carmen Eneida Guzmán-Rosado (the "Victim") at the Lod Airport Massacre.

58. While litigating the <u>Vega-Franqui</u> case, Ambush was contacted by representatives of the U.S. Department of State in July 2008.  The Department of State formally advised Ambush that an effort was underway to formalize a treaty between the United States of America and the government of Libya.  The goal of the treaty was for Libya to renounce terrorism and, in exchange, it would be removed from the list of states that are sponsors of terrorism.  The Department of State told Ambush that, as a prerequisite of the treaty, Libya would have to settle all *outstanding* lawsuits against it at the time of the execution of the treaty, including the <u>Vega-Franqui</u> case.

59. Libya was operating on two tracks.  It was seeking a settlement with the Department of State while simultaneously filing lengthy and legally complex motions to dismiss the very cases that were the subject of the settlement discussions.  The Department of State advised Ambush that the <u>Vega-Franqui</u> claimants would only be eligible for compensation under the treaty <u>if their claim was still pending before the court on the date of the execution of the treaty.</u>

60. Therefore, Ambush had to continue litigating the case to keep it alive until the execution of the treaty.  If the case were to be dismissed on a motion prior to the execution of the Libyan Settlement Agreement, the <u>Vega-Franqui</u> plaintiffs would have been barred from making a claim to the Libyan Settlement Fund (as defined below).  Ambush's legal services were thus very valuable and significant for all the <u>Vega-Franqui</u> plaintiffs.

61. On August 14, 2008, the governments of Libya and the United States of America executed a settlement agreement promising to settle the claims of both states' nationals against each state if Libya established a fund for the compensation of the victims (the "Libyan Settlement Fund" or the "Fund").

62. Once the Fund was established, victims of Libyan terrorism who had pending lawsuits against Libya, including victims of the Lod Airport Massacre, would be eligible for compensation from the Fund.

63. The Fund would be administered by the Department of State.

64. Ambush was in direct and frequent contact with the Department of State throughout 2008 on behalf of his clients, to advocate for his clients and to make sure they were included in the Libyan Settlement while simultaneously litigating the Vega-Franqui case.

65. On November 26, 2008, Ambush received correspondence from the Department of State notifying him of the procedure to apply for compensation for wrongful death claims covered under the August 14, 2008, treaty between the United States and Libya.

66. Ambush forwarded the Department of State's letter to his clients.  At that time no individual had been formally or officially appointed representative of any of the Estates.

67. The Department of State, however, required strict proof of the legal authority of the Estates' representative and proof of appointment and authorization of legal counsel by each estate.

68. Notwithstanding the fact that Ambush had acted as counsel for the Vega-Franqui plaintiffs, including the five Estates, without a written retainer agreement until that time, now his relationship with his clients would have to be formalized, and each Estate's representative would have to be authorized formally as well.

69. Meanwhile, in December 2008, Ambush and ACCJ, Engelberg and Perr were embroiled in a dispute as to the management and control of the pending claims before the Department of State and Ambush's compensation.

70. ACCJ, Engelberg and Perr contended that they controlled every aspect of the pending claims and could make decisions for the claimants without even consulting them.  They demanded Ambush give them the <u>Vega-Franqui</u> case files and direct the funds that would soon flow from the U.S. Treasury to an account they controlled.

71. Ambush contended that he had a duty and obligation to the claimants and had an attorney-client relationship with them.  Moreover, Ambush had a fiduciary duty to his clients to preserve and protect *their* interest in *their* settlement funds and was mandated to preserve and protect those assets in his attorney escrow account.

72. After this dispute among Ambush, ACCJ, Engelberg and Perr arose, it became clear to Ambush that ACCJ had no intention to pay for his attorney fees as it had agreed with the claimants under the Claimant and Center Agreements.

73. Between December 15 and 16, 2008, Ambush met in person with his clients, including members of each of the five Estates, at which time they expressly confirmed in writing that they wished for him to continue as their attorney notwithstanding any demands to the contrary made by the ACCJ and its representatives.  Moreover, Ambush's clients expressly directed him to act as intermediary between them and ACCJ.

74. Ambush and his clients executed various retainer agreements that provided for the payment of attorney fees by the clients to Ambush.  These retainer agreements did not interfere with the Claimant and Center Agreements between the ACCJ and Ambush's clients.

**Defendants Obstruct Justice in <u>ACCJ v. Ambush</u>**

75. On February 6, 2009, ACCJ filed the complaint in the related case of ACCJ v Ambush to gain control and management of all aspects of the settlement for each of the claimants that Ambush represented before the Department of State.   ACCJ's goal was to usurp Ambush, maximize its own compensation and completely block the payment of any compensation to Ambush.

76. Throughout <u>ACCJ v. Ambush</u>, ACCJ engaged in vexatious litigation practices and orchestrated a fraudulent and malicious scheme in order to prevail in its claims against Ambush.

77. This court in <u>ACCJ v. Ambush</u>, sought to achieve a practical solution to the dispute and issued orders governing the case schedule, the conduct of the parties, and the management of the funds for the Guzmán Estate.

78. Immediately thereafter, ACCJ circumvented those orders.

**Defendants Circumvent This Court's Order in <u>ACCJ v. Ambush</u>**

79. To circumvent the Scheduling Order mandated by this Honorable Court in <u>ACCJ v. Ambush</u> that restricted ACCJ from directly communicating with the <u>Vega-Franqui</u> plaintiffs, and in a blatant effort to sabotage the entire course of conduct and payment process agreed to by the parties and as ordered by the court, ACCJ, Engelberg and Perr placed a provocative and defamatory full page advertisement in the major newspaper in Puerto Rico, *El Nuevo Día*. ACCJ admitted that it hired *an* attorney, Javier López-Pérez, to place the advertisement.  A defamatory and disparaging news article accompanied the advertisement.

80. ACCJ placed the advertisement at the precise moment that it knew Ambush was on his way to Puerto Rico to serve subpoenas on his clients pursuant to this Court's order, and to meet

with his clients to obtain written responses to the ACCJ's interrogatories, as directed by the Court.  See ACCJ v. Ambush, Doc. 71.

81. This advertisement succeeded in catching the attention of the Vega-Franqui plaintiffs.

82.  These actions not only constituted obstruction of justice, tortious interference with contracts, defamation, and a violation of this Court's order, but it also turned the case of ACCJ v. Ambush on its head.

**Defendants Suborn Perjury**

83. Some of the Vega-Franqui plaintiffs who saw the advertisement were unfazed by the obvious attempt to drive a wedge between them and their lawyer and continued with Ambush as their attorney.  They answered the ACCJ's written discovery requests that were delivered by Ambush as ordered by this Court.

84. However, at least two families of the Vega-Franqui plaintiffs were provoked by the advertisement to contact Javier López-Pérez, Esq.  Then, at the direction of ACCJ, Engelberg and Perr, they were given affidavits to sign for use in the related case of ACCJ v. Ambush, stating that Ambush coerced them into signing retainers for an additional compensation, precisely the position that ACCJ was espousing.  See ACCJ v. Ambush, Doc. 64-1.

**The Defendants Tortiously Interfere with Ambush's Representation of His Clients**

85. Certain of the Vega-Franqui plaintiffs were also instructed by Javier López-Pérez, Esq., and ACCJ not to meet Ambush and not to accept any document from him, including the written discovery requests demanded by ACCJ itself, which motivated Ambush's trip to Puerto Rico in the first place.  See ACCJ v. Ambush, Doc. 71.  See also ACCJ v. Ambush, Doc. 64-1 and Order of January 15, 2010, at note 2.

86. As a result of ACCJ's blatant disregard for this Court's orders, its campaign to suborn witnesses in the related case of ACCJ v. Ambush and its tortious interference with Ambush's relationship and contracts with his clients, ACCJ, Engelberg and Perr, succeeded in instigating the case of Berganzo, et al., v Ambush, Civil No. 10-1044 (GAG) (D.P.R.).

### The Estate of Guzmán

87.  Despite the interference of ACCJ, Engelberg and Perr, Ambush worked diligently for more than a year to establish and prosecute the claim of the Estate of Guzmán before the Department of State.

88. All the members of the Estate of Guzmán (at that time 38 individuals), with the advice and supervision of their independent counsel, signed powers of attorney documents authorizing Lourdes Domenech-Guzmán to act on behalf of the Estate for purpose of the claim before the Department of State.  The powers were given to her in conformity with applicable Puerto Rico law, and thus were enumerated and limited, and the document itself was notarized and protocolized as required by Puerto Rico law.[2]

89. In addition, each and every heir to the Estate of Guzmán, in the powers of attorney documents, expressly authorized the estate representative to ratify the engagement of Ambush as the lawyer for the Estate and to pay him 10% in attorney's fees plus expenses, as agreed in the retainer agreement.  Ultimately, each and every heir confirmed the retainer agreement with Ambush through the power of attorney deeds.

90. In addition, the late Tomás Guzmán, who was alive at the time, with the advice and supervision of his independent counsel, also executed a retainer and fee agreement with

---

[2] In contrast, Michael Engelberg of ACCJ had long claimed that he held power of attorney to act on behalf of all the Vega-Franqui claimants by virtue of a power of attorney purportedly granted to him.  Those powers of attorney documents, to the extent they existed at all, were void ab initio as they fail to conform to Puerto Rico law. See note 1, supra.

Ambush.

91. As proof of his authority to act on behalf of the Guzmáns and the Estate of Guzmán, Ambush had a retainer from three sub-estate representatives, including the putative overall Estate Representative, Lourdes Domenech-Guzmán.  Ambush also had an acknowledgment from each and every claimant member of the Estate of Guzmán, signed and notarized after being advised by their independent local counsel.

**Ambush Performed All the Legal Work for the Estate of Guzmán**

92. Ambush located, acquired and compiled all of the documents required by the Department of State, including multiple court orders for Declarations of Heirs for each Guzmán sub-Estate, birth certificates, proof of citizenship, and birth and death records.  In doing so, Ambush had no assistance from ACCJ or any of the Defendants.

93. By February 2010, Ambush had completed all of the work for the Guzmán Estate and had submitted all of the required documents, affidavits, court orders and exhibits to the Department of State.

94. Ambush also obtained a certification from the putative Estate Representative to the effect that Ambush represented the Estate.  Ambush also obtained, from a professional translation company, certified translations from Spanish to English of numerous documents required by the Department of State.

95. In addition, Ambush paid out of pocket expenses of over $43,960.00 to prepare the claim and all the required documents.

96. After Ambush satisfied all of the requirements of the Department of State, the Estate's claim was established.  The $10 million award from the Fund would have been granted and disbursed to the Guzmán Estate at that point but for the demand of the Department of State

that two heirs re-execute their power-of-attorneys to the estate representative, and for her to re-execute the Estate's release of Libya *after* the execution of those two powers-of-attorney. The demand from the Department of State was related to the order and timing of the execution of those documents, not with the content of the documents themselves.

97. It was at this precise moment that ACCJ interfered and sabotaged the Guzmán estate as described below.

98. During the pendency of ACCJ v. Ambush, and before the Settlement Agreement, the other four estates were paid a total compensation of $40 million.  Ambush handled payments for those estates and made payments to ACCJ according to the agreements reached by the parties and the orders from this Court.  However, the fifth estate, the Estate of Guzmán, had not been paid by the time the parties to ACCJ v. Ambush, and also Engelberg and Perr, entered into the Settlement Agreement.  This delay of more than four years was largely due to the tortious interference by ACCJ, Engelberg and Perr with the relationship between Ambush and the members of the Estate of Guzmán.

**Defendants Sabotage Ambush's Representation of the Estate of Guzmán**

99. As to the compensation remaining to be paid to the Estate of Guzmán and the payment to ACCJ, this Honorable Court ordered that it be handled in the same manner as the payments to the other four estates.  See ACCJ v. Ambush, Doc. 22.

100. On August 5, 2009, in the case of ACCJ v. Ambush this Honorable Court issued a Scheduling Order stating the procedure for discovery.  See ACCJ v. Ambush, Doc. 33.

101. However, while it was clear that ACCJ could not contact the members of the Estate of Guzmán directly, but could only do so through Ambush, their counsel, ACCJ, Engelberg and Perr circumvented the Scheduling Order and communicated with them by running an

advertisement and procuring the publication of an article in a major newspaper in Puerto Rico, *El Nuevo Día*.   See <u>ACCJ v. Ambush</u>, Doc. 63-1, and the discussion above at paragraphs 79-82.

102.  As a result of ACCJ's placing of the newspaper advertisement and the publication of the article, some members of the Estate of Guzmán, including the putative estate representative Lourdes Domenech-Guzmán, contacted the lawyer hired by ACCJ, Javier López-Pérez, Esq. <u>See</u> <u>ACCJ v. Ambush</u>, Doc. 64-1.

103.  Upon information and belief, approximately by January 2010, Lourdes Domenech-Guzmán and certain other members of the Guzmán family met with Javier López-Pérez, Engelberg, Perr and Neal M. Sher,[3] in Puerto Rico.

**Defendants Use False Pretenses, Bribes and Deceit to Create a Conflict of Interest Between Ambush and His Guzmán Estate Clients**

104.  Engelberg, Perr, Sher and Javier López-Pérez, acting as officers, directors or agents for ACCJ, and individually, convinced some of the members of the Estate of Guzmán, including Lourdes Domenech-Guzmán, to terminate Ambush as their attorney and hire Javier López-Pérez and Sher instead.

105.  Defendants falsely told the Guzmáns that Ambush was their employee, that they would pay him 20% of the recovery, and that he was now illegally demanding an additional 10% from them, for a total share of 30% of the recovery.

106.  Defendants hid from the Guzmáns the fact that Neal Sher had been previously disbarred and suspended for "serious professional misconduct which involves dishonesty, fraud, deceit,

---

[3] Sher had been previously disbarred by the D.C. Court of Appeals on August 28, 2003.  <u>See</u> <u>In re Sher</u>, 830 A.2d 1262 (D.C. 2003).  Following his disbarment in D.C., Sher was reciprocally disciplined with a one year suspension in New York.  <u>See</u> <u>In re Sher</u>, 15 A.D.3d 123 (N.Y. App. Div. 2005).

and misrepresentation."[4]

107.  Defendants also lied to the Guzmáns by stating falsely that Sher and López-Pérez were lawyers who had worked on the <u>Vega-Franqui</u> case and who were trying to "get back in the case."

108.  Despite Defendants' efforts to thwart Ambush, the Guzmáns ignored ACCJ and its representatives and expressly told Ambush they wished for him to continue as their lawyer.

109.  Prior to the meeting with Perr, Engelberg, Sher, López-Pérez and certain of the Guzmán family members, Lourdes Domenech-Guzmán tried to extort an additional 5.5%  payment for herself from the other members of the Estate of Guzmán.  She demanded that Ambush, as lawyer for the Estate, arrange for her to receive a payment of 5.5% over and above whatever she was to receive as a beneficiary of the Estate.  Ambush rejected her demand in writing informing Domenech-Guzmán that her demand was unlawful and a breach of her fiduciary duty to the Estate. Lourdes Domenech-Guzmán seemed to drop the matter and continued to cooperate with Ambush in establishing the Estate's claim.

110.  At some point in time thereafter, Lourdes Domenech-Guzmán apparently had a change of heart and began actively working with ACCJ against Ambush.  Upon information and belief, a motivating factor for Domenech-Guzmán was that ACCJ and its agents arranged for her to receive an additional payment of 1.5% over and above what she was to receive as an heir to the Estate of Guzmán.

111.  In a bizarre episode in this saga, ACCJ and Lourdes Domenech-Guzmán sought to remove Ambush in a stunning manner.  Domenech-Guzmán wrote to Ambush stating she hereby fired him "on behalf of all her family members."  Neal Sher wrote Ambush saying "he was retained" and that Ambush should forward the Estate of Guzmán files to him.

---

[4] <u>See</u> <u>In re Sher</u>, 15 A.D.3d at 125.

112. Knowing the *modus operandi* of the ACCJ, Perr and Engelberg, Ambush recognized the fraud inherent in the letters. Ambush was in contact with many of his clients, members of the Estate of Guzmán, and knew they wanted him to continue as their lawyer. Thus, he knew the statement of Lourdes Domenech-Guzmán's that "her <u>entire</u> family was in agreement" to fire Ambush, was false. Moreover, Neal Sher's letter carefully omitted mention of who exactly retained him. Upon information and belief, that omission was deliberate to hide the fact that it was ACCJ, and not Lourdes Domenech Guzmán, who had retained him.

113. Accordingly, Ambush refrained from sending the Guzmán file to Neal Sher, and wrote to Lourdes Domenech-Guzmán for clarification.

114. About the same time, ACCJ, Sher and Lourdes Domenech-Guzmán participated in a campaign of dirty tricks against Ambush. Lourdes Domenech-Guzmán filed a false criminal complaint against Ambush, alleging that he was stalking her and her family. That allegation effectively prevented Ambush from contacting his clients and from representing them.

115. In addition, Sher then filed a frivolous bar complaint against Ambush, purportedly on behalf of his client Lourdes Domenech-Guzmán, for failing to turn the Guzmán files over to Sher.

116. Both allegations were demonstrably false and eventually were dropped.

117. Due to the conflict of interest that now existed between the two camps within the Estate of Guzmán, those who wanted Ambush to continue his representation and those who did not, Ambush was forced to withdraw as counsel for all of them. Thus, despite the express orders of this Court in <u>ACCJ v. Ambush,</u> and despite the wishes of many of the Guzmán family members, ultimately, the ACCJ Defendants succeeded in sabotaging Ambush's representation of the members of the Estate of Guzmán.

118. Thereafter, in the vacuum left in the wake of Ambush's absence, Lourdes Domenech-Guzmán, with the assistance and sponsorship of ACCJ, engaged attorneys David Efrón and José A. Cuevas-Segarra, Esq., to replace Ambush.

119. At the time, the claim by the Estate of Guzmán, which was virtually complete after being prepared and prosecuted by Ambush, was still pending before the Department of State.

120. Despite the fact that Ambush was the attorney who actually did all of the work to establish the Guzmán estate's claim, Efron, Cuevas-Segarra and ACCJ sought to take credit and claim the legal fees.

121. Later on, fee disputes arose between ACCJ, on one side, and Efron and Cuevas-Segarra, on the other. Those disputes are still pending in the case of Domenech v. Guzmán.

### ACCJ Obstructs and Fraudulently Manipulates the Distribution of the Guzmán Estate's Award

122. The controversy regarding the legal representation of the Estate of Guzmán and the authority of the estate representative, Lourdes Domenech-Guzmán, delayed the proceedings before the Department of State until almost two years later, when the Court of First Instance of Puerto Rico issued an order in the case of Domenech v. Guzmán granting Lourdes Domenech-Guzmán limited authority to act as Administrator of the Estate.

123. On March 20, 2012, the Department of State deposited the $10 million compensation from the Fund with the court in the case of Domenech v. Guzmán.

124. Once the funds reached the court, the court itself was supposed to make the appropriate inquiries, supervise the division and distribution of the funds, and ensure that all the proper and lawful heirs to the estate were accounted for, and that each and every one received their appropriate pro rata share of the settlement.

125. The court, however, did not make any independent inquiry whatsoever and relied instead on a joint petition of the parties to skip directly to the distribution of the funds.  Since, at that time, ACCJ in effect controlled counsel for the Guzmán plaintiffs, Efron and Cuevas-Segarra, and Lourdes Domenech-Guzmán, as well as its own counsel, the court was led to believe that the only matter on the agenda was the uncontested distribution of the funds in the court registry that stemmed from an inheritance.

126. By controlling three sides in the case, ACCJ was able to assert its claims virtually uncontested.  The representations made to the Department of State and the court put the interests of ACCJ first and foremost above the Estate of Guzmán and were designed to ensure that ACCJ would get paid the full amount it was claiming, while the interests of the heirs to the Estate of Guzmán were secondary, and the interest of Ambush in the payment of his attorney fees was denied entirely and was hidden from the court.

127. On March 26, 2012, after the Department of State deposited the $10 million with the court, the plaintiffs in the case of <u>Domenech v. Guzmán</u> filed a "Motion Requesting Remediation."  In this motion, the lawyers hired by ACCJ to represent the plaintiffs, Efron and Cuevas-Segarra, requested the court to distribute the compensation deposited with the court.

128. However, those same lawyers hired by ACCJ to represent the plaintiffs members of the Estate of Guzmán also requested the court to disburse 20% of the funds to ACCJ.  Paragraph 13 of the motion claims the following:

> In addition to the distribution expressed herein based on share by line and per stirpe, the suit in this case requests that 20% of the amount, or two million dollars ($2,000,000.00) be granted as attorney's fees.  This takes into consideration that the "American Center for Civil Justice," has contracts signed by parties who are beneficiaries to the consigned fund.  Said entity, in the last seven (7) years, has dedicated itself in this case to lobbying and negotiating with the United States

Government, and to litigating against the Libyan Government in Washington for the claims of Puerto Rican victims present at the Lod airport, Israel, to be included in the compensations which the Libyan republic paid. Said organization initially committed itself - via the government of Israel – to the task of identifying Puerto-Rican victims and/or their heirs, locating them on the island, and covering all costs of the claims, such as attorney's fees, for claims filed in Washington as well as in Puerto Rico. It is based on those negotiations that the agreed-upon payment is requested in the name of the American Center for Civil Justice, Lcdo. David Efron and Lcdo. José A. Cuevas Segarra, jointly.

Translation of Motion Requesting Remediation, ¶ 13.

129. The statements quoted above regarding ACCJ are patently false. The language quoted in that paragraph 13 demonstrates that, in addition to representing the plaintiffs in the case of Domenech v. Guzmán, the lawyers hired by ACCJ were also making a claim for ACCJ itself, and for attorneys Efron and Cuevas-Segarra to get paid. The assertions made on behalf of ACCJ by Efron and Cuevas-Segarra are consistent with ACCJ's other admitted motives of protecting its reputation and ensuring that it is not sued by the claimants. See ACCJ v. Ambush, Transcript of April 21, 2009, hearing, p. 8, lines 12-16; p. 26, line 8; p. 36, line 19; and p. 37, line 5.

130. The claim made for the ACCJ by Efron also fails to mention that ACCJ never complied with its obligations to pay all expenses, including attorney fees. It also requests the payment of $2,000,000.00, which is equivalent to 20% of the gross proceeds, when the Claimant and Center Agreement expressly states that it should be only **up to 20% net of expenses**.

131. However, the complaint and all other filings by the parties in Domenech v. Guzmán fail to mention the 10% in attorney fees that the members of the Estate of Guzmán agreed to pay Ambush for his legal services as the attorney of the Estate for close to a decade, from 2001 to 2010. By the time Ambush withdrew as the attorney for the Estate of Guzmán due to conflicts of interest created by ACCJ, he had already completed all the substantive work and

filed the documents required by the Department of State.

132.   Counsel for Ambush wrote to counsel for the plaintiffs and the defendants in the case of Domenech v. Guzmán demanding that Ambush's 10% fee be recognized and paid, and that the record of the case be corrected to reflect the undisputed fact that Ambush had represented the Estate of Guzmán and individual Guzmán family members both during the Vega-Franqui case and during the administrative claim proceedings before the Department of State.

133.   On August 6, 2012, ACCJ filed a petition for intervention in the case of Domenech v. Guzmán.

134.   With the consent of the plaintiffs and the defendants in that case, on August 31, 2012, the Court of First Instance of Puerto Rico granted ACCJ's petition for intervention, making it a party to the case of Domenech v. Guzmán.

135.   In a stipulation entered into by the plaintiffs, the defendants and ACCJ, they agreed to distribute to the plaintiffs and the defendants 80% of the deposited funds.  The parties and ACCJ failed to mention Ambush's claim for attorney fees to the court.  Based entirely on the pleadings and without the benefit of discovery or a hearing in which the court could hear from witnesses, and without inquiring why certain lawful heirs that were expressly identified in the Declarations of Heirs that Ambush submitted to the Department of State and that had appeared as claimants there had been excluded from the distribution list, by order of August 31, 2012, the court granted the request for the distribution of 80% of the deposited funds as agreed to by the plaintiffs, defendants and the ACCJ.

136.   The parties in Domenech v. Guzmán agreed that the remaining 20% would be subject to the competing claims by the defendants, ACCJ and counsel for plaintiffs, Efron and Cuevas-Segarra.

137.   Even when they were fully aware of Ambush's claim for 10% in attorney fees, the parties and their lawyers hid Ambush's claim from the court.  And even knowing of Ambush's claim for 10% in attorney fees, the parties and ACCJ only requested the court to retain 20%, instead of 30%, and to distribute the other 80% rather than 70%.

138.   The actions of ACCJ, Engelberg and Perr were designed to deliberately exclude Ambush completely and make sure that ACCJ was paid a full 20% gross of the total award, even though the Claimant and Center Agreement states that it should be **only up to 20% net of expenses**, including attorney fees, and despite ACCJ not fulfilling its obligations under the Agreement.  Moreover, certain heirs were also deliberately excluded completely and their pro rata shares were wrongfully distributed to the other heirs.

## The Settlement Agreement in ACCJ v. Ambush

139.   Less than two weeks after the court in Domenech v. Guzmán granted ACCJ's petition for intervention and approved the joint stipulation and partial distribution of funds agreed to by the parties on August 31, 2012, approximately by September 12, 2012, ACCJ, Engelberg and Perr agreed to settle the related case of ACCJ v. Ambush, and entered into the Settlement Agreement with Ambush.  Paragraph 6 of the Settlement Agreement states:

> Neither Ambush, on the one hand, or the Center, Dr. Engelberg, or Perr, on the other hand, nor any person or entity acting with their knowledge or under their direction or control, shall encourage, sponsor, initiate, or finance, including, but not limited to, the payment of attorneys' fees or costs, any form of claim or litigation against the other arising out of or related to the subject matter of the Litigation [ACCJ v. Ambush] or the Franqui Litigation [Vega-Franqui v. Syria] or the services performed by any of the Parties in connection with the Franqui Litigation or the administrative claims of any of the plaintiffs in the Franqui Litigation after that Litigation was dismissed.  In the event of any breach of this provision, the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000, plus reasonable attorneys' fees and expenses incurred in enforcing the remedy provided for under this Paragraph 6.  Any action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court of the District of Columbia (the "Court") and

shall include the request that the case be assigned to the judge of that Court who presided over the Litigation.  The Parties consent to the exercise of jurisdiction over them by the Court in any such proceeding filed to enforce the remedy provided under this Paragraph 6.

Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

### The Settling Defendants Breach the Settlement Agreement
### Breach One: Interference in <u>Domenech v. Guzmán</u>

140.   Even though Ambush had made his claim of attorney fees directly to his clients, who include the plaintiffs and the defendants in the case of <u>Domenech v. Guzmán</u>, and who were the claimants in the administrative proceeding before the Department of State, none of them made any attempt to pay him.  They didn't even notify the court of his claim.  ACCJ did not notify the court of Ambush's claim either, nor did it pay Ambush the attorney fees owed to him by the members of the Estate of Guzmán for the work he performed on their behalf as it agreed with some of the members of the Estate of Guzmán in the Claimant and Center Agreement.  All of them were trying to avoid Ambush's collection attempts.

141.   Ambush did not want to sue his former clients.  However, since no party to the case recognized Ambush's claim for attorney fees and did not even inform the court of his pending claim, Ambush filed a petition for intervention in that case on April 26, 2013 ("Ambush's Intervention").

142.   On May 16, 2013, the judge ordered the parties to state their positions as to Ambush's Intervention.  On June 18, 2013, ACCJ filed a "Motion in Compliance With Order," in which it **expressly opposed** Ambush's Intervention ("ACCJ's Opposition to Intervention").   In ACCJ's Opposition to Intervention, ACCJ expressly stated that Ambush was not making any claims against ACCJ.  However, **ACCJ expressly opposed Ambush's Intervention** and his attempt to collect his attorney fees for the work performed for the Estate of Guzmán in the

Vega-Franqui case and in the administrative proceedings before the Department of State.

143.   On July 31, 2013, Ambush filed a reply to ACCJ's Opposition to Intervention.

144.   Previously, on July 24, 2013, Ambush had filed a motion to disqualify the attorneys for plaintiffs in Domenech v. Guzmán, attorneys Efron and Cuevas-Segarra, due to numerous conflicts of interests among the plaintiffs themselves, the plaintiffs and their lawyers, and among those same lawyers and ACCJ and the defendants.[5]  Instead of filing an opposition to Ambush's motion to disqualify, on August 1, 2013, plaintiffs filed a motion to strike Ambush's motion to disqualify.   On August 20, 2013, Ambush filed an opposition to plaintiffs' motion to strike.

145.   Even though the controversy related to the disqualification of plaintiffs' lawyers was between Ambush, on one side, and the plaintiffs and their lawyers, on the other, on September 4, 2014, by its own initiative and without any order from the court, ACCJ filed a document titled "Motion in Reply to Statements of Attorney Ambush in his 'Opposition to Motion to Strike'" ("ACCJ's Reply to Motion to Strike").  In this reply, ACCJ argued that Ambush had no rights or claims over the money deposited in court, which was the award from the Fund product of the case of Vega-Franqui and the administrative proceeding before the Department of State.  In the prayer for relief, **ACCJ expressly requested the court to "deny Ambush's intervention."**

146.   Since the court delayed ruling on Ambush's Intervention, and the related motions and oppositions, on February 28, 2014, ACCJ took the initiative again of filing another motion, the "Motion Requesting Adjudication and Remedies" ("ACCJ's Motion for Adjudication"). In this motion, ACCJ requested that the court hold in its favor and deny Ambush's

---

[5] Previously, on October 24, 2012, ACCJ had filed its own motion to disqualify attorneys Efron and Cuevas-Segarra based on similar grounds.

Intervention.  As in ACCJ's Opposition to Intervention, in its Motion for Adjudication ACCJ expressly states that Ambush is not making any claims against it.  However, in this motion ACCJ argues again that Ambush has no rights to any of the money deposited with the Court.

147.   Among other things, ACCJ argued to the court in Puerto Rico that the court had already issued a judgment adjudicating part of the deposited money remaining in court to ACCJ.  To support its argument, it cited the Partial Judgment issued by the court.  The Partial Judgment does not order the adjudication of anything to ACCJ.  What the court did was grant ACCJ's petition for intervention and grant defendants a period of time to file an opposition.  In addition, the Partial Judgment was obtained by the agreement of ACCJ, the plaintiffs, the defendants and their corresponding lawyers, being fully aware of Ambush's claim for attorney fees and knowingly excluding him.  In the process, they purposely hid these facts from the court to procure and obtain the Partial Judgment.  ACCJ did this immediately after executing the Settlement Agreement in the related case, in which it agreed not to interfere with Ambush's attempts to collect his attorney fees from the Estate of Guzmán.

148.   When the parties to this case entered into the Settlement Agreement in the case of <u>ACCJ v. Ambush</u>, they all knew that each of them had claims against the Estate of Guzmán that would be pursued if and when the members of the Estate of Guzmán got paid from the Fund.

149.   The potential for each party to the Settlement Agreement to be able to pursue their corresponding actions for collection of their fees from the members of the Estate of Guzmán was of vital importance and essential to the Settlement Agreement.

150.   The Department of State held the payment to the Estate of Guzmán because there were conflicting claims as to the authority of the Estate's representatives and as to who was the attorney for the Estate.  After Ambush originally represented the Estate, Neal M. Sher, David

Efron and José A. Cuevas-Segarra, all hired by ACCJ, claimed to represent the Estate. Upon information and belief, Michael Engelberg and Lourdes Domenech-Guzmán also claimed to the State Department that they represented the Estate. The Department of State then wrote to Ambush stating that payment would be withheld until a court order was obtained that indicated who was authorized to act on behalf of the Estate.

151.   The Settlement Agreement was specifically drafted in a way to prevent each party from interfering with the collection efforts of the other.

152.   If ACCJ had abided by the Settlement Agreement, it would have notified the court in Domenech v Guzmán that it did not oppose Ambush's Intervention or it could have remained silent. The amount due to Ambush by the members of the Estate of Guzmán was an issue to be litigated between Ambush, the plaintiffs and the defendants, and to be decided by the court. ACCJ had no standing or right to oppose Ambush's Intervention. In fact, ACCJ was prohibited by the Settlement Agreement to oppose Ambush's Intervention. However, it is obvious now from its actions that ACCJ's intention with the Settlement Agreement was all along to interfere with Ambush's collection efforts.

153.   Furthermore, since ACCJ knew that Ambush had a claim for attorney fees of 10% while ACCJ had a claim for 20%, ACCJ should have brought that to the attention of the court. ACCJ, jointly with the other parties, should have requested the court to set aside 30% of the deposited funds subject to the competing claims of the parties, including Ambush, to be determined later by the court. Had ACCJ assumed this position, it would have been in compliance with the Settlement Agreement. Instead, ACCJ manipulated the information it had in order to increase its chances of getting 20% in fees from the Estate of Guzmán while making sure Ambush had no chance to get any payment whatsoever.

154.   On May 21, 2014, the court in <u>Domenech v. Guzmán</u>, issued a resolution denying Ambush's Petition for Intervention and his motion for consolidation, based primarily on the arguments and objections of ACCJ.  This resolution was notified on May 23, 2014.

155.   Therefore, ACCJ's actions effectively interfered with, and blocked Ambush's efforts to collect his attorney fees for the legal services he offered the Estate of Guzmán in relation to the <u>Vega-Franqui</u> case and the procedure before the Department of State.  Given ACCJ's admitted attorney-client relationship with plaintiff's counsel in <u>Domenech v. Guzmán</u>, David Efron, its numerous filings expressly opposing Ambush's Intervention, and the payment it fought for in <u>Domenech v. Guzmán</u>, the filings of the plaintiffs in that case supporting payment to ACCJ but opposing payment to Ambush, all coming after the Settlement Agreement, there can be no doubt that the Settling Defendants directly obstructed Ambush's efforts to get paid for the work he performed in relation to claims stemming from <u>Vega-Franqui</u>.

156.   The actions taken by ACCJ, Engelberg and Perr, constituted a material breach of the Settlement Agreement and resulted in a loss to Ambush of $1 million in attorney fees, plus expenses of over $43,960.00.

**The Settling Defendants Breach the Settlement Agreement**
**Breach Two:  The Settling Defendants Instigate *Vivas-Ruiz v. Ambush***

157.   In what constitutes a second breach of the Settlement Agreement, just months after the parties to this case entered into the Settlement Agreement, ACCJ, Engelberg and Perr instigated the filing of the case of <u>Vivas-Ruiz v. Ambush</u>, Civil No. 12-2046-JAF (D.P.R.), with Efron acting as the lawyer for the plaintiff.

158.   The plaintiff in that case, Rubén Vivas-Ruiz, was injured at the Lod Airport Massacre and

is one of the original <u>Vega-Franqui</u> plaintiffs.

159.   In 2009, ACCJ hired a Puerto Rico attorney, Javier López-Pérez, Esq., to publish a notice in a newspaper to the <u>Vega-Franqui</u> plaintiffs, stating that they had been defrauded and urging them to contact him immediately.  Provoked by López-Pérez's advertisement, certain of Ambush's clients met with him and Neal Sher, Esq., along with Engelberg, and later filed a lawsuit against Ambush captioned <u>Estate of Berganzo, et al., v. Ambush</u>, Civil No. 10-1044-GAG–MEL (D.P.R.).  Although Noemí Rodrígez-Robles, Vivas-Ruiz's wife, was a plaintiff in that action, Vivas-Ruiz expressly stated that he was not part of the <u>Berganzo</u> claim, and remained a client of Ambush.

160.   When López-Pérez withdrew his appearance from the <u>Berganzo</u> case, Engelberg admits that he found and retained a new attorney, David Efron, for the plaintiffs in that matter. ACCJ did this as a way of "protecting [its] role or protecting [its] interests."

161.   ACCJ admits that it has an ongoing attorney and client relationship with David Efron.

162.   On or about September 24, 2010, once Efron was retained by ACCJ, all the <u>Berganzo</u> plaintiffs and Vivas-Ruiz met with Efron in his office, and signed a retainer to "engage[ ] the professional services of and give our authorization to the firm LAW OFFICES DAVID EFRON, PC ("EFRON") to represent us in a possible cause of action against Joshua Ambush, and any other party responsible for the monies that said individual improperly collected from us."

163.   However, Vivas-Ruiz later disclaimed any intent to sue Ambush.  In February 2011, Vivas-Ruiz attended his wife's, Noemí Rodríguez-Robles, deposition in the <u>Berganzo</u> case. Ambush allowed this on Efron's representation that Vivas-Ruiz did not intend to bring a claim against Ambush.  Throughout all this, Vivas-Ruiz still retained Ambush as his attorney

for the prosecution of his main claim and for a supplemental claim before the United States Department of Justice Foreign Claims Settlement Commission ("FCSC").

164.   Vivas-Ruiz, with Ambush as his lawyer, prevailed on his primary claim, but not on his supplemental claim.  He collected his $3 million compensation on the first claim and paid Ambush his attorney fees of $300,000.00 as agreed.  Ambush spent thousands of dollars on expenses on behalf of Vivas-Ruiz in the supplemental claim for which expenses have not been compensated.

165.   However, on December 26, 2012, after Ambush had completed all of the work on both of Vivas-Ruiz's claims before the FCSC, Vivas-Ruiz filed a lawsuit against Ambush.  Vivas-Ruiz seeks the return of all attorneys' fees he had paid to Ambush.  Surprisingly, he is not seeking the return of any money from ACCJ nor is ACCJ a defendant in that suit.  Efron represents Vivas-Ruiz in that action.  The case is <u>Rubén Vivas-Ruiz v. Joshua M. Ambush, et al.</u>, Civil No. 12-2046 (JAF) (D.P.R. 2012).

166.   On June 12, 2014, the U.S. District Court for the District of Puerto Rico dismissed the complaint filed by Vivas-Ruiz.

167.   On June 24, 2014, Vivas-Ruiz filed a notice of appeal before the First Circuit.  The appeal was assigned the case number 14-1740.  This appeal is still pending today.

**The Settling Defendants' Breach of Settlement Agreement**
**Breach Three:**
**Settling Defendants Further Instigate and Encourage More Litigation Against Ambush**

168.   In yet a third breach of the Settlement Agreement, ACCJ, through Efron, is also attempting to interfere with Ambush's attorney and client relationships with the victims of the Lod Airport Massacre through similar defamatory advertising as the 2009 *El Nuevo Día* advertisement made through Javier López-Pérez.

169.   On or about May 30, 2013, months after the Settlement Agreement, Efron appeared on an
internet web "program," the "Insider Exclusive Investigative TV series" (hereinafter "Web
Program") which is actually in essence an attorney advertising infomercial video.   The
subject of the Web Program was "AIRPORT TERROR - The Lod Airport Massacre –
Remembrance."

170.   The text of the website advertising the Web Program explained that Efron "represented
several victims who were victimized twice - first, when they each lost their respective fathers
in the gruesome, terrorist act at Lod Airport and second, by their former lawyer whom
swindled them out of the settlement monies they should have received for the massacre of
their fathers."   The website and the Web Program expressly named Ambush as that lawyer.
Noemí Rodríguez-Robles, one of the plaintiffs in the Berganzo case instigated by ACCJ and
who is Vivas-Ruiz's wife, appeared in the Web Program alongside plaintiff Efraín Berganzo
and attorney Efron.

171.   In the Web Program, Efron once again parroted ACCJ's allegations in the case of ACCJ v.
Ambush, to the effect that: (1) Ambush had already been paid by ACCJ for his legal work;
(2) any attempt to collect further monies from the Vega-Franqui plaintiffs was illegal; and (3)
payment of legal fees to ACCJ was legitimate.   ACCJ had repeatedly argued all three of
these positions before this Court in ACCJ v. Ambush, in the *El Nuevo Día* advertisement, in
the Domenech v. Guzmán case, and in the Berganzo case.   Specifically, in the Web Program
Efron states:

> And [Ambush] persuaded them and by misleading them, by lying to them, and by
> withholding information […] to sign a contract where he would get an additional ten
> percent fee of everything he collected on ten million dollar estates for the death of each
> Puerto Rican and  U.S. Citizen.  We're talking a million dollars per estate, and he did this
> to a number of people in Puerto Rico.  He misled them by withholding information, by
> not telling them that even if they didn't sign that agreement, they would still get the

money, by not telling them that the only thing left to do in the case [of <u>Vega-Franqui</u>] was to voluntarily dismiss it because it was worthless, […] and by not telling them that he had already been paid by an organization [ACCJ] that the victims were already paying 20% for, including their legal fees.

172.   Notably, Efron falsely stated several things, including that Ambush had been fully paid by ACCJ, which was <u>not</u> found by the jury or the First Circuit Court in the <u>Berganzo</u> case. The text of the website praised Efron's original legal victory over Ambush in the case of <u>Berganzo</u>, expressly listed all of the victim-decedents of the Lod Airport Massacre, and then provided Efron's contact information.  Efron also, virtually verbatim, repeated the identical "theme" that ACCJ espoused in the 2009 article and that Engelberg espoused repeatedly in his testimony in <u>Berganzo</u>, specifically, that the victims were victimized twice, first at the Lod Airport Massacre and second by their attorney, Ambush.

173.   Like the 2009 advertisement and the article posted in *El Nuevo Día* newspaper at the behest of ACCJ, there can be no doubt that the intent of ACCJ in making Efron appear on the Web Program was to encourage further claims or litigation against Ambush by other <u>Vega-Franqui</u> plaintiffs, with Efrón as the attorney representing them.

174.   ACCJ and its principals Engelberg and Perr, through their attorney and agent Efron, continue to interfere with Ambush's clients and collections of attorney fees with the publication of the Web Program.

175.   Instigating and encouraging litigation against Ambush by his former clients in the case of <u>Vega-Franqui</u>, directly or through the Web Program, constitutes a material breach of the Settlement Agreement by ACCJ, and also by Engelberg and Perr.

176.   The amount of damages for the breach of the Settlement Agreement by ACCJ, Engelberg and Perr was already determined by the parties in Paragraph 6 as $600,000 for any breach.

177.   Accordingly, Ambush requests from the Honorable Court that it issue an order declaring

that ACCJ, and also Engelberg and Perr, have incurred in three different instances of material breach of the Settlement Agreement, and that Ambush is no longer limited and restricted by it.

## VII.  FACTUAL ALLEGATIONS AGAINST RICO DEFENDANTS

### Background Description of the Enterprise

178.    As explained above, the Settling Defendants, along with the RICO Defendants named herein and other RICO Enterprise Members, engaged in an illegal enterprise whose activities affect interstate commerce. The "Enterprise" refers to a network of alleged "non-profit organizations" run by Engelberg, Perr, Yedidiah Perr, and their associates that in reality function for the personal enrichment of Engelberg, Perr, Yedidiah Perr, and their family members and associates.  ACCJ acts as the *de facto* parent corporation of the non-profit corporation members of the Enterprise.  Engelberg, Perr, and Perr's son, Yedidiah Perr, either control or have an interest in ACCJ or several non-profit corporation members of the Enterprise.

179.    The Enterprise is involved in a pattern of racketeering conduct, including wire fraud, mail fraud, and obstruction of justice, in violation of the Civil Racketeering and Corrupt Organizations Act ("RICO").  Ambush is just one of many victims of the defendants' fraudulent scheme.

### Description of The RICO Enterprise – Individual Defendants
### Engelberg, Perr, Yedidiah Perr

180.    Defendants Engelberg, Perr, and Yedidiah Perr, by and through defendant ACCJ, formed an association-in-fact, which directs the Enterprise.   Within the Enterprise, Engelberg, Perr, and Yedidiah Perr, by and through ACCJ, established a system of decision-making in furtherance of their various criminal activities, unrelated to ACCJ's asserted mission of

advocating for individuals who have been victims of foreign terrorist attacks. Their roles in

breaching the Settlement Agreement as well as in directing and participating in the RICO

Enterprise are described in detail throughout this complaint.

### Neal M. Sher

181.    Neal Sher, an attorney, has served since at least 2010 as counsel for ACCJ.

182.    Sher was previously disbarred by the D.C. Court of Appeals on August 28, 2003.  See In

re Sher, 830 A.2d 1262 (D.C. 2003).  Following his disbarment in D.C., he was reciprocally

disciplined with a one year suspension in New York.  See In re Sher, 15 A.D.3d 123 (N.Y.

App. Div. 2005).  Sher's very active role in the Enterprise is described in detail throughout

this complaint.

### The Role of the Numerous Entities in the Enterprise
### Description of the RICO Enterprise – Corporate Defendants
### The Center Entities

183.    In addition to the two entities known as the American Center for Civil Justice, Inc., and

the American Center for Civil Justice, Religious Liberty & Tolerance, Inc., all of them

collectively known as ACCJ, Perr, Engelberg and Yedidiah Perr, and, along with certain

other of their relatives and friends, control a network of numerous other affiliated and

purportedly tax exempt 501(c)(3) organizations and at least one for-profit entity, all with

names similar to or partially similar to the name the "Center," as in the "American Center."

184.    These entities include but are not limited to: ACFR, ARC, NYCCJ; and NYCCJRTV.

### Description of the RICO Enterprise – Non-Party Actors
### The Hamerkaz Entities

185.    In addition to the numerous entities with names that include the word "Center",

Engelberg, Perr and Yedidiah Perr, and, along with certain other of their relatives and

friends, control a network of numerous additional affiliated and purportedly tax exempt 501(c)(3) organizations, all with names similar to or partially similar to the name "Hamerkaz." The term "Hamerkaz" originates from the early 1970's when Perr operated a congregation called, "Hamerkaz," which is Hebrew for "The Center." These include but are not limited to: Hamerkaz NJ, Inc.; Hamerkaz (NJ); Hamerkaz (NY); Yeshiva Hamerkaz; Hamerkaz Rivka Ross Children's Foundation For Life, a/k/a Rivka Ross Children's Foundation For Life; and Hamerkaz Cherry Hill.

186.    Upon information and belief, none of these entities conducts any business. The original Yeshiva Hamerkaz, a synagogue and yeshiva established by Perr, has not been in operation since approximately 1972. Rather, these entities exist to serve as shell companies to facillitate the transfer and movement of funds from ACCJ for the benefit of defendants. These entities also exist to allow the defendants's to claim tax deductions that would otherwise not be available to them.

187.    For example, Perr's longtime residence at 1646 41st Street, Brooklyn, New York 11210, was not owned by him personally, but by the entity known as Hamerkaz (NY) thereby allowing Perr to claim his house as a tax deductible parsonage.


**Engelberg, Perr and Yedidiah Perr Operate a Racketeering Enterprise**

188.    The numerous Centers and Hamerkaz entities are vehicles through which Perr, Engelberg and Yedidiah Perr manage and make possible their illicit racket. Funds flowing from ACCJ as charitable donations from one nonprofit organization to another are in reality a money laundering scheme to embezzle funds to themselves and their family members.

189.    In addition, payments are made by certain of the RICO Defendants on behalf of and for expenses incurred by other RICO Defendants.  By making payments and bank transfers in such a circuitous way, the defendants are able to hide their assets from potential creditors and their involvement in the conspiracy tortiously to harm Ambush.

190.    Furthermore, Perr, Engelberg and Yedidiah Perr operate numerous entities with virtually identical missions as a means to deny plausibly any involvement in the fraudulent and tortious schemes afoot.  They feign ignorance while casting responsibility on any one of the other entities or principals.  Moreover, the numerous entities enable ACCJ, Perr, Engelberg and Yedidiah Perr to dissipate, transfer and hide funds in a myriad number of accounts.

191.    For example, Perr and Engelberg, through ACCJ gave a $12,500 "donation" to Chabad of Puerto Rico in 2010. Although Chabad is a religious organization that has nothing to do with assisting victims of terrorism, that donation was nevertheless made by ACCJ to Rabbi Mendel Zarchi, who is the Rabbi of the Chabad of Puerto Rico located in San Juan, Puerto Rico.  Zarchi is the individual who referred attorneys Javier López-Pérez and David Efron to ACCJ. The donation is presumably a "finder's fee" masquerading as a "donation".

### The Engelberg Family Foundation

192.    The Engelberg Family Foundation, a purportedly tax exempt 501(c) (3) organization, is operated by Engelberg and his wife **Mindy Engelberg** from their home. Although presumably established as a family charitable foundation, it has been used to pass funds to Chabad of Puerto Rico and its rabbi, Mendel Zarchi, who is the individual Engelberg credited with introducing attorneys Javier López-Pérez and David Efron to ACCJ.

**Javier López-Pérez**

193.    RICO Enterprise Member **Javier López-Pérez**, is an attorney with offices in San Juan, Puerto Rico and Los Angeles, California.   During the pendency of the case of <u>ACCJ v. Ambush</u>, López-Pérez was hired by ACCJ to place a defamatory advertisement in a newspaper in Puerto Rico for the sole purpose of inducing Ambush's clients to contact López-Pérez (and thus, ACCJ).   ACCJ hired López-Pérez for this purpose despite this Court's orders that barred ACCJ from contacting Ambush's clients.

194.    López-Pérez, with direct involvement of ACCJ and Engelberg, enflamed the clients to sue Ambush and later represented the plaintiffs in <u>Berganzo, et al., v. Ambush</u>, Civil No. 10-1044 (GAG) (D.P.R.), until he suddenly abandoned the case. He also had a direct role in tortiously interfering in Ambush's representation of other clients. Despite ACCJ's efforts to cover up its involvement with López-Pérez, it is known that ACCJ paid López-Pérez for his very active role in the Enterprise, as described in great detail throughout this complaint.

195.    López-Pérez is currently living in California but has maintained a law practice in Puerto Rico.

**Other RICO Enterprise Members**

196.    In order to give each of the individual entities established as part of the Defendants' Enterprise the appearance of legitimacy, Perr, Engelberg and Yedidiah Perr recruited friends, family members and associates to serve as board members for each of the corporate entities. In some cases, these individuals merely allowed their name to be utilized on corporate documents and  were not active participants in the Enterprise.  Upon information and belief that is the case for Enterprise Members **Mark Hirschhorn, Simmone Beckheld Hirshhorn, Joseph Orlow, Joel Seitler, Solomon Lapidus, Sean Kellner,** and others.

197. Nevertheless, they knew or should have known that Perr, Engelberg and Yedidiah Perr were setting up companies with fictitious boards by virtue of the fact that in all the years the entities existed these individuals never participated in board meetings, never voted, and never did anything to further the stated mission of the entity. By virtue of the fact that they did nothing but allow their names to be used, they knew or should have known that they were giving a veneer of legitimacy to the illegal activities the defendants were conducting.

198. Other Enterprise Members went beyond merely allowing their names to be utilized on corporate documents. RICO Enterprise Members **Jonathan Tendler, Shlomo Perr, Shalva Perr Blum, and Mindy Engelberg,** also enabled and facillitated the Enterprise by allowing their addresses to be used as mail drops or fictitious corporate headquarters.

199. The role of RICO Enterprise Member **Milton Pollack**, appears to have recently become active in retroactively covering up the illicit activity of Perr and Yedidiah Perr, as exposed in the Engelberg v. Perr case, described in greater detail below.

### Facts Establishing Defendants' Pattern of RICO Activity

200. Despite their stated altruistic purposes, Defendants routinely defraud victims of terrorism, the courts, the U.S. Government, other attorneys and the public in numerous ways. The nature of Defendants enterprise, as thoroughly described in this complaint, combined with its pattern of illicit conduct, detailed in the preceding paragraphs, constitutes racketeering activity as proscribed by 18 U.S.C. § 1962.

201. Defendants routinely use attorneys to further the illicit goals of the Enterprise. Ambush is just one of many victims who have been harmed by the Defendants' *modus operandi*.

202. To further their illicit enterprise, Defendants, who are not lawyers nor a law firm, in effect engaged in the practice of law without a license.

203.    Since at least 2001, Engelberg has fooled victims into believing he was an "attorney" by virtue of the fact that he claimed to hold a "*power of attorney.*"

204.    While wrapping themselves in the cloak of authority, ACCJ, Engelberg and Perr failed to abide by the code of conduct required of attorneys.  They failed to keep the victims informed and signed documents in their name without their consent.

205.    For instance, in 2010 in FCSC Claim Number LIB-II-137, ACCJ, by and through Neal Sher, undertook an unauthorized appeal before the FCSC on behalf of a victim of the Lod Airport attack.  The victim, while living, was under the belief that Neal Sher had followed her express wishes to dismiss the appeal.  However, Sher failed to follow her wishes, and indeed argued the appeal after the victim's death.

206.    Defendants created conflicts of interest by undertaking to represent multiple victims of terrorism from various terrorist attacks but then favoring one group of victims and prosecuting their claims while abandoning other groups of victims.

207.    For instance, in ACCJ's 2011-2014 litigation relating to the Alavi building located at 650 5th Avenue in New York City, Engelberg, Perr, ACCJ, and Yedidiah Perr deliberately excluded certain victims of terrorism from recovering any of the Iranian assets related to that building.

208.    Still further, in the case of Domenech v. Guzmán, defendants, by and through Efron, deliberately excluded certain heirs to the Guzmán Estate for the distribution of the $10 million compensation from the Fund without disclosing that decision to their purported clients.

209.    In the Claimant and Center Agreement, ACCJ promised victims of terrorism that they would retain counsel for them but then failed to do so, thereby jeopardizing their claims.

Furthermore, as detailed in this complaint, they promised victims they would pay all legal fees and all expenses and then failed to do so.

210.    ACCJ filed false claims and then abandoned victims without their knowledge.   In addition, by using their non-profit status as a means to perpetuate fraud, Defendants in effect committed champerty.

211.    As defendant Engelberg has admitted, ACCJ has had trouble retaining counsel to bring suit on behalf of victims of terrorism on a contingency basis.   Thus, despite their stated altruistic purposes Defendants routinely defraud attorneys, including Ambush, by enticing them to undertake the representation of victims under the promise of payment of their attorney fees but then reneging on that promise and scheming to avoid paying their earned fees and expenses after the legal work is completed.

212.    For instance, in 2008, the Settling Defendants, by and through counsel, Elisa Feit sent a fraudulent e-mail to Ambush promising a bonus for his work in the case of Vega-Franqui. Later on, Defendants failed to comply with their obligations to pay Ambush his attorney fees or the bonus.

213.    This court recognized Defendants' method of defrauding attorneys as early as 2001.

214.    In the case of Higgins v. Islamic Republic of Iran, et al., Civil No. 99-00377-CKK (D.D.C.), defendants in this case secretly engaged substitute counsel to wrest control away from the attorney who did all the work in order to avoid paying the attorney fees earned by the original attorney.   See Jackson Campbell v. McDermott, Civil No. 01-00499 (RMC) (D.D.C.), Docket entry 76 at 2.   That is the exact *modus operandi* that the defendants utilized to defraud Ambush beginning in 2008 in the Vega-Franqui case, as well as in the cases that

spawned from it after the Libya Claims Settlement Agreement between Libya and the United States.

215.    Despite their stated altruistic purposes, Defendants routinely defraud the public by using their non-profit status to solicit tax deductible charitable donations from the public via internet solicitations but then embezzle most of the money to Perr, Engelberg, Yedidiah Perr and their family members and associates through accounts in the name of the various Centers under their control. *See https://amex.justgive.org/basket?acton=donate&ein=26-0018649*. In the case of Engelberg v. Perr, Engelberg admits that this has occurred.

216.    Despite their altruistic purposes, as stated in the allegations in the case of Engelberg v. Perr, Defendants routinely defraud the U.S. Government by using their non-profit status to dodge paying corporate income taxes.

217.    In addition, Defendants use their income to make "donations" to private schools, yeshivas and synagogues with which Perr and Engelberg have ongoing affiliations and relationships.

218.    In 2010, ACCJ donated $12,500.00 to the Chabad of Puerto Rico.  The Chabad of Puerto Rico has nothing to do with terrorism-related litigation. Rather, upon information and belief, ACCJ's donation was a payment of an illegal finder's fee to Rabbi Zarchi of Puerto Rico for referring Javier López-Pérez and David Efron to Perr and Engelberg.  In addition, the Engelberg Family Foundation also contributed money to the Chabad of Puerto Rico.

219.    Despite their altruistic purposes, Defendants defraud the courts and administrative agencies of the United States by lying repeatedly under oath while providing testimony in sworn affidavits, depositions, and evidentiary hearings. For example, in the trial of Berganzo v. Ambush, Perr and Engelberg repeatedly lied in their testimony regarding payments to Ambush for his work on behalf of the Vega-Franqui claimants.

220.     Defendants suborned perjury of witnesses in the related case of <u>ACCJ v. Ambush</u> by

illicitly securing sworn affidavits from certain plaintiffs in the <u>Vega-Franqui</u> case, without

benefit of counsel and against this Court's standing order.

**Defendants' RICO Enterprise Exposed in Four Cases**

*1.   <u>In re Engelberg</u>*

221.     During the pendency of the <u>ACCJ v. Ambush</u> case, Ambush countersued ACCJ and

sought to determine the relationship between Perr and Engelberg and the money transfers

between them and the numerous entities under their control, including the Defendants named

in this case.   A discovery dispute stemming from Ambush's third party subpoena of Apple

Bank of New York bank records related to those issues ensued.   This court can take judicial

notice of the fact that in that ancillary matter, Perr, Engelberg, Sher, ACCJ, NYCCJ,

ACCJRLT, Hamerkaz and ACFR all appeared jointly as petitioners.   Prior to that time,

ACCJ did not disclose its relationship with the other entities that comprise the RICO

Enterprise.   <u>See</u> <u>Engelberg, et al., v. Ambush</u>, 12-MC-00283 (S.D.N.Y.); <u>Engelberg, et al. v.</u>

<u>Ambush</u>, 11-MC-00043 (S.D.N.Y.); and <u>In Re Engelberg</u>, Misc. No. 11-MC-00148-JG-JO

(E.D.N.Y.).

*2.   <u>Domenech v. Guzmán</u>*

222.     In <u>Domenech v. Guzmán</u>, Efron is currently disputing fees with the ACCJ.   In that case,

Efron now argues that the ACCJ's Claimant and Center Agreement with various victims of

the Lod Airport Massacre is null, fraudulent, and illegal.   Efron's current position is in direct

contravention to his earlier position, articulated in <u>Berganzo v. Ambush,</u> <u>ACCJ v. Ambush</u>

and throughout the early parts of <u>Domenech v. Guzmán</u>, that the Claimant and Center

Agreements were valid and that ACCJ had earned a 20% fee from the gross amounts awarded to the claimants.

### 3.   *Ambush v. Domenech*

223.    As alleged in paragraphs 141 through 156, incorporated by reference herein, due to the actions of ACCJ in opposing his intervention in Domenech v. Guzmán, Ambush was forced to claim the fees for his work in a suit against the beneficiaries of the Guzmán Estate.  In Ambush v. Domenech, Civil No. D CD2013-2891 (501) (P.R. Superior Court, Bayamón) ("Ambush v. Domenech"), certain individual beneficiaries are stating that they have no idea what claims were made in their name in Domenech v. Guzmán.  They are also claiming that they wanted to pay Ambush, but that they were told by David Efron and Lourdes Domenech Guzmán, agents of ACCJ, that Ambush was an employee of ACCJ and he had already been paid.

### 4.   *Engelberg v. Perr*

224.    Engelberg has recently filed a shareholders' derivative suit against Perr, Milton Pollack, and Yedidiah Perr, in the case of Engelberg v. Perr, et al., Case No. 606919/2014, before the Supreme Court of New York (Nassau County) ("Engelberg v. Perr").  Engelberg's verified complaint sheds some light on the insider dealings between Engelberg, Perr, Yedidiah Perr, ACCJ and its affiliated entities.  In his complaint, Engelberg states the following:[6]

> This is a case about the effective privatization of a not-for-profit entity, the ACCJ, by a father and son duo, defendants Eliezer Perr ("Rabbi Perr" or "Elie Perr") and Jedidiah Perr ("Jed Perr") (collectively, the "Perrs"), who control its management and Board, and used their respective positions of authority as officers and directors to siphon off, both directly and indirectly, over $20 million dollars of charitable funds to other shell for-profit and not-for-profit

_____

[6] These are direct quotes from the complaint in Engelberg v. Perr.  Ambush is not admitting or denying the statements made in the complaint by Engelberg.  Most internal references to the exhibits of the complaint have been omitted to avoid confusion with any exhibits to this complaint.

entities, owned and controlled by them. Not only have the Perrs used ACCJ funds for private gain and caused ACCJ to violate the Internal Revenue Code's (the "IRC") ban on private inurement, but they essentially have treated the ACCJ as their own personal piggy bank, donating over $800,000 to various Jewish religious and educational organizations entirely unrelated to, and beyond the scope of the Center's charitable mission.

Complaint in Engelberg v. Perr, pp. 2-3.

By the late 2000s, as the ACCJ's share of settlement proceeds from the cases against Libya was received and recoveries from the collection efforts in the litigations against Iran were imminent, the Perrs sought to divert funds to themselves through entities set up by Yedidiah Perr, who was leading collection efforts by this time as [Engelberg] had been diagnosed with multiple myeloma and was undergoing treatment. Over $2.5 million dollars of settlement proceeds from the Libyan cases was transferred unlawfully to The American Center for Civil Justice, Religious Liberty and Tolerance, Inc. (the "New Jersey Center"), a not-for-profit founded by Yedidiah Perr, its principal officer and director. Yedidiah Perr also set up the American Recovery Center, LLC a/k/a American Center for Recovery, LLC ("ARC"), a for-profit single member limited liability company personally owned by him and used his position as a representative of the ACCJ to usurp business opportunities for ARC. Based on misrepresentations by the Perrs that the ACCJ and ARC were somehow related to each other, agreements were entered into with third parties, in which ARC, rather than the ACCJ, was retained as the consultant to assist with collection efforts for service fees potentially worth a minimum of $18 million…

Complaint in Engelberg v. Perr, pp. 3-4.

At the same time, the Perrs have attempted to have individual claimants revoke [Engelberg's] powers of attorney with them and fraudulently induced and sought to coerce claimants into signing new agreements with the ACCJ that would provide for additional fees to private persons and/or entities, including Jed Perr's ARC, as "other professionals/personnel" retained by the ACCJ to assist with recovery efforts.

Complaint in Engelberg v. Perr, pp. 4-5.

Under the Center and Claimant Agreements, claimants agreed to pay the Center a portion of the net proceeds of any recovery. […]  Claimants gave a share of the recovery to the ACCJ "(i)n further consideration of the ongoing efforts and services of the Center to assist other victims of oppression and deter further acts of terrorism, and in order to promote the Center' s ability to carry out its goals and purposes." As stated in [ACCJ's] Certificate of Incorporation […] the purpose for which the Center was formed is "to create,

form, and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad."   The use of ACCJ funds, therefore, is restricted.

Complaint in Engelberg v. Perr, ¶¶ 219-221.

225.   However, according to Engelberg's complaint, the Perrs have been using the ACCJ for personal purposes unrelated to its institutional purpose and mission:

> As officers and directors of the Board [of ACCJ], Defendants [in the case of Engelberg v. Perr] breached their fiduciary duties of loyalty, care and obedience by donating $837,500 of ACCJ funds in breach of the Center and Claimant Agreements, to these various organizations and entities that have nothing to do with the Center's mission but rather advance their own personal agenda.

Complaint in Engelberg v. Perr, ¶ 229.

226.   In his complaint, Engelberg details the illegal donations.   See Complaint in Engelberg v. Perr, ¶¶ 223-228.   Engelberg also states that the ACCJ, the Perrs and the other entities controlled by the Perrs that are part of the RICO Defendants in this case, have provided false and misleading information to the Internal Revenue Service ("IRS") in response to various Information Document Requests ("IDRs") issued by the IRS.   Here is how Engelberg states it:

> The ACCJ reported $6.4 million from the wrongful death claims, plus $960,000, from the personal injury claims, for a total receipt of $7,360,000, to the IRS on its annual informational report, Form 990, for 2009.

Complaint in Engelberg v. Perr, ¶ 92.

> Although in or around September 29, 2009, a check for $2,010,000 had been drawn to the ACCJ as part of it share from the settlement of the Collett case pursuant to the Center and Claimant Agreement, the Perrs never reported the receipt of these funds on ACCJ's Form 990 for 2009.  Instead, the Form 990 for Jed Perr's New Jersey Center, which had minimal funds since its inception in 2001 and did not file any Form 990s from 2003 until 2007, suddenly reported a receipt in program service revenues in 2009 in the amount of $2,646,144 on its Form 990 […] . During this time, the Center also

was responding to an examination by the IRS and two Information Document Requests ("IDRs") issued on September 7, 2010 and February 28, 2011, including questions regarding the ACCJ's Forrn 990 for 2009.

Complaint in Engelberg v. Perr, ¶¶ 95-97.

… The ACCJ reported that it received no settlement funds from the Collett case because, in 2007, the ACCJ had sought the assistance of Jed Perr's New Jersey Center to "pursue collections on behalf of the victims" and on April 12, 2007, the ACCJ had entered into an "arm's length agreement" (the "April 12, 2007 Agreement" or "Agreement") with the New Jersey Center and "as part of this Agreement [the] ACCJ assigned all of its rights, title to, and interest in Libyan claims to the [New Jersey] Center." The "arm's length agreement" was purportedly authorized at a Board Meeting on April 1, 2007. **No such meeting ever took place.**

Complaint in Engelberg v. Perr, ¶ 110 (bold letters in the original).

The response to the IRS examination was demonstrably false. The ACCJ never entered into an "arm's-length agreement" with Jed Perr's New Jersey Center in 2007 that was authorized by the Board. (i) The April 12, 2007 Agreement was never authorized. The April 1, 2007 Board minutes purportedly authorizing the April 12, 2007 Agreement were fabricated.

Complaint in Engelberg v. Perr, ¶¶ 113-117.

Apart from being unauthorized, the April 12, 2007 Agreement, signed by Milton Pollack on behalf of the ACCJ, was not "arm's-length". The explanation in the IRS response as to why the Agreement was "arm's-length" is false and misleading.

Complaint in Engelberg v. Perr, ¶¶ 118-119.

Moreover, the IRS response, blatantly misrepresents that the "[New Jersey] Center and the ACCJ do not share any governance overlap" when there was **in fact**, a governance overlap. Jed Perr was an officer of the ACCJ at the time. He has acted and represented himself to be an officer of the ACCJ over the years and continues to do so even today in his communications with the Iranian judgment creditors and DLA as evidenced by numerous documents referenced herein and correspondence over the course of years…

Complaint in Engelberg v. Perr, ¶¶ 122-123 (bold letters in original).

[I]n 2009 -- for the first time in eight years since its inception -- the New Jersey Center filed a Form 990, suddenly reporting the receipt of the approximately $2.6 million dollars (from the Libyan cases) in contributions

and grants. As Ex. 7 shows, the Form 990 also lists $103,635 in program service expenses. Notably, however, for an organization purportedly providing **legal** support for collection efforts, a breakdown of expenses on page 10 of the Form 990 shows **no** fees for legal services, even though "pursuing legal claims and judgments together with law firms" is one of its three noted principal program service accomplishments.

Complaint in Engelberg v. Perr, ¶ 136.

The Perrs' complete lack of regard for either the claimants' wishes and interests or the Center's reputation and mission is further exemplified by the fact that they have continued to use the organization's resources to fund personal causes in violation of the Center and Claimant Agreements and the ACCJ's charitable purpose.

Complaint in Engelberg v. Perr, ¶ 218.

**Engelberg is <u>Not</u> ACCJ's Victim**
**Engelberg Actively Directed All of ACCJ's Activities Including Funds**
**Transfers to ACFR and Rivka Ross Children's Foundation**

227.    Notably absent from Engelberg's complaint is any objection to ACCJ's charitable

donations when *he* was in charge of ACCJ. For instance, in 2001, when Engelberg was Vice-

President of ACCJ and in *de facto* control of the organization with Perr, ACCJ donated one

million dollars to an organization named "Freedom of Religion."  "Freedom of Religion" is

really the "American Center for Freedom of Religion," or ACFR, which is run by Yedidiah

Perr.  It used the name, "Freedom of Religion" deliberately, to hide the fact that its true name

is "American Center for Freedom of Religion."  Furthermore, as indicated on the same 2001

tax return, ACCJ donated $24,000 to the Rivka Ross Children's Foundation.  It used the

name "Rivka Ross Children's Foundation" deliberately, to hide the fact that its true name

was "Hamerkaz Rivka Ross Children's Foundation," in which Perr's daughter, Shalva Perr

Blum, was the purported president.

**New York Center for Civil Justice, Religious Tolerance & Values, Inc.**
**American Center for Civil Justice, Religious Tolerance & Values, Inc.**

228.   Also notably absent from Engelberg's complaint is any mention of the NYCCJRTV, which he runs with money funneled to it from ACCJ.  The NYCCJRTV was started by Perr and Engelberg in approximately 1999. Throughout its history it has been entirely controlled by Perr and Engelberg. Its address is Engelberg's home address, and throughout its duration, he has been the only paid officer or employee.

229.   Although the NYCCJRTV conducts no activities, Engelberg pays himself a six-figure salary from NYCCJRTV.  This is significant because during his September 21, 2011, testimony in <u>Berganzo v. Ambush</u>, Engelberg testified that he volunteered his time to ACCJ and drew no salary from it.  That testimony was false and misleading because he failed to disclose that he drew a six figure salary from the NYCCJRTV from funds that originated from ACCJ.

230.   Approximately from 2001 to 2003, the NYCCJRTV suddenly acquired 4.3 million dollars in assets.  Upon information and belief, these 4.3 million dollars were transferred to the NYCCJRTV by ACCJ from Iranian judgments.  Although the NYCCJRTV's mission is to "promote multicultural tolerance and fairness," it has nevertheless used funds to pay ACCJ's legal fees and to funnel at least $62,000 directly back to ACCJ.  This is significant because ACCJ bases every Claimant and Center Agreement it enters into on the premise that the Claimants do not have the ability to fund litigation but ACCJ does have the funds to do so.

231.   In <u>Berganzo v. Ambush</u>, however, Engelberg testified that ACCJ had run out of funds and therefore, NYCCJRTV had to pay the invoices for ACCJ.  That testimony was false and misleading because he failed to disclose that ACCJ ran out of funds because he and Perr had

dissipated millions of dollars to the various RICO Enterprise Members operated by himself, Perr and Perr's children and charities.  The NYCCJRTV has also funneled at least $20,000 to Yedidiah Perr's New Jersey based ACCJRLT.  Additionally, Engelberg and Perr have used the NYCCJRTV to funnel at least eight hundred thousand dollars to various Jewish charitable enterprises that have nothing to do with the mission of the NYCCJRTV.  This includes $150,000 to the Aish National College Program, $59,000 to Bnai Brith Ottawa Division, $10,000 to the Holland's Children Fund, and $5,000 to Midreshet Tzofarat.

**Payments to NYCCJ and ACCJ-NJ**
**Wire Fraud, Mail Fraud, Embezzlement, Tax Evasion, Obstruction of Justice**

232.    As detailed extensively in the preceding paragraphs, in <u>Engelberg v. Perr</u>, Engelberg states that Perr and Yedidiah Perr have siphoned millions of dollars from ACCJ for their own personal gain. He also states that Perr and Yedidiah Perr have submitted various false documents and false statements under oath to the IRS.

233.    However, Engelberg does not have clean hands. He siphoned off over four million dollars to the New York Center for his own personal use. Indeed, the New York Center donated to Yedidiah Perr's New Jersey-based American Center for Civil Justice, although the missions of these two entities are completely unrelated. Moreover, although Engelberg had previously testified in <u>Berganzo v. Ambush</u> that he drew no salary for his work with ACCJ, he hid the fact that ACCJ donated millions to the New York Center and that he has continuously drawn a six figure salary from New York Center since at least 2004.

234.    Just as with the "American Center," there are also more than one "New York Centers" whose names defendants use interchangeably to further their racketeering activities as they see fit.

235.     Engelberg also collected a salary from the ACCJ and other RICO Defendants and RICO Enterprise Members.  He also had the use of a leased luxury car and extracted money from ACCJ through a pension plan that he later rolled over to an Individual Retirement Account in his name.  See the "Verified Answer and Counterclaims" in the case of Engelberg v. Perr, Doc. 132, filed on June 12, 2015.

**Mail Fraud, Wire Fraud, Telephone Fraud**

236.     ACCJ and the RICO Defendants are enterprises engaged in and whose activities affect interstate commerce.  They have agreements with claimants in many different states and territories, they hire lawyers in different states to prosecute cases in different jurisdictions, and they move money among different states.

237.     The RICO Defendants are mostly based in New York, from where they operate.  Ambush is based in Maryland, where he has his office.  The cases of Vega-Franqui and ACCJ v. Ambush were prosecuted here.  The claimants and plaintiffs in the case of Vega-Franqui are mostly residents of Puerto Rico.  The money from the Fund was deposited and is being distributed in a court in Puerto Rico.

238.     Engelberg, Perr, and Yedidiah Perr are employed by or associated with the RICO Enterprise.

239.     The Defendants agreed to, and did conduct and participate in the conduct of the RICO Enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Ambush, victims of terrorism, other members of the public, and the U.S. Government, for their own personal enrichment.

240.     Pursuant to, and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of mail, wire, and telephone fraud as alleged above, by using the U.S.

Mail, telephones, faxes and the Internet for most of their communications in furtherance of their illegal activities, and also to move money from different bank accounts and among different entities.

241.    For example, as alleged in paragraphs 168 to 177, the Defendants caused the publication of a defamatory video on the internet.  The video misrepresents the nature of the work that Efron, ACCJ's attorney, had done on behalf of victims of terrorism with the intent of luring Ambush's clients to ACCJ's attorney, David Efron so as to further enrich ACCJ and further its vendetta against Ambush.

242.    Still further, ACCJ fraudulently either maintains or subscribes to an internet site, http://www.donationto.com/nonprofit-organizations/new-york/brooklyn/american-center-for-civil-justice-inc, that seeks to lure members of the public into donating to ACCJ by misrepresenting that the purpose of the organization is to assist victims of "injustice."

## Perjury, Suborning Perjury, False Claims, Obstruction of Justice

243.    Engelberg and Perr have committed extensive perjury about the nature of Ambush's work, his compensation, and their role in the ACCJ in several judicial proceedings, including the case of Berganzo v Ambush and before this Court in ACCJ v. Ambush.

244.    ACCJ, Engelberg and Perr, through Efron, continue to suborn perjury in Vivas-Ruiz v. Ambush.  They have misled or coerced Mr. Vivas-Ruiz to execute an affidavit untruthfully stating that Ambush misrepresented to him the existence of a Post-Traumatic Stress Disorder compensation fund.

245.    Still further, as alleged in paragraphs 224 to 242, and 205, Defendants have committed various acts of fraud against the U.S. Government and the FCSC of the Department of Justice, in violation of 18 U.S.C. § 1001.

246.    In Claim LIB-II-137, ACCJ convinced the claimant, who was already a client of Ambush in a claim for her husband's estate, to allow it to file a physical injury claim on her own behalf, even though she was uninjured.

247.    ACCJ, Javier López-Pérez and Neal Sher attempted to circumvent the physical injury requirement by styling the claim as being for "Post-Traumatic Stress Disorder" which they knew was expressly disallowed under the FCSC's rules.

248.    After discovering that the Post-Traumatic Stress Disorder claim had no merit, the claimant expressly demanded that ACCJ withdraw her claim.  The claim was subsequently denied as meritless.

249.    Contrary to the client's express instructions, ACCJ's attorney Neal Sher falsely represented to the FCSC that the client wished to appeal anyway, and prosecuted her appeal without her knowledge or her consent.  In fact, Neal Sher argued the appeal of that claim before the FCSC two weeks after the victim had died.

250.    ACCJ fraudulently filed numerous other meritless claims for PTSD for numerous other misinformed Claimants.

251.    Still further, as alleged in paragraphs 224 through 242, the Defendants have committed various acts of mail and wire fraud through transfer of ACCJ funds to Engelberg, Perr, and Yedidiah Perr for their own personal enrichment.

252.    These acts constitute a pattern of racketeering activity as defined by 18 U.S.C. § 1961.

253.    The Defendants have directly and indirectly conducted and participated in the conduct of the RICO Enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962.

254.    As a direct and proximate result of the Defendants' racketeering activities and violations

of 18 U.S.C. § 1962, Ambush has been injured in his business and property in that: he has suffered injury to his reputation, loss of potential clients, loss of millions of dollars in attorneys' fees, and had to disgorge more than $2 million in attorney fees earned from legal work performed for his previous clients.

255.   Therefore, Ambush requests compensatory damages, punitive damages, and attorneys' fees.

## VIII.  CLAIMS FOR RELIEF

### COUNT ONE
**Breach of Settlement Agreement
Interference with Guzmán Estate
Liquidated Damages
(The Settling Defendants)**

256.   Ambush incorporates by reference the allegations made in the previous paragraphs.

257.   In the Settlement Agreement, ACCJ, Engelberg and Perr, on one hand, and Ambush, on the other, agreed that, "[i]n the event of any breach of [paragraph 6], the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000, plus reasonable attorneys' fees and expenses incurred in enforcing the remedy provided for under this Paragraph 6." See Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

258.   As stated above, ACCJ, Engelberg and Perr breached the Settlement Agreement by expressly and actively opposing in the case of Domenech v. Guzmán, Ambush's efforts to collect his attorney fees for the legal services he provided to the members of the Estate of Guzmán in the Vega-Franqui case and the proceedings before the Department of State.

259.   As agreed to by the parties to the Settlement Agreement, ACCJ, Engelberg and Perr are jointly and severally liable to Ambush for $600,000 in liquidated damages for this first instance of breach described above, plus reasonable attorney fees and expenses incurred in this process.

## COUNT TWO
### Breach of Settlement Agreement
### Instigation of <u>Vivas Ruiz v. Ambush</u>
### Liquidated Damages
### (The Settling Defendants)

260.    Ambush incorporates by reference the allegations made in the previous paragraphs.

261.    ACCJ, Engelberg and Perr also breached the Settlement Agreement by instigating other claims against Ambush which resulted in the filing of the case of <u>Vivas-Ruiz v. Ambush</u>, as described above.

262.    As agreed to by the parties to the Settlement Agreement, ACCJ, Engelberg and Perr are jointly and severally liable to Ambush for $600,000 in liquidated damages for this second instance of breach described above, plus reasonable attorney fees and expenses incurred in this process.

## COUNT THREE
### Breach of Settlement Agreement
### Instigation of Claims Against Ambush Through Defamatory Web Program
### Liquidated Damages
### (The Settling Defendants)

Ambush incorporates by reference the allegations made in the previous paragraphs.

263.    ACCJ, Engelberg and Perr, through Efron, breached the Settlement Agreement by using the defamatory Web Program to instigate and encourage former clients of Ambush to file claims against him for rescission of his retainer agreement and recoupment of attorney fees.

264.    As agreed to by the parties to the Settlement Agreement, ACCJ, Engelberg and Perr are jointly and severally liable to Ambush for $600,000 in liquidated damages for this third instance of breach described above, plus reasonable attorney fees and expenses incurred in this process.

## COUNT FOUR
## Punitive Damages
## (The Settling Defendants)

265.    Ambush incorporates by reference the allegations made in the previous paragraphs.

The actions of the Defendants, acting in concert or otherwise conspiring to carry out, aid and

abet these unlawful objectives of harming Ambush, were intentional, malicious, unconscionable,

and in reckless disregard of Ambush's rights.   Defendants, acting individually, jointly and

severally, intended to carry out actions that would harm Ambush.

266.    Moreover, Ambush has also incurred expenses in attorney fees to make his claim in the

case of Domenech v. Guzmán, including filings to defend from the filings by ACCJ in that

case, to defend himself in the case of Vivas-Ruiz v. Ambush, and to file and prosecute the

case of Ambush v. Domenech, for the collection of the attorney fees he could not collect in

the case of Domenech v. Guzmán.   None of this would have been necessary but for Settling

Defendants' breaches of the Settlement Agreement.

267.    The potential losses in the case of Vivas-Ruiz, amount to $300,000 in disgorgement of

legal fees plus $500,000 for other damages, for a total of $800,000.   This potential loss does

not include the attorney fees and expenses incurred for the defense of the case, which is

pending appeal.

268.    Ambush estimates the damages caused by the defamatory Web Program at $1 million due

to lost clients and the potential claims by former clients.   The loss to his reputation results in

substantial economic harm.

269.    As a result of their intentional, malicious, outrageous, willful, and reckless conduct, the

Settling Defendants are jointly and severally liable to Ambush for punitive damages in an

amount to be determined by the trier of fact.

**COUNT FIVE**
**Attorneys' Fees Under the Settlement Agreement**
**(Settling Defendants)**

270.    Ambush incorporates by reference the allegations made in the previous paragraphs.

271.    In the Settlement Agreement, the parties expressly agreed that, in case of any breach, the breaching party would be liable to the non-breaching party for "reasonable attorneys' fees and expenses incurred in enforcing the remedy provided" in Paragraph 6 of the Agreement. See Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

272.    As agreed to by the parties to the Settlement Agreement, ACCJ, Engelberg and Perr are jointly and severally liable to Ambush for reasonable attorney fees and expenses incurred by him in enforcing the provisions of the Settlement Agreement.

**COUNT SIX**
**Violation of the RICO Act, 18 U.S.C. § 1962(a)**
**(All Defendants)**

273.    Ambush incorporates by reference the allegations made in the previous paragraphs.

274.    By virtue of the criminal and tortious acts as described herein, including without limitations, engaging in the predicate acts of mail and wire fraud, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful and tortious activity and the use of interstate commerce, Defendants, with the material support of the RICO Enterprise Defendants and RICO Enterprise Members, transferred, received, supplied, promoted, financed, and engaged in both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, and used and invested, both directly and indirectly, the income and the proceeds of such acts in establishing and furthering the operation of its  enterprises, in violation of 18 U.S.C. § 1962(a).

275.    Defendants herein, including the agents, directors, officers, and employees of Defendants, were associated in fact with a common purpose and constituted an "enterprise" as that term is defined in 18 U.S.C. §§ 1961 *et seq*., which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.

276.    This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "Enterprise."  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

277.    Defendants herein and others, being persons employed by and associated with the Enterprise, which engaged in activities which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(a), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

 (a)  18 U.S.C. § 1341 (mail fraud);

 (b)  18 U.S.C. § 1343 (wire fraud);

 (c)  18 U.S.C. § 1503 (obstruction of justice);

 (d)  18 U.S.C. § 1956 (money laundering).

274.    It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the Enterprise.  It was a part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

275.   It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purpose of, and acts done, in furtherance of the conspiracy, and in violation of 18 U.S.C. § 1962(a).

276.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Ambush suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

277.   All Defendants are jointly and severally liable to Ambush for an amount in excess of Ten Million Dollars ($10,000,000.00) plus interest, costs and attorney fees.

## COUNT SEVEN
### Violation of the RICO Act, 18 U.S.C. § 1962(b)
### (All Defendants)

278.   Ambush incorporates by reference the allegations made in the previous paragraphs.

279.   By virtue of the criminal and tortious acts as described herein, including without limitation, engaging in the predicate acts of mail and wire fraud, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful and tortious activity and the use of interstate commerce, Defendants, with the material support of the RICO Enterprise Defendants and RICO Enterprise Members, transferred, received, supplied, promoted, financed, and engaged in both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, and used and invested, both directly and indirectly, the income and the proceeds of such acts in establishing and furthering the operation of its enterprises, in violation of 18 U.S.C. § 1962(b).

280.   Defendants herein, including the agents, directors, officers, and employees of Defendants

were associated in fact with a common purpose and constituted an "enterprise" as that term is defined in 18 U.S.C. §§ 1961 *et seq*., which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.  This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "Enterprise."  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

281.   Defendants herein and others, being persons employed by and associated with the Enterprise, which engaged in activities which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(b), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

      (a)  18 U.S.C. § 1341 (mail fraud);

      (b)  18 U.S.C. § 1343 (wire fraud);

      (c)  18 U.S.C. § 1503 (obstruction of justice);

      (d)  18 U.S.C. § 1956 (money laundering).

282.   It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the Enterprise.  It was a part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

283.   It was a further part of the conspiracy that Defendants and others would and did

misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purpose of, and acts done, in furtherance of the conspiracy, and in violation of 18 U.S.C. § 1962(b).

284.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(b), Ambush suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

285.    All Defendants are jointly and severally liable to Ambush in an amount in excess of Ten Million Dollars ($10,000,000.00) plus interest, costs, and attorney fees.

## COUNT EIGHT
### Violation of the RICO Act, 18 U.S.C. § 1962(c)
### (All Defendants)

286.    Ambush incorporates by reference the allegations made in the previous paragraphs.

287.    By virtue of the criminal and tortious acts as described herein, including without limitation, engaging in the predicate acts of mail and wire fraud, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful and tortious activity and the use of interstate commerce, Defendants, with the material support of the RICO Enterprise Defendants and  RICO Enterprise Members herein, transferred, received, supplied, promoted, financed, and engaged in both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, and used and invested, both directly and indirectly, the income and the proceeds of such acts in establishing and furthering the operation of its Enterprises, in violation of 18 U.S.C. § 1962(c).

288.    Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose and constituted an "enterprise" as that term is

defined in 18 U.S.C. §§ 1961 *et seq.*, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.  This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "Enterprise."   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

289.    Defendants herein and others, being persons employed by and associated with the Enterprise, which engaged in activities which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

> (a)  18 U.S.C. § 1341 (mail fraud);
>
> (b)  18 U.S.C. § 1343 (wire fraud);
>
> (c)  18 U.S.C. § 1503 (obstruction of justice);
>
> (d)  18 U.S.C. § 1956 (money laundering).

290.    It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the Enterprise.  It was a part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

291.    It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the

purpose of, and acts done, in furtherance of the conspiracy, and in violation of 18 U.S.C. § 1962(c).

292.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Ambush suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

293.    All Defendants are jointly and severally liable to Ambush in an amount in excess of Ten Million Dollars ($10,000,000.00) plus interest, costs, and attorney fees.

## COUNT NINE
### Violation of the RICO Act, 18 U.S.C. § 1962(d)
### (All Defendants)

294.    Ambush incorporates by reference the allegations made in the previous paragraphs.

295.    By virtue of the criminal and tortious acts as described herein, including without limitation, engaging in the predicate acts of mail and wire fraud, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful and tortious activity and the use of interstate commerce, Defendants, with the material support of the RICO Enterprise Defendants and RICO Enterprise Members herein, transferred, received, supplied, promoted, financed, and engaged in both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, and used and invested, both directly and indirectly, the income and the proceeds of such acts in establishing and furthering the operation of its enterprises, in violation of 18 U.S.C. § 1962(d).

296.    Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose and constituted an "enterprise" as that term is defined in 18 U.S.C. §§ 1961 *et seq*., which enterprise was engaged in, and the activities of

which affected, interstate and foreign commerce. This enterprise, consisting of the herein described individuals, entities, and others known and unknown, is hereby referred to for purposes of this Complaint as the "Enterprise." The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

297.    Defendants herein and others, being persons employed by and associated with the Enterprise, which engaged in activities which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

> (a) 18 U.S.C. § 1341 (mail fraud);
>
> (b) 18 U.S.C. § 1343 (wire fraud);
>
> (c) 18 U.S.C. § 1503 (obstruction of justice);
>
> (d) 18 U.S.C. § 1956 (money laundering).

298.    It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the Enterprise. It was a part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

299.    It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purpose of, and acts done, in furtherance of the conspiracy, and in violation of 18 U.S.C. §

1962(d).

300.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Ambush suffered the loss of valuable property, financial services and support, and suffered other pecuniary and personal damages in an amount to be determined at trial.

301.    All Defendants are jointly and severally liable to Ambush in an amount in excess of Ten Million Dollars ($10,000,000.00) plus interest, costs, and fees.

## COUNT TEN
### Treble Damages Under RICO Act
### (All Defendants)

302.    Plaintiff incorporates the previous paragraphs as if fully alleged herein.

303.    18 U.S.C. § 1964(c) provides that the plaintiff who suffers damages due to violations of 18 U.S.C. § 1962 may recover three times the damages suffered.

304.    Wherefore, Plaintiff demands judgment of an award equal to three times the damages determined by the trier of fact.

## COUNT ELEVEN
### Costs and Attorney's Fees Under RICO Act
### (All Defendants)

305.    Plaintiff incorporates by reference the allegations made in the previous paragraphs.

18 U.S.C. § 1964(c) provides that the plaintiff who suffers damages due to violations of 18 U.S.C. § 1962 may recover the costs of the suit and reasonable attorney's fees.

306.    Wherefore, Plaintiff demands judgment of an award of the costs of the suit and reasonable attorney's fees.

## COUNT TWELVE
### Request For Injunctive Relief
### (All Defendants)

307.    Plaintiff incorporates by reference the allegations made in the previous paragraphs.

308.    From the allegations stated above and incorporated by reference here, Ambush has a substantial likelihood of success on the merits of his claims.

309.    Given that Defendants have the means and willingness to move assets around, transfer, hide, make disappear and dispose of those assets, while at the same time hiding the true intentions and movements of those assets from the U.S. Government, third parties, and even among themselves, Ambush would not be able to enforce any judgment entered in this case and, therefore, would suffer irreparable injury, unless this Court issues the injunction requested here.

310.    An injunctive remedy by this Honorable Court would not injure other parties that are not before the Court.  The remedy would not injure the Defendants, since the assets would still be in their possession until the Court orders otherwise.

311.    The public interest in enforcing the laws, avoiding any further fraud or tax evasion against the U.S. Government, and avoiding other citizens from becoming victims of the fraud perpetrated by Defendants would be furthered by the injunctive remedy requested here.

312.    Therefore, Plaintiff Ambush requests from this Honorable Court that it issue the following equitable orders:

   a)  Ordering the dissolution of the corporate defendants;

   b)  Enjoining Defendants from disposing, transferring or encumbering their assets;

   c)  Freezing Defendants' bank, securities or investment accounts, enjoining them from withdrawing money or securities from them, or transferring them to other accounts or

parties;

d) Assigning Ambush a lien over ACCJ's claims or proceeds in the case of <u>Domenech v.</u>
<u>Guzmán</u>.

## VIII.  PRAYER FOR RELIEF

313.    With the purpose of ending all the litigation between the parties to the Settlement

Agreement, ACCJ, Engelberg, and Perr entered into the Settlement Agreement with Ambush.

314.    According to the Settlement Agreement, one party would not interfere with the other

party's attempts to collect the money they understood were each owed for their own services

provided or performed in relation to the <u>Vega-Franqui</u> case and the proceedings before the

Department of State.  The purpose and essence of the Settlement Agreement was for Ambush

and ACCJ to pursue their own claims without any interference from the other party.

315.    As stated in this Complaint, ACCJ, Engelberg and Perr have materially breached their

obligations and duties under the Settlement Agreement in at least three separate instances

and, even though they expressly state and admit that Ambush did not make any claims

against them in the case of <u>Domenech v. Guzmán</u>, they expressly and actively interfered with

and opposed Ambush's attempts to collect his attorney fees.  Eventually, the Settling

316.    Defendants were successful in their attempts to block Ambush's efforts to collect his $1

million in attorney fees.

317.    Defendants are also instigating additional litigation against Ambush for the rescission of

his retainer agreements with other clients from the original plaintiffs in the case of <u>Vega-</u>

<u>Franqui</u> and for the disgorgement of the attorney fees Ambush earned and already collected

from those clients.

318.    Finally, ACCJ, Engelberg and Perr, through their agent and attorney Efron, are

instigating and encouraging additional litigation against Ambush through the Web Program.

319.    ACCJ, Engelberg and Perr have intentionally, expressly, blatantly and materially breached the Settlement Agreement, its purpose and its intent, in at least three different instances.

320.    The RICO Defendants are an alter ego of ACCJ, Engelberg and Perr, and therefore, each is also jointly and severally liable for the Settling Defendants' breach of the Settlement Agreement.

321.    Accordingly, this Honorable Court should declare ACCJ, Engelberg and Perr to be in material breach of the Settlement Agreement, release Ambush from its limitations and restrictions, and order ACCJ, Engelberg, and Perr to jointly and severally pay Ambush $1.8 million as liquidated damages, plus punitive damages for the egregious breach, and costs, interests, reasonable attorneys' fees and expenses incurred for the enforcement of the Settlement Agreement.

322.    In addition, this Honorable Court should find all the Defendants in violation of the RICO statute and order them to pay Ambush three times the damages caused for their violations, plus costs, expenses and reasonable attorney's fees.

**WHEREFORE**, Ambush respectfully requests that this Honorable Court grant the remedies requested in this complaint and order the following:

1) Declare the Settling Defendants in material breach of the Settlement Agreement and release Ambush from the limitations and restrictions imposed by it;

2) Order the Settling Defendants to jointly and severally pay Ambush $600,000 in liquidated damages per violation, for a total of $1.8 million;

3) Order the Settling Defendants to pay punitive damages for the egregious and intentional breach of the Settlement Agreement;

4) Order the Settling Defendants to jointly and severally pay Ambush costs, attorneys' fees

and expenses incurred in the prosecution of these claims, as agreed to in the Settlement Agreement;

5) Order Defendants to jointly and severally pay Ambush $10 million for the damages they caused him for their violations of the RICO Act;

6) Order Defendants to jointly and severally pay Ambush three times the damages they caused him for their violations of the RICO Act;

7) Order the dissolution of the corporate Defendants;

8) Enjoin Defendants from disposing of, transferring or encumbering their assets;

9) Freeze Defendants' bank, securities and investment accounts, enjoin them from withdrawing money or securities from them, or transferring them to other accounts or parties;

10) Assign Ambush a lien over ACCJ's claims or proceeds in the case of Domenech v. Guzmán;

11) Award Ambush costs, expenses and reasonable attorney's fees under the RICO Act; and

12) Grant Ambush any other remedy justified under applicable laws.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, today July 31, 2015.

**/s/ Ángel Sosa**
Ángel Sosa
DC Bar No. 1,000,094
E-mail: asosa@tcmrslaw.com

**/s/ Jaime E. Toro**
Pro Hac Vice Pending
E-mail: jetoro@tcmrslaw.com

**Toro, Colón, Mullet, Rivera & Sifre, P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

complaint v24