## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

JOSHUA M. AMBUSH,          )
                                       )
            Plaintiff,          )
                                       )
            v.               )     Civil Action No. 1:15-cv-01237-EGS
                                       )
MICHAEL ENGELBERG, et al.,     )
                                       )
           Defendants.       )
_____)

### REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS MICHAEL ENGELBERG AND THE NEW YORK CENTER FOR CIVIL JUSTICE, TOLERANCE & VALUES, INC.'S MOTION TO DISMISS COMPLAINT

SCHWARTZ & ASSOCIATES PLLC
Christopher "Kip" Schwartz
D.C. Bar No. 44450
1010 Wisconsin Avenue NW, Suite 540
Washington, DC 20007
Tel.:  (202) 342-0413 | Fax:  (202) 330-5272
kip.schwartz@schwartzassociates-law.com

LIVINGSTON HOWE LLP
David D. Howe, admitted *Pro Hac Vice*
Jeffrey E. Livingston, of counsel
747 Third Avenue, 20th Floor
New York, New York 10017
Tel: (212) 986-7887
david@livingstonhowe.com

*Counsel for Defendants Michael Engelberg and The New York Center for Civil Justice, Tolerance & Values, Inc.*

Dated:  January 22, 2016

# **TABLE OF CONTENTS**

Page

Table of Authorities ................................................................................................... ii

Preliminary Statement.................................................................................................. 1

ARGUMENT ............................................................................................................... 3

I.  THE BREACH OF CONTRACT CLAIMS (COUNTS ONE
    THROUGH FIVE) SHOULD BE DISMISSED ....................................................... 3

    A.  Ambush's failed allegations of breach of contract............................................... 3

    B.  Ambush's confused arguments regarding the release ........................................... 5

    C.  Contract remedies............................................................................................... 8

II. THE RICO ACT CLAIMS (COUNTS SIX THROUGH TWELVE)
    SHOULD BE DISMISSED ....................................................................................... 9

    A.  Res Judicata......................................................................................................... 9

    B.  Release .................................................................................................................. 11

    C.  Statute of Limitations........................................................................................... 13

    D.  Proximate Cause and RICO Injury ...................................................................... 14

    E.  Pattern of Racketeering Activity .......................................................................... 15

    F.  Relatedness and Continuity .................................................................................. 17

    G.  No Personal Jurisdiction Over The N.Y. Center on RICO Act Claims ............... 17

CONCLUSION............................................................................................................. 18

# **TABLE OF AUTHORITIES**

Page

Cases

*Annulli v. Pannikar*, 200 F.3d 189 (3d Cir. 1999) ................................................................ 12

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S.Ct. 1991 (2006) .............................. 15

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) ........................................................ 2

*Astron Industrial Assocs. v. Chrysler Motors Corp.*, 405 F. 2d 958 (5th Cir. 1968)............. 9

*Baseload Energy, Inc. v. Roberts,* 654 F. Supp. 2d 21 (D.D.C. 2009) .................................. 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007) ....................................... 1-3

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008).................... 15

*The Cuneo Law Group, P.C. v. Joseph*, 669 F.Supp.2d 99 (D.D.C. 2009),
     *aff'd*, 428 Fed. Appx. 6 (D.C. Cir. 2011).................................................................1-2, 5-8

*Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003) ......................................... 16-17

*Estate of Berganzo-Colon v. Ambush*, 704 F.3d 33 (1st Cir. 2013)...................................... 10

*Hinson ex rel. N.H. v. Merritt Educational Ctr.*, 521 F.Supp.2d 22 (D.D.C. 2007).............. 1

*Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311 (1992)........ 15

*New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987).......................... 12

*Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007 (D.C. Cir. 1985) ....................... 8

*U.S. Anchor Mfg. v. Rule Industries*, 264 Ga. 295 (1994).................................................... 8, 13

*Waldman v. Village of Kiryas Joel*, 207 F.3d 105 (2d Cir. 2000) ........................................ 11

*Walford v. McNeill*, 100 F. 2d 112 (D.C. Cir. 1938) ............................................................ 4

*Western Assocs. Ltd. Ptp. v. Market Square Assoc.*, 235 F.3d 629 (D.C. Cir. 2001) ........... 17

Statutes and Rules

18 U.S.C. § 1961(a) ........................................................................................... 15

18 U.S.C. § 1965 ................................................................................................. 1

Fed. R. Civ. P., Rule 9(b) .................................................................................. 1

Fed. R. Civ. P., Rule 12(b)(2) ........................................................................... 1

Fed. R. Civ. P., Rule 12(b)(6) ........................................................................... 1

U.S. Dist. Ct. Local Civil Rule 7(i) ................................................................... 2


Other Authorities

29 *Williston on Contracts* § 73:11 (4th ed.) .................................................... 8, 13

18A Wright & Miller, *Fed. Prac. & Proc.* § 4443 (2d ed.) .................................... 9

This Reply Memorandum is submitted by defendants Michael Engelberg ("Dr. Engelberg") and The New York Center for Civil Justice, Tolerance & Values, Inc. (hereinafter, the "New York Center") (together, the "Engelberg Defendants") in further support of their motion to dismiss the Complaint pursuant to Civil Rules 12(b)(6) (failure to state a claim upon which relief can be granted) and 9(b) (failure to plead fraud with particularity), and in further support of the New York Center's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) and 18 U.S.C. §1965.[1]

Preliminary Statement

At the outset of his opposition, plaintiff Ambush quotes at length from *The Cuneo Law Group, P.C. v. Joseph*, 669 F.Supp.2d 99, 117-18 (D.D.C. 2009), *aff'd*, 428 Fed. Appx. 6 (D.C. Cir. 2011) (hereinafter "*Cuneo*"), concerning the standard of review applicable to motions to dismiss.  "Opposition to Defendants' Michael Engelberg's And Others, Motion to Dismiss Complaint, Doc. 15," filed December 11, 2015 (Document 18) ("Ambush Memo"), at 1-2.  He then proceeds to ignore key elements of that standard.  As shown below, Ambush fails to point to any allegations in his Complaint that constitute more than "labels and conclusions" (*Cuneo*, 669 F.Supp.2d at 117, *citing Hinson ex rel. N.H. v. Merritt Educational Ctr.*, 521 F.Supp.2d 22, 27 (D.D.C. 2007), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)) or that would afford a "reasonable inference" that Dr. Engelberg or the New York Center is liable

---

[1] In his opposition, Ambush attempts to create an issue regarding whether there is more than one "New York Center" entity.  Ambush Memo, p. 1, n. 1.  He has alleged that there are two such entities, which he has misidentified as "New York Center for Civil Justice" and "New York Center for Civil Justice, Religious Tolerance & Values, Inc." He argues that "the real identity of these defendants is at issue" because the defendants have created a "convoluted, misleading and deceitful ... network of corporate entities." *Id.* The only person who has made this issue convoluted, however, is Ambush himself, due to his failure to investigate and properly identify this party in his Complaint. The publicly-available databases of active entities for the states of New York and New Jersey show that the only registered entity with the name in the style of "New York Center for Civil Justice" is "The New York Center for Civil Justice, Tolerance & Values, Inc.," incorporated in New York.  See NY database at http://www.dos.ny.gov/corps/bus_entity_search.html (one entry); NJ database at https://www.njportal.com/DOR/BusinessNameSearch/ (no entries).

1

for the alleged misconduct (*Cuneo*, 669 F.Supp.2d at 117, *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (*quoting Twombly*, 550 U.S. at 556)). Instead, Ambush offers only "labels and conclusions," bolstered by fallacious arguments that misconstrue, evade or ignore the arguments and authorities the Engelberg Defendants presented in their motion to dismiss, and that misconstrue and/or distort authorities that Ambush himself cites.   Ambush offers nothing that raises his claims "above the speculative level" (*Cuneo* at 118, *quoting Twombly*, 550 U.S. at 555) and falls far short of showing a "reasonable inference" of liability (*Cuneo* at 117, *quoting Twombly*, 550 U.S. at 556).

As we show below, Ambush's breach of contract claims against Dr. Engelberg are couched in merely conclusory terms, lack factual plausibility, and never rise above the speculative level.   Further, his RICO Act claims, which have been asserted against both Engelberg Defendants, are plainly barred by *res judicata*, by the broad release of claims, known and unknown, contained in the Settlement Agreement, and by the statute of limitations, and should be dismissed on any one or all of those grounds.   They also fail to meet well-established RICO pleading requirements as to proximate cause, RICO injury, a pattern of racketeering activity, and relatedness and continuity. This is unsurprising, because the least scrutiny makes clear that the purported RICO claims are merely a failed effort to confect RICO claims out of breach of contract claims that themselves lack substance.   Finally, Ambush has failed to show a basis for personal jurisdiction over the New York Center in this district on the RICO claims.

For these reasons, and for the reasons set forth in their initial motion papers, the Engelberg Defendants request that the Complaint be dismissed with prejudice.   Ambush has submitted no information to suggest that he can salvage this Complaint with an amendment, nor has he submitted a proposed amended pleading (see Local Civil Rule 7(i)).

## ARGUMENT

### I.   THE BREACH OF CONTRACT CLAIMS (COUNTS ONE THROUGH FIVE) SHOULD BE DISMISSED

#### A.   *Ambush's failed allegations of breach of contract.*

In his motion to dismiss, Dr. Engelberg argues that plaintiff's claims alleging breach of the Settlement Agreement dated September 12, 2012, should be dismissed because plaintiff does not plausibly allege that Dr. Engelberg engaged in any conduct that could be 3a breach, *i.e.*, conduct <u>after</u> entry into that agreement that "encourage[d], sponsor[ed], initiate[d], or finance[d] … any form of claim or litigation" against Ambush related to *ACCJ v. Ambush* or the *Franqui* Litigation. *See* Engelberg Defendants' Memorandum of Points and Authorities (Document 15-1), filed October 26, 2015 ("Engelberg Memo"), pp. 2, 8-9, 13-15.

In his opposition, Ambush implicitly confirms this argument by failing to point to any allegation in his Complaint that could provide a basis for the Court to make a "reasonable inference" that Dr. Engelberg engaged in such conduct (*Twombly*, 550 U.S. at 556).  It is thus clear that, for his breach of contract claims against Dr. Engelberg, plaintiff relies entirely on unsupported inferences and conclusory statements.

Faced with this fundamental deficiency, Ambush opposes dismissal with strained arguments that either mischaracterize Dr. Engelberg's positions or rely on distracting irrelevancies. First, contrary to Ambush's assertion, Dr. Engelberg has not "admitted" that the Complaint contains "allegations to state claims for material breach of the Settlement Agreement" (Ambush Memo at 6).  In his motion, Dr. Engelberg identified the three alleged post-settlement events upon which Ambush relies in his Complaint for his breach of contract claims:

(1)   ACCJ's filing of certain papers in *Domenech v. Gusman* (Count 1), an allegation which has nothing to do with Dr. Engelberg, and which the other defendants have fully negated;

(2)   claimant Vivas-Ruiz's filing of a lawsuit against Ambush several months after the Settlement Agreement was entered (Count 2); and

(3)   attorney Efron's posting in 2013 of an "attorney advertising infomercial video" in the form of a webcast (Complaint ¶ 169) (Count 3).

Nowhere in his memorandum, however, does Dr. Engelberg admit, suggest or imply that these allegations amount to a proper allegation of a breach of the Settlement Agreement *by him* (or anyone else), let alone a material breach. To the contrary, he simply argues that Ambush's allegations seeking to connect him to the three alleged post-settlement events are mere conclusions unsupported by any factual allegations. *See* Engelberg Memo, pp. 2, 8-10, 13-15.

Ambush points to no allegations in the Complaint that overcome this argument. Instead, he devotes argument to events that occurred <u>before</u> the settlement, as if such events could form the basis for a breach of the Settlement Agreement. Thus, Ambush treats the placing of allegedly-injurious newspaper advertisements in 2009 as an example of "events that constitute the breach" of the settlement agreement. Ambush Memo at 3-4. This is simply irrelevant, however, to the issue of whether Dr. Engelberg breached the Settlement Agreement made in 2012. Conduct in 2009 obviously cannot breach a contract made in 2012.

Ambush also asserts that Dr. Engelberg is "jointly and severally liable for ACCJ's breach" of the Settlement Agreement, because a corporate officer or agent may bind himself by "express agreement" to liability for corporate actions (Ambush Memo at 4-5). The authorities he cites, however, are wholly inapposite. For example, in *Walford v. McNeill*, 100 F. 2d 112, 115 (D.C. Cir. 1938) (*see* Ambush Memo at 5), an agent of a corporation was held responsible to pay commissions based on a contract that he signed in his personal capacity and that provided that he, not the corporation, would pay the commission. But Ambush does not allege that Dr. Engelberg bound himself by express agreement to liability for actions of ACCJ. As Ambush

4

admits, Dr. Engelberg is party to the Settlement Agreement "in his personal capacity."  Ambush
Memo at 5.  This is not equivalent to assuming personal liability for the actions of ACCJ.

### B. *Ambush's confused arguments regarding the release.*

Ambush makes confused and circular arguments concerning application of the Settlement
Agreement's release provision to his breach-of-contract claims.  Ambush Memo at 7-8.  First, to
be clear, Dr. Engelberg is <u>not</u> arguing that the release will bar a claim based on breaches of the
Settlement Agreement.  This is a red herring raised by Ambush at the outset of his argument on
this point (see Ambush Memo at 7).  Dr. Engelberg has invoked the release provision only to the
extent that Ambush seeks to base his breach of contract claims on events that occurred <u>before</u> the
Settlement Agreement came into existence. Engelberg Memo at 14. This is not controversial.
Indeed, Ambush recognizes, in opposing a different argument, that "it is axiomatic that breaches
of the settlement Agreement can only take place after it takes effect . . . ."  Ambush Memo at 13.

Ambush also argues that Dr. Engelberg cannot invoke the release provision on a motion
to dismiss because to do so would implicate questions of fact. His argument is that, to the extent
Dr. Engelberg materially breached the Settlement Agreement, he has "no right to enforce it now"
(p. 7), and further that, because whether a material breach has occurred is generally a question of
fact, "use of the release as a defense to the allegations of the Complaint is not permitted under
Rule 12(b)(6)."  Ambush Memo at 8, citing *Cuneo*, 669 F. Supp. at 118.

This argument fails for several reasons.  First, as noted above, Ambush's allegations of
breach by Dr. Engelberg are entirely speculative and thus inadequate under *Twombly*.  Even
assuming, however, that Ambush could make proper allegations of breach of contract against Dr.
Engelberg, his argument that such a breach would vitiate the release provision fails, as it
misconstrues *Cuneo* and the concept of material breach.

The extensive quotation from *Cuneo* at pages 7-8 of the Ambush Memo illustrates that the concept of material breach – that is, "conduct that goes to the essence and frustrate[s] the purpose for which the contract was agreed to" – can be used to excuse future performance by the aggrieved party. This generally arises where the breaching party would be entitled to the benefit of a future performance by the non-breaching party, such as a payment, but for his material breach. However, the concept of material breach is not germane to the Settlement Agreement. Its main provisions, its "essence," had already been performed before the alleged breaches arose. These bargained-for performances were: (i) a division between ACCJ and Ambush of the funds held in the court's registry; (ii) entry of a Consent Order implementing this division of funds; (iii) payment to ACCJ of $90,000 by Ambush's malpractice insurer; (iv) a stipulated dismissal of the action with prejudice; and (v) the exchange of comprehensive mutual releases of "any manner of claim ... whether known or unknown ... that arises from or relates to the subject matter of [*ACCJ v. Ambush*] or the *Franqui* Litigation." All of these performances were completed.

By the time the alleged breaches of paragraph 6 of the Settlement Agreement occurred (post-settlement), there were no further payments or affirmative performances required of either party under the agreement. Thus, a breach of paragraph 6 could not frustrate the agreement's main purpose. Nothing in the agreement evidences an intent of the parties that any of these other provisions could subsequently be undone, abrogated or rescinded as a result of a breach of paragraph 6.

Moreover, paragraph 6 of the Settlement Agreement, by its own terms, provides a remedy for its breach, which Ambush has invoked: a suit for money damages. Ambush's pursuit of this remedy serves to ratify the agreement and confirm that the concluded performances, including the exchange of releases for consideration, remain valid and cannot be unwound.

Further, the *Cuneo* court did not hold, as Ambush argues, that a release provision found in a settlement agreement was unenforceable because of a material breach. Rather, the court upheld and implemented the settlement agreement according to its terms. The defendant in *Cuneo*, an attorney, was entitled under a settlement agreement to payment of portions of contingency fees expected to be received by his former law firm. The court reasoned that if the defendant committed a material breach, then "under the terms of the settlement agreement" the defendant was not entitled to these future payments due under that agreement. *Cuneo* at 109. The court found that the defendant had "knowingly and deliberately" and materially breached a non-interference clause that was at the heart of the settlement agreement. *Id.* at 111. The court then applied the remedy provided for in the non-interference clause, to wit, forfeiture of future payments. Far from nullifying a release provision of the settlement, the Court held that the release provision "preclude[d]" certain claims by the defendant, and upheld the release provisions. *Id.* at 119.

While the *Cuneo* court acknowledged that the question whether a material breach has occurred is "generally" a question of fact, it also made clear that if "there is only one reasonable conclusion . . . the court must address what is ordinarily a factual question as a question of law." *Id.* at 109 (internal quotations and citations omitted).

In the present case, based on a plain reading of the Settlement Agreement and court filings which this Court may also consider, there is only one reasonable conclusion that can be drawn:  that no breach of the Settlement Agreement, let alone a material breach, has been committed by Dr. Engelberg. Ambush's argument that the release provision of the Settlement Agreement is unenforceable or can be abrogated has no possible validity.  Thus, the viability and application of the release can and should be determined as a matter of law on this motion.  As the

Settlement Agreement is properly before the Court, its plain reading does not raise a fact issue. Whether a contract is ambiguous is a matter of law.  *See Baseload Energy, Inc. v. Roberts,* 654 F. Supp. 2d 21, 26 (D.D.C. 2009); *see also Cuneo* at 107 ("A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract . . . .") (citations and internal quotations omitted).   The Settlement Agreement should be upheld and applied according to its terms.   For obvious reasons, settlement agreements are held in "high judicial favor."  *See Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1015 (D.C. Cir. 1985).

Ambush also relies on 29 *Williston on Contracts* § 73:11 (4th ed.), and the sole case cited in that section, *U.S. Anchor Mfg. v. Rule Industries*, 264 Ga. 295 (1994).   Ambush Memo at 8. These authorities are completely inapposite.   *U.S. Anchor* stands for the proposition, under Georgia law, that a release does not release a party for injury caused by subsequent acts, even if the subsequent acts are made pursuant to a conspiracy that was ongoing at the time the release was executed.   264 Ga. at 297-98.   This proposition is not relevant, since Dr. Engelberg has invoked the release only with respect to alleged acts that predate the Settlement Agreement; he has not argued that the release would apply to subsequent acts.   As for subsequent acts, the Complaint contains no allegations of actionable misconduct on Dr. Engelberg's part subsequent to the release.   Thus, the citations to *Williston* and *U.S. Anchor* are not responsive or relevant to Dr. Engelberg's arguments.

### C. *Contract Remedies.*

Notwithstanding Ambush's lengthy treatment of these issues (pp. 9-12), Dr. Engelberg will rest on his previously-stated position, that plaintiff's lack of entitlement to any remedy for the alleged breaches of contract is clear.   Engelberg Memo at 16.   The other defendants will brief these issues in their reply and the Engelberg Defendants will rely on such arguments.

## II.  THE RICO ACT CLAIMS (COUNTS SIX THROUGH TWELVE) SHOULD BE DISMISSED

### A. *Res Judicata.*

In Point X of his opposition (pp. 12-14), Ambush argues that his RICO claims are not barred by the doctrine of *res judicata*.  First, he argues that *res judicata* only applies if there has been a prior judgment, and there was no judgment in *ACCJ v. Ambush*.  He cites 18A Wright & Miller, *Fed. Prac. & Proc.* § 4443 (2d ed.), for the proposition that a settlement agreement "by itself is effective only as a contract." Ambush Memo at 12-13.  But this is not a case of a settlement agreement "by itself."  As part of their bargained-for exchange (Settlement Agreement, ¶ 5), the parties filed a Stipulation of Dismissal with Prejudice in *ACCJ v. Ambush* (Motion Exh. 19).  As we have previously argued, for purposes of *res judicata* a stipulation of dismissal with prejudice has the same force and effect as a final judgment on the merits.  *Astron Industrial Assocs. v. Chrysler Motors Corp.*, 405 F. 2d 958, 960 (5th Cir. 1968) (cited in Engelberg Memo at 19).  Ambush has ignored that case and that rule, which is self-evident and fundamental to the policies of *res judicata*.

Alternatively, Ambush attempts to respond to defendants' argument that *res judicata* bars his RICO claims because he could have raised such claims in the prior case, which involved the same "nucleus of facts" that he now relies upon in his RICO counts.  Engelberg Memo at 18-20.  Ambush opposes on the ground that the "factual nucleus here is separate and new" (Ambush Memo at 13), contending that the filing of *Engelberg v. Perr* in New York resulted in what he suggests were revelations about the "relations among [the RICO Defendants] and the money transfers they made" that were essential to his ability to formulate his RICO claims. Ambush Memo at 13-14.

9

This argument obviously lacks merit, since Ambush himself had already made similar allegations in *ACCJ v. Ambush*.  In his counterclaims in that case, he described his extensive and long-standing relationship with Eliezer Perr, going back to the 1990's.  See Motion Exhibit 14 (Amended Counterclaim in *ACCJ v. Ambush*) at ¶¶ 17-19.  He alleged that ACCJ and related entities were not truly "altruistic," but instead functioned primarily as vehicles for personal enrichment of Eliezer Perr, Michael Engelberg, and others.  *Id.* at ¶ 5 ("[d]espite its stated altruistic purpose, the Center [ACCJ] and a series of related or similar entities . . . have *as their primary purpose the personal enrichment* of [Perr, Engelberg, and associates]") (emphasis added), and ¶ 16 (alleging the formation of multiple "Centers," and that "[a]s a result of … transfers of funds among these entities and other payments … [Perr, members of his family, and Engelberg] profited from their affiliations with [such Centers].").  Thus, Ambush's argument that there is a new "factual nucleus" regarding alleged financial improprieties fails.

As Ambush states in his Complaint, the factual nucleus of this case concerns a fee dispute and alleged efforts to deprive him of his fees, as was the case in *ACCJ v. Ambush*.  The operative facts were known to Ambush before his counsel filed the stipulation of dismissal in *ACCJ v. Ambush*. ACCJ had filed that suit against Ambush over his fees. The supposed subornation of claimants as witnesses had occurred, and their affidavits had been filed in this Court, in *ACCJ v. Ambush*.  The *Berganzo* case had gone to trial; Dr. Engelberg had testified and supposedly committed perjury; the claimants had testified about Ambush's deceit; the jury had returned a verdict finding that Ambush had procured their retainer agreements by deceit; and judgment was entered requiring Ambush to disgorge $2 million in fees.  *See Estate of Berganzo-Colon v. Ambush*, 704 F.3d 33 (1st Cir. 2013).

The factual nucleus out of which Ambush has attempted to weave his RICO claims was well known to him before he signed the Stipulation of Dismissal With Prejudice in *ACCJ v. Ambush* (Motion Exhibit 19). The present Complaint contains nothing new, except to the extent of the few insubstantial post-settlement events referred to above.  While certain details might be new, Ambush had knowledge of the nucleus of facts regarding the alleged financial irregularities, and he could, and did, make allegations about such payments in his counterclaims in the prior case.  See Motion Exhibit 14 (*ACCJ v. Ambush*, Amended Counterclaims) at ¶¶ 5, 16-19.  "[A]dditional instances of what was previously asserted," *Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 112-114 (2d Cir. 2000) (cited in Engelberg Memo at 19), are not sufficient to avoid claim preclusion.  His argument that the factual nucleus is new is contrived.

Nor is there any merit to Ambush's throwaway suggestion that the facts of *Engelberg v. Perr* were fraudulently concealed from him before the filing of that case.  Ambush Memo at 14. He offers no basis whatever for such a suggestion, and indeed his allegations in *ACCJ v. Ambush* that ACCJ was run for personal enrichment of certain defendants puts the lie to this argument.

### B. *Release.*

As we argued in our initial submission, the release provision contained in the Settlement Agreement is fatal to Ambush's RICO claims, because (i) its language clearly releases all RICO claims based on RICO predicate acts that occurred prior to the date of the Settlement Agreement, and (ii) the Complaint does not tie Dr. Engelberg or the New York Center to any RICO predicate acts that occurred, or supposedly occurred, after the Settlement Agreement was entered. Engelberg Memo at 20-21.

It is apparent from Ambush's arguments that he recognizes that the release is devastating to his RICO claims, for he shifts ground and asserts repeatedly that his RICO claims are based on

post-settlement events.   Thus, he asserts that the Complaint alleges that the RICO injuries "occurred **after** the Settlement Agreement and **because** of the RICO Defendants breach ...." Ambush Memo at 14 (emphasis in original).   He explains further that predicate acts of mail and wire fraud "took place in furtherance of those breaches, thus clearly **after** the Settlement Agreement was executed" (*id.* at 15) (emphasis added).   He also asserts that "numerous predicate acts were committed **after** the settlement" and that the "Complaint contains abundant allegations that predicate acts were committed **post-settlement** ...." (*id.*) (emphasis added).   Conspicuously absent from these assertions are references to specific allegations in the Complaint.

It is obvious that Ambush puts little faith in his assertions about "numerous" and "abundant" predicate acts occurring after the settlement, because he requests "discovery specific to the predicate acts and leave to amend."   Ambush Memo at 15.   The Engelberg Defendants oppose such discovery because the Complaint does not contain any plausible allegations of RICO claims or RICO predicate acts that supposedly occurred post-settlement.   Nor has Ambush provided any information or allegations that could raise the possibility of such claims above the "speculative level."   This distinguishes Ambush's case from *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 291–92 (1st Cir. 1987) (cited at *id.*), where the Court found there were plausible allegations of a scheme to defraud and a high probability of communications by wire or mail pursuant to such scheme to defraud.

As noted above, Ambush has failed even to allege plausible breach of contract claims against the Engelberg Defendants, let alone plausible RICO claims.   Even if he could assert a contract claim that could pass muster, it is obvious that breach of contract claims are not the stuff of RICO.   RICO claims that purport to rely on breaches of contract are not viable.   *See Annulli v. Pannikar*, 200 F.3d 189, 192 (3d Cir. 1999).

Although Ambush again purports to rely on *Williston on Contracts*, now as to the effect of the release on the RICO claims (Ambush Memo at 14), he misconstrues his earlier reference to that treatise.  He states that "the release cannot be invoked to discharge liability when the conspiracy was ongoing at the time of the release."  *Id.*  As explained above, the citation to *Williston* and the case of *U.S. Anchor, supra*, do not support such a broad proposition.  Rather, these authorities merely stand for the proposition that a release does not release liability for *subsequent acts* even if those acts are committed pursuant to a pre-existing conspiracy.  That is of no moment here, since Ambush has not made plausible allegations of RICO claims or predicate acts that supposedly occurred post-release, and any prior acts clearly *have* been released.

Ambush's suggestion that "the breaches of the settlement agreement make the release unenforceable," and concludes that "thus Ambush can rely on any prior actions to support his claims, if this were necessary" (Ambush Memo at 15) wholly misreads the agreement and the applicable law. See discussion *supra*.

### C. *Statute of Limitations.*

Ambush attempts to dodge RICO's four year statute of limitations by arguing, as he did in regard to the release provision, that the alleged breaches of the of the Settlement Agreement "also caused the RICO injuries" and that these acts "logically took place **after September 2012**" and therefore are within the four-year limitations period.  Ambush Memo at 16 (emphasis added).  While it is true that RICO predicate acts that occurred after September 2012, if there were any, would be within the limitations period, as the Complaint was filed on July 31, 2015, the argument fails because the Complaint is devoid of any allegations of RICO predicate acts within the prior four years that rise above the level of labels and conclusions.

Ambush's second gambit for avoiding the time-bar dismissal is to argue for equitable tolling of the RICO limitations statute.  He claims that he could not have known of the scheme against him until he gained access to the record in *Engelberg v. Perr*.  He thus argues he should be granted the benefit of equitable tolling "until at least the time when [he] learned that Engelberg and Perr controlled not only ACCJ, but a host of other entities that they unlawfully used to defraud him . . . ."  Ambush Memo at 16-17.  However, as explained above in regard to Ambush's *res judicata* arguments, Ambush was in possession of the "nucleus of facts" before the Settlement Agreement was entered.  Thus, there is no basis for equitable tolling.

### D. *Proximate Cause and RICO Injury.*

In attempting to overcome the Engelberg Defendants' arguments that Ambush has failed to adequately allege RICO injury and proximate causation, Ambush again seemingly abandons pre-settlement conduct as a basis for his claims, and instead focuses on actions that constitute, allegedly, "violations of the Settlement Agreement."  In particular, he focuses on the "web program" posted to the internet in or about May 2013 by attorney David Efron.  Ambush Memo at 17-18.  Efron had represented claimants in the *Berganzo* trial.  He was thus intimately familiar with the results of that case:  a finding that Ambush had deceived his clients and a judgment requiring him to disgorge $2 million in fees.  Efron thus apparently launched the web video, described in the Complaint as an "attorney advertising infomercial video," for purposes of his own advertising.

Except by purely speculative allegations, Ambush does not connect the Engelberg Defendants to the web program.  The Complaint also lacks any allegation that the web program caused Ambush any loss of fees in connection with the *Franqui* Litigation.

14

Ambush quotes extensively from *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131 (2008), concerning elements of mail and wire fraud, but they are not germane to the issues of causation raised by the Engelberg Defendants.  Ambush Memo at 18-19.  Also, contrary to the implications of Ambush's arguments, in *Bridge* the Supreme Court did not depart from the requirement of proximate cause to show RICO injury that it had set out in *Holmes* and *Anza,* as described in our initial submission.  *See* Engelberg Memo at 18-19, citing *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311 (1992) and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S.Ct. 1991 (2006).  Ambush's RICO claims thus fail for lack of RICO injury.

### E. *Pattern of Racketeering Activity.*

We have previously showed how Ambush's Complaint falls short of alleging a pattern of racketeering, because it does not successfully plead the commission of RICO predicate acts by either of the Engelberg Defendants.  Engelberg Memo at 26-31.  We showed that the Complaint fails to plead particulars required to plead mail and/or wire fraud, and we showed that it fails to plead even basic elements necessary to pleading the supposed predicate acts of obstruction of justice and money laundering. Thus, it should be clear the Complaint fails to afford a basis for a reasonable inference that the Engelberg Defendants committed any indictable RICO predicate acts, 18 U.S.C. § 1961(a), let alone that they engaged in a pattern of racketeering.

In his opposition, Ambush makes little to no effort to respond to these arguments.   See Ambush Memo at 19-20.  Instead he repeats arguments that amount to mere conclusions, and he again tries new theories that find no support in his Complaint. In all, his arguments amount to tacit admission of the Complaint's inadequacies. Thus, Ambush cites (p. 19) paragraphs 168 through 177 of his Complaint, in which he alleges that attorney Efron's publication of the "web

video" in May 2013 gave rise to a supposed breach of the Settlement Agreement by Dr. Engelberg. As noted above, Efron had represented plaintiffs against Ambush in the *Berganzo* trial. Even as alleged by Ambush in his Complaint, the statements Efron made in the video appear in large part to be a recounting of the results of that trial.

With respect to the required allegations of RICO predicate acts, Ambush's allegations concerning the web video fail as acts of mail or wire fraud, because they fail to allege the circumstances of the supposed fraud with the requisite particularity. They fail also for the same reason the claimed breach of contract fails: the allegations do not connect Dr. Engelberg or the New York Center to the web video, except by speculative, indirect, and conclusory allegations. Nor does Ambush address the obvious inadequacies addressed in detail in Dr. Engelberg's initial submission regarding the alleged predicate acts of obstruction of justice and money laundering (Engelberg Memo at 27-30).

Again shifting ground, Ambush tries a new theory, not raised in his Complaint: that defendants fraudulently induced his entry into the Settlement Agreement. Ambush asserts that, even as the defendants were entering the agreement, "they were acting ... to continue the actions they agreed in the Settlement Agreement to cease," and concludes that "[t]his in itself is fraud." Ambush Memo at 19-20. Ambush cites *Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003), but that case is readily distinguishable. In *Deck*, a *pro se* plaintiff sued a corporate defendant and others, alleging that he was fraudulently induced to enter into a settlement agreement by, among other things, promises of future payments to plaintiff that the company did not intend make, because it planned instead to transfer all its assets to another company under a similar name. The case makes clear that a scheme to defraud by fraudulent inducement, with mail and/or wire communications, can form the basis for RICO predicate acts of mail and/or wire

fraud.  *Deck*, 349 F.3d at 1258-59.  However, a fraudulent scheme was the gravamen of the *Deck* complaint. Ambush's Complaint contains no such allegations.

Ambush concludes that he has succeeded in including "detailed circumstances as to the predicate acts he is claiming" (Ambush Memo at 20), without reference to specific allegations. Obviously, such conclusory arguments do not meet the pleading standards articulated in *Twombly* or *Cuneo*.  They do not afford a reasonable inference that any of the supposed RICO predicate acts was committed by Dr. Engelberg or the New York Center.

### F.  *Relatedness and Continuity.*

In our initial memorandum (pp. 31-33), we cited authorities concerning the requirements of "relatedness" and "continuity" for the pleading of a pattern of racketeering activity and discussed in detail the shortcomings of Ambush's pleadings in these respects.  We cited *Western Assocs. Ltd. Ptp. v. Market Square Assoc.*, 235 F.3d 629, 633-35 (D.C. Cir. 2001), to support the argument that Ambush's RICO claims fail to meet these requirements, because it alleges a single scheme, a single injury and a single victim.

Ambush does not mention *Western Associates* in his opposition or respond to its holding. He simply asserts disagreement with the movant's arguments, without analysis. See Ambush Memo at 20-21.  He argues that the threat of continuing violations is demonstrated by his allegations of conduct breaching the settlement agreement.  These meager responses are, we submit, tacit admission of the inadequacies of his RICO pleadings.

### G.  *No Personal Jurisdiction Over The N.Y. Center on RICO Act Claims.*

In his opposition, plaintiff does not address the key issue, which is that it is <u>his</u> burden to prove that there is no other district in which a court will have personal jurisdiction over all of the RICO defendants.  See Engelberg Memo at 32-33.  Whether the Settlement Agreement includes

a forum clause is of no concern to the New York Center; it is not a party to that agreement, and plaintiff does not explain why he could not have brought his RICO case in another forum. The other defendants will brief these issues at greater length in their reply and the Engelberg Defendants will rely on such arguments as well.

## CONCLUSION

Based on the foregoing, defendants Michael Engelberg and The New York Center for Civil Justice, Tolerance & Values, Inc. respectfully request that the Court enter an order dismissing the Complaint as against them, with prejudice, for failure to state any causes of action and failure to plead fraud with particularity, and in the alternative dismissing the action as against the New York Center for lack of personal jurisdiction, all together with costs and disbursements, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

SCHWARTZ & ASSOCIATES PLLC

Dated:  January 22, 2016

By:   /s/ Christopher "Kip" Schwartz
Christopher "Kip" Schwartz
D.C. Bar No. 44450
1010 Wisconsin Avenue NW, Suite 540
Washington, DC 20007
Tel.:  (202) 342-0413 | Fax:  (202) 330-5272
kip.schwartz@schwartzassociates-law.com

LIVINGSTON HOWE LLP
By:   /s/ David D. Howe
David D. Howe, admitted *Pro Hac Vice*
Jeffrey E. Livingston, of counsel
747 Third Avenue, 20th Floor
New York, New York 10017
Tel: (212) 986-7887
david@livingstonhowe.com

*Counsel for Defendants Michael Engelberg and The New York Center for Civil Justice, Tolerance & Values, Inc.*