UNITED STATES BANKRUPTCY COURT


American Center for Civil Justice, Inc.,) Case No.
                                        ) 18-15691 (CMG)
                          Plaintiff,    )
                                        ) Chapter 11
              vs.                       )
                                        ) Adv. Proc. No.
Joshua M. Ambush,                       ) 18-01273 (CMG)
                                        )
                          Defendant.    )
_____)




DEPOSITION of JAVIER LOPEZ-PEREZ

EL SEGUNDO, CALIFORNIA

TUESDAY, JUNE 18, 2019




REPORTED BY:
CYNTHIA L. VARELA
CSR No. 5917

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 2 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 2

1          DEPOSITION of JAVIER LOPEZ-PEREZ, taken on behalf
2   of the Defendant, at Embassy Suites, 1440 East Imperial
3   Avenue, El Segundo, California, on Tuesday, June 18,
4   2019, commencing at 9:12 a.m., before Cynthia L. Varela,
5   CSR No. 5917.
6
7   APPEARANCES OF COUNSEL:
8
9   FOR THE PLAINTIFF:
10  BROEGE, NEUMANN, FISCHER & SHAVER, LLC
    BY:  TIMOTHY P. NEUMANN, ESQ.
    Old Squan Plaza
11  25 Abe Voorhees Drive
    Manasquan, New Jersey 08736
12  (732) 223-8484
    tneumann@bnfsbankruptcy.com
13
         and
14
    COLLINS, VELLA & CASELLO, LLP
15  BY:  JOSEPH M. CASELLO, ESQ.
         (Telephonic Appearance)
16  2317 Highway 34
    Suite 1A
17  Manasquan, New Jersey 08736
    jcasello@cvclaw.net
18
19  FOR THE DEFENDANT:
20  McMANIMON, SCOTLAND & BAUMANN
    BY:  ANDREA DOBIN, ATTORNEY AT LAW
21  427 Riverview Plaza
    Trenton, New Jersey 08611
22  (973) 323-8667
    adobin@msbnj.com
23
24  Also Present:          Joshua Ambush
25

Page 3

1               I N D E X
2   WITNESS              EXAMINATION          PAGE
3   JAVIER LOPEZ-PEREZ   By MS. DOBIN           4
4                        By MR. NEUMANN        74
5
6
7   DEFENDANT'S EXHIBITS                      PAGE
8   JLP1 5/30/1972 Spanish article, Victimas Masacre    16
         Aeropuerto De Lod, Israel
9
    JLP2 12/24/2009 Spanish article, Enganan a          21
10        Victimas de Masacre de Lod
11  JLP3 12/24/2009 English article, Victims of Lod     24
         Massacre Were Allegedly Defrauded
12
    JLP4 United States District Court for the           31
13        District of Puerto Rico Complaint
14  JLP5 Email thread; 5/25/2010, 6/26/2012,            52
         6/29/2012, 7/2/2012
15
16
17
18      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
19                  (None)
20
21
22          INFORMATION REQUESTED
23                  (None)
24
25

Page 4

1          EL SEGUNDO, CALIFORNIA
2          TUESDAY, JUNE 18, 2019
3               9:12 A.M.
4
5
6          JAVIER LOPEZ-PEREZ,
7   called as a witness by and on behalf of the Defendant,
8   and having been first duly sworn by the Court Reporter,
9   was examined and testified as follows:
10
11
12               EXAMINATION
13  BY MS. DOBIN:
14      Q.  Good morning, Mr. Lopez-Perez.
15      **A.  Good morning.**
16      Q.  My name is Andrea Dobin.  I represent Joshua
17  Ambush and his claim against the American Center for
18  Civil Justice, Inc. in its bankruptcy in the United
19  States Bankruptcy Court for the District of New Jersey.
20  For the purposes of this deposition we will refer to
21  that entity as ACCJ.
22          Mr. Casello, can you put us on mute?
23          **MR. CASELLO:** Sure.
24          **MS. DOBIN:** Thank you.
25      Q.  First of all, I would like to thank you for

Page 5

1   appearing today.  I know you have had some physical
2   difficulties, and this is a long way from home.  We are
3   going to do our best to make this productive so we don't
4   have to bother you again and let you get back to the
5   business of healing.
6      **A.  Thank you.**
7      Q.  You're an attorney; correct?
8      **A.  Yes, I am.**
9      Q.  Do you currently still have a license to
10  practice?
11      **A.  Yes, I do.**
12      Q.  In what state?
13      **A.  In the Commonwealth of Puerto Rico.**
14      Q.  That's it?
15      **A.  Yeah.**
16      Q.  Now, I assume that since you are an attorney,
17  you have dealt with the deposition process before.  But
18  let me just, for the record, state what we all know to
19  be true.
20          And that is our court reporter here is lovely.
21  She seems to be doing a very lovely job at well.  But
22  she can only take down one person speaking at a time.  I
23  speak fast enough.  So we need to make sure that there
24  is only one person speaking at a time, and that your
25  answers are all verbal, not uh-huh, huh-uh, those kinds

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 6

1 of answers.
2     I'm not here trying to trick you up.  I'm here
3 trying to get some facts from you.  So if I ask you a
4 question to which you don't know the answer, just tell
5 me you don't know.  Please don't guess.
6     If you are giving me an estimation as to time
7 or an amount, please make it clear that it's an
8 estimation.
9   **A.  Okay.**
10   Q.  Counsel for ACCJ is here, Mr. Neumann, making
11 himself quite comfortable on the couch.  If he has an
12 objection to a question that I have asked, please wait
13 for the two of us to work out our problems and then
14 we'll tell you what to do.
15     Are you under the influence of any substance
16 that is going to make it difficult for you to answer
17 questions today?
18   **A.  No.**
19   Q.  A little bit more about you.  Where did you go
20 to high school?
21   **A.  I went to high school in a school named Papa**
22 **Juan XXIII.  I can spell it if you want.**
23   Q.  That's okay.
24   **A.  P-a-p-a.  The name Juan, J-u-a-n.  Roman**
25 **numeral XXIII.  As Pope John XXIII.**

Page 7

1   Q.  Nice Jewish boy going to Pope John.
2   **A.  Right.**
3   Q.  There you go.
4     Where did you go to college?
5   **A.  I went to college in -- to the University of**
6 **Puerto Rico.**
7   Q.  What's your degree in?
8   **A.  In biology.  And I have a minor in chemistry**
9 **and philosophy.**
10   Q.  I'm still not reading going to law school from
11 where.
12   **A.  Right.**
13   Q.  So where did you go to law school?
14   **A.  I went to law school at the Interamerican**
15 **University of Puerto Rico School of Law.**
16   Q.  When did you graduate?
17   **A.  I graduated in 1997.**
18   Q.  Okay.  What was your first law related job?
19   **A.  My first law related job was as a law clerk**
20 **starting when I was in my first year of law school in a**
21 **law firm called Goldman, Antonetti, A-n-t-o-n-e-t-t-i, &**
22 **Cordova.  In San Juan, Puerto Rico.**
23   **MR. NEUMANN:** He covered everything.  He's the
24 Jew, the Italian and the Puerto Rican.
25   **THE WITNESS:** That's true.

Page 8

1     I was a law clerk there in their Litigation
2 Department.
3 **BY MS. DOBIN:**
4   Q.  So after you graduated from law school what did
5 you do?  Did you return to that firm?
6   **A.  They offered me an associate position in the**
7 **firm of their Litigation Department.**
8   Q.  And that's what you ended up doing after law
9 school?
10   **A.  Yes.**
11   Q.  What kind work did you do there?
12   **A.  As an attorney?**
13   Q.  Yes.
14   **A.  Okay.  So I was an attorney in the Litigation**
15 **Department.  It was one of the biggest firms in Puerto**
16 **Rico.  It's a long service law firm.  I was baptized by**
17 **fire, so to speak.**
18     **They would dump on me a federal copyright case**
19 **and do discovery.  I had to learn copyright.  We did**
20 **everything.  Trademark and also diversity jurisdiction**
21 **cases towards or distribution law.  I was basically the**
22 **appellate department of the litigation division.**
23 **Everything fell on me.**
24   Q.  How long did you work there?
25   **A.  I worked there since '94 until 2006.**

Page 9

1   Q.  Why did you leave?
2   **A.  I left because, as many other associates, the**
3 **upward mobility in the law firm was not as great.  Some**
4 **senior associates will stay there without becoming**
5 **partners for years and years.**
6     **A lot of us took the decision to establish our**
7 **own practice.**
8   Q.  Is that what you did in 2006?
9   **A.  Yes, I did.**
10   Q.  What were you purporting to -- going to
11 specialize in, in 2006 when you opened your own place?
12   **A.  Okay.  So it was -- again, it was state and**
13 **federal litigation and appellate law.**
14   Q.  Okay.  When did you first learn of ACCJ, the
15 very first time?
16   **A.  The very first time was in 2009.**
17   Q.  Who told you about it?
18   **A.  By Rabbi Mendel Zarchi of Chabad of Puerto**
19 **Rico.  He spoke to me.  He said it was his rabbi and**
20 **another person that were in Puerto Rico looking for some**
21 **assistance in cases related to the 1972, I believe,**
22 **Lod Massacre in Israel which was a bunch of Puerto Rico**
23 **pilgrims were killed by terrorists while they were**
24 **arriving at the Lod Airport in Tel Aviv.**
25   **THE COURT REPORTER:** My battery is low.  Let me

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

---

Page 10

1  plug in the charger.
2      (Whereupon a short recess was taken.)
3      **THE COURT REPORTER:** Thank you.
4
5
6          EXAMINATION RESUMED
7  **BY MS. DOBIN:**
8   Q.  So when did your rabbi approach you about ACCJ?
9  Do you remember what year that was?
10  **A.  2009.**
11  Q.  That's right.  You said "2009."
12  **A.  Yeah.**
13  Q.  You said that there was some people in Puerto
14  Rico looking to help victims of terror.
15      Why was he telling you about it.  What was the
16  purpose or his telling you?
17  **A.  Well, Chabad of Puerto Rico is the only --**
18      **THE COURT REPORTER:** "Is the only" what?
19      **THE WITNESS:** The only orthodox synagogue on
20  the island.
21      **THE COURT REPORTER:** Counsel, I know you want
22  to help, and I truly appreciate it.  But it makes my job
23  much easier if you allow him to repeat it.
24      **MS. DOBIN:** Okay.
25      **THE COURT REPORTER:** Thank you.

---

Page 11

1      **THE WITNESS:** So if you're Jewish and you have
2  some business in Puerto Rico and you're religious, you
3  end up, like we say, davening or praying in what we call
4  the shul.  The synagogue.
5      He thinks that the rabbi, which his name is
6  Rabbi Perr, and the other gentleman, whose last name is
7  Engelberg, went to the synagogue and spoke to Rabbi
8  Zarchi about -- and this is speculation.  I guess they
9  said, "Do you know any Puerto Rican attorneys in
10  Puerto Rico?"
11      Of course I was the only Puerto Rican Jew that
12  was also an attorney in the Jewish community.
13      So he said, "Sure.  I know Javier Lopez."
14      And he told me that they wanted to meet me.
15  **BY MS. DOBIN:**
16  Q.  Did he tell you -- did the rabbi tell you why
17  they wanted to meet you?
18  **A.  He only said that it was something related to**
19  **cases related to the Lod Massacre, which interested me a**
20  **lot when he said that because they were Puerto Rican**
21  **victims.  I like international law.**
22      **And when he said that, I said, "Whoa.  Sure**
23  **I'll meet them."**
24      **But at the time I didn't know specifically what**
25  **they needed me for.  And I met them eventually.**

---

Page 12

1   Q.  So the next thing that happened was that you
2  met with Rabbi Perr and Mr. Engelberg?
3  **A.  Yes.**
4   Q.  Where did that meeting take place?
5  **A.  That meeting -- let me think about it for a**
6  **second.  Because this happened ten years ago.  That**
7  **meeting happened -- the initial meeting, which is why**
8  **they said that they want to meet and talk, was precisely**
9  **during morning services I think the next day.**
10      **And then they said -- yeah, it was in the**
11  **synagogue.  Now that I remember the initial introduction**
12  **to this factual scenario was in the synagogue.**
13  Q.  All right.  What did you discuss during that
14  meeting?
15  **A.  Okay.  So what I recall, to the best of my**
16  **recollection, is that they said that they were**
17  **representatives of the ACCJ, an entity called the ACCJ.**
18      **They said that -- they introduced me to their**
19  **mission statement, helping victims of terrorism, and**
20  **their families to get, you know, justice in the form**
21  **compensation.**
22      **They told me about the fact that there were**
23  **some cases that were already either pending or that they**
24  **had finished.  I think it was -- I believe it was court**
25  **cases at the time where they had hired this mainland**

---

Page 13

1  attorney where they had compensated him.
2      Now, this attorney was doing an injustice to
3  the Puerto Rican victims and their families because they
4  had an agreement with the attorney to compensate him for
5  his work.  The ACCJ would compensate him for his work.
6      Instead, the fees that claimants were supposed
7  to pay the ACCJ, this attorney was embezzling them.  He
8  was charging more -- he was charging sort of a
9  contingent fee, which he was not supposed to get because
10  he was being compensated by the ACCJ.
11  Q.  Did they identify that person by name?
12  **A.  Yes, they did.**
13  Q.  Who was that?
14  **A.  Attorney Joshua Ambush.**
15  Q.  Okay.  Did they ask you to provide legal
16  services to the ACCJ as a result of this injustice they
17  identified?
18  **A.  They asked me to -- not so much legal services.**
19  **Because I was never retained by the ACCJ in terms of a**
20  **formal retainer agreement.**
21      **However, they said that they needed a**
22  **Puerto Rican attorney to reach out to those families to**
23  **basically -- I'm trying to recollect right now.  To**
24  **basically save them from this attorney because he was**
25  **doing something illegal.**

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 5 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                      June 18, 2019

Page 14

1     He was sort of like stealing from these
2 claimants. He basically got the awards given by the
3 cases that had already been resolved. And he was
4 keeping it in contravention of the agreement that they
5 had with the center.
6   Q. Okay. Did they provide you with a list of the
7 names of the families that they contended had been
8 misled?
9   A. Not in those initial encounters. No.
10   Q. Did they ask you to undertake any independent
11 investigation of the facts they presented to you?
12   A. Well, what they proposed to me was that they
13 didn't know where a lot of these people were located in
14 Puerto Rico. Because supposedly Mr. Ambush had all the
15 files and was hiding them in furtherance of his
16 purported scheme.
17     They proposed for me to, according to their
18 version of the events, which I took as true coming from
19 a rabbi, the standard of an orthodox Jew, my rabbi in
20 Puerto Rico recommends to me these people. He's a
21 rabbi. I'm a religious Jew. So I said: How can this
22 rabbi be lying? So I accept it as true, the version of
23 the events.
24     And based upon that information they provided
25 to me, they proposed -- they paid for an advertisement

Page 15

1 in the newspaper in which basically it's directed at the
2 families of the claimants or all of our future claimants
3 warning them of foreign attorneys that are trying to
4 reach out to victims and families not to be fooled by
5 this foreign -- these foreign attorneys. I don't think
6 they did identify Mr. Roberts (phonetic) by name.
7 Instead to talk to me.
8     But I think that advertisement, I don't recall
9 well, also mentioned that I had some relation with the
10 American Center for Civil Justice. So that was
11 published in the El Nuevo Dia Newspaper. I think it was
12 once. And I gave -- it gave my phone number and my
13 email so that these victims and their families could
14 contact me.
15   Q. Whose idea was it to put the ad in the paper?
16   A. Mr. Engelberg.
17   Q. Who paid to put the ad in the paper?
18   A. The ACCJ.
19   Q. Who designed the advertisement?
20   A. Okay. I drafted it. Of course, it was in
21 Spanish. But it was verbatim of the story that you,
22 know, a summary of the story that Perr and Engelberg had
23 given me.
24     MS. DOBIN: We're going to mark this as an
25 exhibit.

Page 16

1     (Whereupon the document was identified
2     and marked as Defendant's Exhibit JLP1.)
3 BY MS. DOBIN:
4   Q. Mr. Lopez-Perez, I've given you what's been
5 marked as JLP1.
6     Is that a copy of the advertisement that we
7 were just discussing?
8   A. Yes.
9   Q. And it was placed in the newspaper how many
10 times?
11   A. I believe it was -- I'm not sure. But I
12 believe it was once. Probably twice. But I don't
13 remember really.
14   Q. So did you pay to place the advertisement or
15 ACCJ did?
16   A. The ACCJ gave me a check to pay for it.
17   Q. How much was it?
18   A. I think it was like $3,000, more or less.
19 Around there.
20   Q. Did you get calls as a result of this
21 advertisement?
22   A. Yes, I did.
23   Q. From how many people?
24   A. I'm having a rough estimate. It's not exact.
25 Probably 11 or 12.

Page 17

1   Q. So that would include both calls and emails, I
2 imagine?
3   A. They were all calls. Yeah.
4   Q. When you got those calls, did you reach back
5 out to Messrs. Perr and Engelberg and let them know that
6 the advertisement had generated these calls?
7   A. Oh, yes. I had to -- I had to report to them
8 any little -- everything that happened regarding this
9 issue. Definitely. I had to keep them informed.
10   Q. So who paid for the time that you spent placing
11 the ad, dealing with these phone calls, and reporting to
12 him?
13   A. Okay. So at the beginning I thought that I had
14 a good opportunity to -- because I was a solo
15 practitioner at the time, to make some money. So I said
16 that this is a good client that can I bill hourly like I
17 usually do.
18     But they said, "Don't worry about it." And I
19 remember when they went to Puerto Rico and we started
20 working together in this matter, they gave me a check
21 for $3,000. But they used to just pay out of their own
22 free will. Sometimes I would be like, "I need you to
23 pay us. I'm spending a lot of money on this."
24     And they will give me another $3,000. I don't
25 think they -- I don't think that they -- in all the

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 18

1  months that I worked for them as -- I should call it as
2  an agent in Puerto Rico for the ACCJ, I don't think I
3  got paid $7,000.
4        I remember that -- I believe that those three
5  initial $3,000 were sort of a retainer.  And I send them
6  an original invoice with my initial rate.
7        That's the first time that I had some sort of a
8  conflict because Engelberg and Perr went wild.  "Don't
9  ever invoice us.  You don't do this.  We're not going to
10 pay you by the hour.  We will issue you, you know,
11 periodic payments, here and there, depending on what we
12 know you're doing."
13        That struck me as strange at the beginning.
14 Why there was any problem with the -- what I thought was
15 a bona fide entity of me billing them by the hour.  But
16 it was a strange reaction.  Because they were very
17 adamant for me to never, never, ever, ever invoice them.
18 I don't know why.
19    Q.  Okay.  Did you email with them back and forth
20 about the progress being made with the placement of this
21 ad?
22    A.  I had to email them like 25 or 30 times a day.
23 And I received an average from 15 to 20 calls per day
24 every day of the month that I had a relationship with
25 the ACCJ.

Page 19

1    Q.  What month do you consider that to be?
2    A.  I think it was from April of 2009.  And I left
3  Puerto Rico -- it was a couple of months before I left
4  to Los Angeles.  It was around the summer of 2010.
5  Probably June or July of 2010.
6        MR. NEUMANN: When the ads started, I didn't
7  think there was an attorney/client relationship with the
8  ACCJ.  But now it appears that ACCJ was paying him.
9        MS. DOBIN: Well, they cannot have it both
10 ways.
11       MR. NEUMANN: Well, yet they were paying --
12       MS. DOBIN: It sounds like they were paying for
13 expenses.
14       MR. NEUMANN: Was anybody else paying you?
15       THE WITNESS: No.
16       MR. NEUMANN: They were the only one paying
17 you?
18       THE WITNESS: When they did, yes.
19       MR. NEUMANN: Were they reimbursing you against
20 expenses or were they just giving you money
21 periodically?
22       THE WITNESS: Yeah.  I think it was a total
23 like disbursed throughout months of seven -- it didn't
24 exceed $10,000.  Probably $7,000.
25 ///

Page 20

1  BY MS. DOBIN:
2    Q.  But they rejected the invoice.
3    A.  Yeah.  Because there was no invoice.  It's just
4  they --
5        MR. NEUMANN: But you were working for them;
6  correct?
7        THE WITNESS: Yeah.  I was their agent in
8  Puerto Rico.
9        MR. NEUMANN: I'll be practical about this.
10 We're here in California, and we won't have to have you
11 come back.  So let's -- can we agree that we go ahead.
12 I'll reserve my rights to argue that this is
13 attorney/client privileged communication and not
14 admissible.  And then we will deal with it later.  Will
15 that work for you, Andrea?
16       MS. DOBIN: Yeah.
17       MR. NEUMANN: Otherwise -- I just want to have
18 a standing objection.  And then we will figure it out.
19       MS. DOBIN: You're client is going to be
20 walking a really thin line between whether or not the
21 folks that did the kind of services that Mr. Javier
22 Lopez did, whether they were attorneys or not.  Because
23 there's more than one that did this.
24       MR. NEUMANN: Well, I don't know.  But I'm just
25 going to reserve my position and note my objection for

Page 21

1  the record.  But I can't direct him not to answer anyway
2  so...
3  BY MS. DOBIN:
4    Q.  Understood.
5        So other than placing the advertisement in the
6  newspaper and fielding the phone calls that came in,
7  what other things did you do that ACCJ was instrumental
8  in having happen?
9    A.  Well, they were very interested in the matter
10 to become more public.  They were very -- they felt a
11 lot of pressure in terms of having in the media this
12 situation so that they could contact as many people as
13 possible.
14       So another strategy that was suggested by
15 Engelberg was to see if I could call a reporter in a
16 Puerto Rico newspaper and sort of tell him about the
17 story and see if they could probably make an article out
18 of it.
19       MS. DOBIN: Let's go ahead and mark this.
20       (Whereupon the document was identified
21        and marked as Defendant's Exhibit JLP2.)
22 BY MS. DOBIN:
23    Q.  Mr. Lopez-Perez, I'm handing you what has been
24 marked as JLP2.  Is that the article about which you
25 just testified?

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 22

1    A.   Yes.
2    Q.   What is the date on that article?
3    A.   December 24, 2009.
4    Q.   Does that refresh your recollection about some
5    of the time frames that we're talking about?
6    A.   Yes.
7    Q.   That's consistent with your testimony, that it
8    was from --
9    A.   Yes.
10   Q.   -- April 2009 through the summer of 2010?
11   A.   Yeah.
12   Q.   How did you get this article published?
13   A.   Okay.  So I had a cousin of mine which was one
14   of the directors, it just so happens, of El Nuevo Dia
15   Newspaper, which is where this article was published.  I
16   fed her the story told to me by the Center, which I
17   believed at the time.  And she was very interested.
18        She knew, as director, this reporter was Juan
19   Perez Mendez.  And she arranged a telephone interview
20   with him so that he could draft the story and have it
21   published.  She was sort of a family thing that worked
22   for the Center.
23        Because Engelberg had -- was very interested in
24   an article being published in the paper.  And I said,
25   "Hey, I have a cousin in the Nuevo Dia."

Page 23

1        And it took like a month of arranging for the
2    article to be published.  And it was -- they interviewed
3    me and they published it.
4    Q.   Now, six years of French isn't doing me any
5    good reading into.  But I do see that Mr. Ambush is
6    identified by name in here.
7    A.   Yes.
8    Q.   Did the author of this article do an
9    independent investigation as to the validity of the
10   claims against Mr. Ambush?
11   A.   No.  They just took my word for it.
12   Q.   You took the word of Mr. Engelberg and
13   Rabbi Perr?
14   A.   Of course.  I was -- up until I met them and
15   they told me their version of the events, I had never,
16   ever, ever heard about ACCJ or Joshua Ambush.  So these
17   facts were verbatim, the Engelberg --
18        THE COURT REPORTER:  The Engelberg what?
19        THE WITNESS:  Events involving Mr. Ambush.
20        THE COURT REPORTER:  Thank you.
21   BY MS. DOBIN:
22   Q.   Is there an English translation of this article
23   around somewhere?
24        I've got it.  Yeah.  Let's mark this.
25   ///

Page 24

1        (Whereupon the document was identified
2         and marked as Defendants' Exhibit JLP3.)
3    BY MS. DOBIN:
4    Q.   Mr. Lopez-Perez, I have handed you what has
5    been marked JLP3.
6    A.   Yes.
7    Q.   Have you seen this document before?
8    A.   Yes.
9    Q.   Is this an English translation of the article
10   that was published in El Nuevo Dia?
11   A.   Yes.
12   Q.   Okay.  Did anybody else work on this ACCJ
13   project with you?
14   A.   No.  Besides Perr and Engelberg.
15   Q.   And nobody in your office?
16   A.   No.  No.  I took charge of following the
17   instructions as their agent in Puerto Rico by myself.  I
18   didn't have any personnel helping me.  I was the only
19   one working on it, I think.  I think.
20   Q.   So you placed the ad and you got the article
21   published.
22        What else did you do for them?
23   A.   Okay.  So I started receiving phone calls.  I
24   started arranging -- because Engelberg was very
25   interested in meeting everybody that would eventually

Page 25

1    call me.
2    Q.   Engelberg wanted to meet them personally?
3    A.   Yes.  Oh, yes.  And I started receiving phone
4    calls from some of the families of the victims and/or
5    victims.  And I was in a crusade to, you know, save
6    these victims and their families from this corrupt
7    attorney.
8    Q.   Let's step back a minute.
9        You say you're getting calls from victims.  Are
10   these victims from the Lod Massacre or "victims," in
11   quotes, of Joshua Ambush?
12   A.   Both.
13   Q.   Did you get calls from victims of the Lod
14   Massacre that were not represented by Mr. Ambush?
15   A.   Well, the thing is that at the time I didn't
16   know which were represented by Mr. Ambush, if they were,
17   and which were not.
18   Q.   Did you ask them when they called you?
19   A.   No.  They -- I believe, and this is to my best
20   recollection.  I'm not exactly sure.  But I believe that
21   some of them will tell me themselves, like, "I have --
22   my father was a victim or I was hurt in the Lod
23   Massacre," and probably they were not -- I think they
24   were not represented by Mr. Ambush.
25        But those that were represented by Mr. Ambush,

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 26

they will tell me themselves.  Because of the nature of the call, they will say, "I saw your ad in the newspaper or I saw the article, and I didn't know that, you know, that Ambush was taking money from what rightfully belonged to us.  We would like to meet you."

Q.  Did you take on any of these people that called you, of the 25, as clients of your own?

A.  Yes.  I can say that I took clients because ACCJ, they're not attorneys.  But I took -- I filed -- let me clarify this.

I filed claims in the Libya Commission in the Department of Justice --

MS. DOBIN:  Libya Commission.

THE COURT REPORTER:  Thank you.

THE WITNESS:  In the Department of Justice because they had opened a division in the Department of Justice, a commission just to deal with the victims of the Lod Massacre.

BY MS. DOBIN:

Q.  It's called the Federal Claims Commission?

A.  The Federal Claims Commission.

Q.  It's not the full name.  But we'll call it that.

A.  Yes.

I did get clients signed in that -- but before

Page 27

that, it was Engelberg's idea that those people -- because of the advertisement or the newspaper article were discontent with Mr. Ambush, that they -- I'm trying give you my best recollection.

I think that part of what they wanted was for them to -- I don't know if it was sending a letter just telling Mr. Ambush, you know, to cease his legal representation in their cases.  In those cases that they already -- that he had already filed before that they were his clients.

They did so.  And then they signed a power of attorney to name Mr. Engelberg as having the power of attorney.

And then after that I, because they were not attorneys, filed probably seven or eight claims in the Federal Claims Commission.

Q.  And all of those claims that you pursued had up until then been pursued by Mr. Ambush?

A.  I don't dare to categorically state that all of them were previously represented by Mr. Ambush.  I will say most of them.

Q.  Did you have any people call you as a result of the advertisement who had never had a relationship with the ACCJ?

A.  (No verbal response).

Page 28

Q.  Strike that.

Were you aware of the fact Mr. Ambush's clients were largely gained through his relationship with ACCJ?

A.  Can you repeat question?

Q.  Were you aware that Mr. Ambush came to represent these terror victims as a result of his, Mr. Ambush's relationship with ACCJ?

A.  Yes.

Q.  Did you know that ACCJ was taking 20 percent of the recovery of these terror victims at that time?

A.  I know it at the point -- one time when they show me what is called the Claimant Center agreement.

Q.  When did you see your first Claimant Center agreement?

A.  I believe by the time that we started receiving the phone calls from claimants.

Q.  Did you send any claimants to ACCJ to sign new Claimant Center agreements because they didn't have one in place yet?

A.  I don't think so.

THE COURT REPORTER:  This call that came in is rather important.  Can we go off the record so I can take it, please?

MS. DOBIN:  Sure.

(Whereupon a short recess was taken.)

Page 29

THE COURT REPORTER:  "Question:  Did you send any claimants to ACCJ to sign new Claimant Center agreements because they didn't have one in place yet?"

"Answer:  I don't think so."

EXAMINATION RESUMED

BY MS. DOBIN:

Q.  Did you take action beyond pursuing claims against -- strike that.

Did you take action other than asserting claims from the Federal Claims Commission for the people that called you as result of the advertisement?

A.  Yes.

Q.  What did you do?

A.  Okay.  So one case in particular I recall, part of the factual theory espoused by the ACCJ was that there were some line of cases.  I think it was called the Frankie (phonetic) case in Federal Court here in the States.  They had reached a settlement.

Once the United States and the Libyan government reached a -- Libya wanted to establish diplomatic relations with us, with the United States.  And they -- as part of that effort, the government of

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 9 of 53

American Center for Civil Justice, Inc. vs.                     JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                June 18, 2019

Page 30

1  Libya paid the government of the United States monies
2  that were used for compensation of these victims, which
3  is where the money came from, both in the court cases
4  and the administrative cases before the Federal Claims
5  Commission.
6        As I recall, Ambush, contrary to, like I said
7  before the agreement with the ACCJ, allegedly took
8  monies that were -- that belonged to that portion of the
9  payment that belonged to them, to the claimants.  So
10 some of the families, in particular I remember the
11 Guzman family --
12 Q.   The Guzman family.
13 A.   The Guzman family.  They had sort of a
14 representative of the family called Lourdes Guzman.  And
15 she was that main contact I had.
16       In that particular case, I also -- and this was
17 at the behest of Engelberg.  I drafted a complaint in
18 Puerto Rico, in the Federal District Court for the
19 District of Puerto Rico.
20       I believe it was the Guzman family, which I
21 already had gotten an award.  And the Berganzo family.
22 The Berganzo family also had gotten an award.
23       I think I drafted that complaint to recover
24 monies from Mr. Ambush that he's supposed to have
25 embezzled or that he not supposed to have those

Page 31

1  amounts awarded to him as attorney's fees.
2        THE COURT REPORTER: 4.
3        MS. DOBIN: JLP4.
4        (Whereupon the document was identified
5         and marked as Defendant's Exhibit JLP4.)
6  BY MS. DOBIN:
7  Q.   Mr. Lopez-Perez, is this the complaint that you
8  just made reference to, the one that you drafted for
9  filing in the District Court for the District Court of
10 Puerto Rico against Mr. Ambush?
11 A.   Yes.  JLP4 is the complaint that I drafted and
12 filed in Puerto Rico.
13 Q.   The facts that are alleged in this complaint,
14 are those the same facts that had been told to you by
15 Rabbi Perr and Mr. Engelberg in your first meeting?
16 A.   Completely.
17 Q.   Did you do any independent investigation to
18 this?
19 A.   No.
20 Q.   Turning to paragraph 32 of this complaint, I
21 will read this into the record for us and then we can
22 discuss it.
23       It says, and I quote, "Specifically,
24 defendant..." that means Mr. Ambush "...traveled to
25 Puerto Rico during December of 2008 and, without

Page 32

1  disclosing that the Center had paid him for his work
2  performed in the Libya action, demanded the execution of
3  an additional 'retainer agreement' ex post facto, where
4  the estates would have him paid an additional 10 percent
5  in fees over the 20 percent agreed upon according to the
6  Center agreement."
7        When you drafted this statement, did you
8  believe that to be accurate?
9  A.   Yes.
10 Q.   Do you still believe it to be accurate?
11 A.   No.
12 Q.   Okay.  Tell me what is not accurate in that
13 statement.
14 A.   At the time I have seen the agreements the
15 claimants, which, of course, had the clause specifying
16 payment of the 20 percent to the Center.
17       And I believed before, I never asked f for any
18 checks or anything to corroborate the version of the
19 fact that he had been compensated for his time.
20       What I didn't know at the time is that -- what
21 I didn't know at the beginning when they approached me
22 initially was that, in fact, the 20 percent was going
23 to be paid by the claimants to the Center of any
24 recovery.
25       Okay.  Now, I was never shown any retainer

Page 33

1  agreements between Mr. Ambush and the claimants.  So I
2  didn't know at the time that -- I believe wholeheartedly
3  that -- because the only thing that I've seen so far
4  were the claimants and Center agreements, that these
5  people were being held by the Center, and that Ambush
6  was merely an employee of the Center which was being
7  compensated.
8        I didn't realize that the Center, of course,
9  this is an afterthought.  They're not attorneys.  That
10 Mr. Ambush was the attorney of record in these cases.
11 That the cases were taken on a contingency basis.  I
12 didn't know that he was not being compensated, as they
13 were telling me.  I learned this later.
14       And that, of course, we all know he has the
15 right, as an attorney, to charge 33 percent in
16 attorney's fees in a contingency case.  I didn't know
17 that the Center got their 20 percent after Mr. Ambush
18 put the funds from the proceeds of those settlements in
19 his IOTA accounts.  I didn't know that when I drafted
20 this.
21 Q.   Had you known that, would you have brought the
22 Berganzo suit?
23 A.   No.
24 Q.   You didn't take this complaint -- strike that.
25       Eventually, you were no longer counsel of

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 10 of 53

American Center for Civil Justice, Inc. vs.                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                      June 18, 2019

Page 34

1  record in this lawsuit that's represented by JLP4;
2  correct?
3      A.   That's correct.
4      Q.   What happened?
5      A.   Okay.  So it was around 2000 -- I believe it
6  was August of 2010.  I was beginning to have treatment
7  from an internal medical condition.  I wasn't working
8  that much, except for the Center.
9          The Center -- before August 2010, the Center
10 occupied my efforts towards -- being an agent of the
11 Center occupied a lot of time.  They were not paying.  I
12 was not making much money.
13         And some friends in Los Angeles offered me --
14 they said, "Why don't you come over for a couple of
15 months."  Oh.  Strike that.
16         Before that, I stopped working for -- making
17 efforts towards -- I ceased any relationship with Perr
18 and Engelberg before I left.
19     Q.   Why?
20     A.   Okay.  Again, I was not being adequately
21 compensated, if at all, at the end.  I don't think I was
22 compensated for like the past -- the four months prior
23 to me leaving or probably six months.
24         It took eight hours a day working with the
25 claims that I did file, phone calls, emails.  And I said

Page 35

1  wait a minute.  I filed the claims.  They know I'm doing
2  the work.  I was involved in other cases.
3          So when I received seven calls from Engelberg
4  in the course of one hour while I was probably in court
5  or dealing with another matter, I wouldn't answer them.
6  And they didn't like that at all.  They didn't like that
7  at all.  That's how we started getting a little bit sour
8  there.
9          So one day I think they communicated with a
10 Rabbi Zarchi.  And I was telling Rabbi Zarchi about the
11 pressure that I was receiving from these people and the
12 lack of compensation.
13         I remember that at that time they had already
14 engaged -- while I was making the efforts in Puerto Rico
15 to sign people to file claims in the Federal Claims
16 Commission, they had sort of a representative of the
17 Center in the States.  I believe probably it was in D.C.
18 in the eastern seaboard that would coordinate and be
19 close to the people at the Justice Department.  His name
20 was Neal Sher.
21         So it struck me as odd.  Because after I filed
22 some of these claims before the Federal Claims
23 Commission, they sort of -- Neal Sher, Mr. Sher comes
24 into the picture.  And he's basically telling me, "I'm
25 in charge now."

Page 36

1          I said, "Okay.  No problem."
2      Q.   In charge of the claims you filed or in charge
3  of ACCJ?
4      A.   In charge of coordinating the claims.  He was
5  sort of the -- as a matter of fact, I'm recalling now
6  letters that he sent to some of the claimants.  I
7  vaguely remember.  But basically saying, "I am the
8  attorney in your claim."
9          We have tried to -- yeah.  It's basically -- I
10 have to see the document.  But it's basically, "I'm the
11 attorney taking care of your claim."  From now on every
12 communication, whatever -- I'm trying remember.
13 Basically saying he was the attorney in Washington for,
14 you know, in charge of the claims.
15     Q.   But you were still the attorney of record?
16     A.   Yes.  I was the attorney of record in the
17 Commission?  Yeah.
18     Q.   So we didn't discuss this.
19         What was your compensation agreement with the
20 victims for whom you filed claims in the Federal Claims
21 Commission?
22         How were you going to get paid?
23     A.   I don't believe that I directly -- it's
24 curious.  I filed the claims as an attorney in
25 Washington.  But believing, thinking in retrospect now,

Page 37

1  just like probably Mr. Ambush at the beginning believed
2  that through my efforts in helping his clients, which
3  are my clients of course, that the Center was going to
4  compensate me.
5      Q.   Not the clients directly?
6      A.   Exactly.
7      Q.   Okay.  Did you get -- as an attorney, did you
8  get a retainer letter of those clients or a power of
9  attorney with those clients that authorized you to
10 submit that claim to the Federal Claims Commission on
11 their behalf?
12     A.   The power of attorney was executed by
13 Engelberg.  During the conversation, some of them would
14 drop by my office at the end when I already had the
15 packet to send to the Federal Claims Commission.  And
16 they considered me their attorney for all purposes.
17         But, again, I thought that the ACCJ will
18 compensate me for what I was doing.  But I never -- I
19 never had -- I don't think I did a retainer agreement
20 like "You will pay me 10 percent of what you get from
21 the" --
22     Q.   Right.
23     A.   -- "Federal Claims Commission."
24     Q.   Which is funny.  Because that's what Mr. Ambush
25 did.

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 11 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                June 18, 2019

Page 38

1    A.  Exactly.
2    Q.  So you didn't have a retainer letter with ACCJ.
3  You didn't have a retainer letter with the victims of
4  terror.
5    A.  Correct.
6    Q.  As an attorney, though, you knew you needed a
7  retainer letter with someone, didn't you?
8    A.  (No verbal response).
9    Q.  I mean, otherwise, how would you -- under what
10 authority did you submit the claims to the Federal
11 Claims Commission?
12   A.  (No verbal response).
13   Q.  Because Mr. Engelberg told you to?
14   A.  Yes.
15   Q.  As the power of attorney for the victims?
16   A.  Yes.
17   Q.  But he wasn't your client and neither --
18   A.  No.
19   Q.  -- were the victims?
20   A.  No.
21   Q.  So who did you believe you were responsible to
22 answering to for these claims?
23       If you got a call, for example, from the Claims
24 Commission that the claim needed to be updated -- and
25 just so you know, we've gotten documents from the Claims

Page 39

1  Commission.  It's a heavy process.
2       So if they came to you and asked for more
3  information from one of these claimants, who did you
4  call, the victim or Dr. Engelberg?
5    A.  I would call the victim.
6    Q.  Okay.
7    A.  I had to immediately after hanging up the phone
8  tell Mr. Engelberg what I did.
9    Q.  Okay.  And for Berganzo, you didn't have a
10 retainment letter in that agreement either in order to
11 begin this complaint either?
12   A.  No.
13   Q.  But this money -- if Berganzo were successful,
14 where was that money to go; to Berganzo, to ACCJ, or to
15 both?
16   A.  It had to go -- of course, it had to go to the
17 victims, which would probably have to give 20 percent to
18 the ACCJ.
19   Q.  At the time that you drafted the Berganzo
20 complaint, JLP4, you didn't know that the ACCJ had
21 already gotten their 20 percent; correct?
22   A.  I didn't know it.
23   Q.  On what basis do you think that they were
24 entitled -- ACCJ would lay claim to 20 percent of what
25 would be recovered on Berganzo?

Page 40

1    A.  Will you repeat the question, please?
2    Q.  What made you think that the ACCJ would get 20
3  percent of the proceeds of the Berganzo complaint?
4    A.  Because the nature of the lawsuit was based on
5  the 20 percent of the original claimant and Center
6  agreement.  So if the Center would get 20 percent, which
7  I didn't know Mr. Ambush did pay them, whatever was
8  recovered from Mr. Ambush, which were the fruit of the
9  poison tree, right, he got this money.
10       So if they recovered it, it makes sense that
11 the basis for this award was controlled by the claimant
12 and Center agreement.  So if I would recover $4 million
13 from Mr. Ambush, then the same agreement governs.
14 Because it's the same contractual relationship.  So the
15 Center will get the 20 percent.
16   Q.  You didn't realize that the Center had already
17 gotten the 20 percent on that money?
18   A.  I didn't know that at all.
19   Q.  Okay.  So we were talking about why it is you
20 didn't finish the Berganzo litigation.  You said that
21 Mr. -- you said you were getting ready to leave for
22 Los Angeles?
23   A.  Well, before that.
24   Q.  Before that.
25   A.  I sort of -- I sort of -- I was working

Page 41

1  actively on the claims.  And I was in a bind because the
2  Center wasn't compensating me.
3    Q.  And you had no agreement that required them to
4  compensate you; correct?
5    A.  No.
6    Q.  Right.
7    A.  So I wasn't answering that much or -- you know,
8  I was just like keeping them abreast of any new
9  developments.  I didn't understand why if nothing was
10 happening to this particular client, because he will
11 know --
12       THE COURT REPORTER: He will know the what?
13       THE WITNESS: Federal Claims Commission.
14       THE COURT REPORTER: Okay.
15       THE WITNESS: It took long time.
16       THE COURT REPORTER: "It took a long time."
17 Thank you.
18       THE WITNESS: Right.  Took a long time.
19       So when they call you about the Aria's family
20 claim, which I didn't know at the time were Mr. Ambush's
21 clients, or if they called me about a claim that I made,
22 probably one or two that Mr. Ambush was not the
23 attorney, and I informed them yesterday about what's
24 going on, and then today they call you and ask you the
25 same question 20 times, it was like they were

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 12 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 42

1  suspicious.  I think they were thinking that I was going
2  to keep the cases.
3  BY MS. DOBIN:
4  Q.  And not pay them?
5  A.  Yes.
6  Q.  Okay.
7  A.  I realize that later, after I was out of the
8  picture.  So I started to see this -- you know, they
9  insisted -- I started to see some kind of suspicion.
10  I never harbored the intent of keeping these
11  clients because I believed in the fact that they were
12  going to eventually compensate me.  But if they call you
13  for the same thing, about the same family 20 times
14  during the week, I was not going to answer it.  I just
15  kept them abreast of the developments.
16  And one day they showed up in Puerto Rico all
17  of a sudden.  They didn't tell me anything.
18  Q.  Who showed up?
19  A.  Perr, Engelberg.  And finally I met personally
20  Neal Sher.
21  Q.  Okay.
22  A.  Backtracking, I should also clarify that when
23  we would go and visit the families to sign the power of
24  attorney for Mr. Engelberg or to sign any document, any
25  document, as soon as I said this family called me, I'm

Page 43

1  going to visit them and see them, Engelberg would fly
2  the next day.
3  I said, "No.  You're not going there except
4  when I'm in Puerto Rico."
5  So I have to wait for him to come.  And he
6  would have to be in my trips.  As a matter of fact, I
7  made two or three trips.  And he was in my car.  And he
8  always went to Puerto Rico.
9  "I'm going tomorrow.  I'll be there in morning.
10  You pick me up in the morning and then we're going to
11  see this family and have them sign."
12  Anyway, in answer to your last question, they
13  showed up.  And my rabbi said, Rabbi Zarchi said,
14  "Rabbi Perr is here with Engelberg and Neal Sher."
15  I don't recall if at that time the relationship
16  was already -- I knew that something was going on
17  because I believe that -- probably I had like a very
18  heated argument with Engelberg because of that issue.  I
19  don't have to -- you know, you don't have to call me
20  every day for the same thing or something like that.
21  So they showed up.  And I went with Rabbi
22  Zarchi.  Specifically, he wanted to go with me.  I know
23  that it was at the Hampton Inn in Isla Verde.  It's
24  close to where I live.  Close to where the synagogue is.
25  And in the lobby was, like I said, Perr,

Page 44

1  Engelberg and Neal Sher.  Mr. Sher didn't look very
2  happy.  He looked a little bit aggressive.
3  I sat down with the rabbi.  And right off the
4  bat, right off the bat he said, "We are here to take
5  your cases because they're not your cases.  They're the
6  Center's cases.  I want the files."
7  And he made some disparaging comment about my
8  person.  I don't recall it exactly.  I don't know if he
9  said, "You drunk" or something like that.  "You drunk.
10  You give me" --
11  I said, "Wait a minute."  I don't want to say
12  it in a deposition.  Because even though I'm religious
13  Jew, I'm still Puerto Rican brought up in the Bronx.  So
14  you know what I will tell him.
15  But the rabbi was there.  And Rabbi Zarchi
16  said, "Wait a minute.  What are you saying?  That's out
17  of line."
18  And I said, "Whoa, whoa, whoa.  Wait, wait,
19  wait."  I saw an escape route.
20  I said, "You think that I want to -- you think
21  that I'm going to keep the cases?  Is that why you are
22  constantly bothering me and calling me and calling to
23  Puerto Rico every time I go see a client?  Do you think
24  I want to keep those cases?  I thought that you were
25  going to compensate me for the cases, and you're not

Page 45

1  doing it."
2  "You know what?  I'm going to go to the office
3  right now and I'm going bring all the files here in this
4  hotel.  So wait for me for half an hour because I don't
5  want nothing to do with the Center.  I don't want your
6  money anymore.  You're not paying me.  You always
7  suspect that I'm going to steal your clients.  I'm sick
8  and tired of this."
9  And I went to my office in Carolina.  And I
10  brought the files and I gave it to them.  And I was so
11  relieved.  And I never, ever heard about them since.
12  Q.  And that was the summer of 2010?
13  A.  Yes.
14  Q.  Okay.  Did you stay in touch with anybody about
15  ACCJ for the next, let's say, five years, from 2010 to
16  2015?
17  A.  Yes.
18  Q.  Who did you talk to?
19  A.  In particular, a claimant that eventually --
20  because we believed in what we were doing at the
21  beginning.  She became my friend.
22  Q.  Who was it?
23  A.  Lourdes Guzman.  The spokesman for the Guzman
24  family.
25  Q.  Spokeswoman for the Guzman family.

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 13 of 53
American Center for Civil Justice, Inc. vs.    JAVIER LOPEZ-PEREZ
Joshua M. Ambush    June 18, 2019

Page 46

1    A.   Spokeswoman.  Yes.  I stand corrected.
2    Q.   So how long were you in touch with her?
3    A.   For five years.  We became friends.
4    Q.   Okay.
5    A.   You know, we became -- I remember she -- one
6  day she wanted to see me.  I don't remember for what
7  reason.  But it had to be related with the case.  I
8  believe it was related to the -- to the -- it was
9  related to --
10   Q.   The estate court case?
11   A.   The estate court case.  Exactly.
12   Q.   For the record, there was a state court case
13  that broke out among the heirs of the estate of Guzman
14  that she was involved in.  That we refer to, those of us
15  that discuss it, as the Domenech case.
16   A.   Domenech case.  Yeah.  I wasn't an attorney in
17  that case.
18        Like I said, because we met and we developed a
19  friendship, she will keep me abreast.  One time she --
20  we met at the house because she was in the area.  I
21  think she was in the beach or something with her family.
22  And I lived at the beach close to the synagogue.  She
23  went and met my wife.  We shared socially a couple of
24  times.  I kept in touch with her, yes.
25   Q.   Did she talk to you at all about her ongoing

Page 47

1  relationship with ACCJ and her issues relating to her
2  relationship with Joshua Ambush?
3    A.   Yes.  I remember that she talked about the case
4  and about the -- you know, it was always the same thing.
5  Specially when I was still in good terms with Perr and
6  Engelberg.  It was about -- she kept me abreast of some
7  procedural schedules in the case, so to speak.  Yeah,
8  she would talk about, you know, Ambush.  You know, "He
9  stole from us.  I'm going to get him."
10   Q.   She believed that?
11   A.   Yeah.
12   Q.   Did you ever tell her otherwise?
13   A.   No.  Because at the time I thought the same
14  thing.
15   Q.   Okay.  So since 2012, have you been contacted
16  at all by Elie Perr, Jed Perr, Michael Engelberg or Neal
17  Sher?
18   A.   No.
19   Q.   How did you come to realize that the
20  allegations that you made in the Berganzo suit were not
21  accurate?
22   A.   Upon -- initially upon learning of the -- I was
23  at home in Washington when I received the subpoena.
24   Q.   In this case?
25   A.   In this case.

Page 48

1        At the time I was in cancer treatment.  And I
2  spoke to -- I believe his name is -- I don't know if
3  it's your firm.  But Mr. Ambush is also -- they were
4  coordinating through this law firm in Puerto Rico my
5  subpoena.
6    Q.   Mr. Sosa?
7    A.   Mr. Sosa.  I spoke to him.
8        MR. NEUMANN:  Can we just get a time frame, for
9  the record.
10       THE WITNESS:  Well, the subpoena was served
11  three, four months ago.  Two, three months ago.
12  BY MS. DOBIN:
13   Q.   Probably February?
14   A.   Yeah.  Sosa will have the date because he
15  served me with the subpoena.
16   Q.   Right.
17   A.   I spoke to him.  He explained to me that there
18  was a bankruptcy case.  That's the first time I learned.
19  It was in New Jersey.  I remember speaking to him.
20       Right off the bat, I said -- because he said,
21  you know, if in lieu of the subpoena if you produce, you
22  know, some documents as per the subpoena, we probably
23  consider -- you know, if we need the depo, we will
24  notify you.
25       I explained to him, I said, "Sosa, I am sick

Page 49

1  with cancer in my vocal cords.  I'm receiving intensive
2  radiation therapy in Seattle."  At that time I could
3  hardly speak.  I'm beginning to speak now.
4        But let me tell you right off the bat so you
5  can tell the New Jersey attorneys.  This happened around
6  10 years ago.  I know I did letters.  And I drafted
7  powers of attorney for -- as dictated by Engelberg.  And
8  agreements as dictated with the permission, and clauses
9  dictated by Engelberg.  We signed some people.
10       And that's about what -- was in a computer and
11  CPU that was 10 years old in an office that I shared
12  with a friend of mine, and it was his computer, 10 years
13  ago.  So whatever documents I have, the only way that
14  I think that I can help you is by sending emails.
15  Because I know that in a Gmail I recreated a file for
16  ACCJ.
17       And all the ACCJ related emails included with
18  the attachments will go into that.  So I can explore
19  that and see if I have anything.
20       I recall that I -- we spoke, like, for half an
21  hour.  He basically went through a summary.  I narrated
22  for him a summary of what was my encounter with the ACCJ
23  on the phone preliminary.  I said same thing.  Nothing
24  as detailed as here.  I met them.  Rabbi Zarchi
25  introduce them to me and then I left.  You know, that

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 14 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                              June 18, 2019

Page 50

1  time span.  Then I left to Los Angeles.  And that was
2  it.
3          I didn't finish the court case of Berganzo
4  versus Ambush.  I believe that attorney -- the attorney
5  named David Efron finished it.
6          THE COURT REPORTER: An attorney named who?
7          THE WITNESS: David Efron, E-f-r-o-n.
8          THE COURT REPORTER: Thank you.
9          THE WITNESS: And this is -- and I had the
10 subpoena.  So, of course, I'm a federal attorney.  So
11 after hanging up I went to Pacer.  I looked at the
12 bankruptcy docket.  And then I saw some of the
13 allegations, some of the exhibits.
14         So I did a research.  I ended up looking at the
15 document of the ACCJ versus Ambush case.
16 BY MS. DOBIN:
17 Q.  The one in the District of Columbia?
18 A.  Yes.
19         I started getting familiar with -- I started
20 seeing angles that I've never seen before when reading
21 the allegations.  And also I believe I saw another case
22 where Mr. Ambush was the plaintiff, I believe.  So I was
23 just reading from Pacer and jumping from case to case,
24 and going like, whoa.
25         So that's when I learned, and it made sense to

Page 51

1  me at the beginning because I subsequently during this
2  couple of days I met with Mr. Ambush.  And I saw some of
3  the same pleadings.
4          And then I saw that he wasn't keeping money.
5  He was paying the Center the 20 percent.  He honored
6  that.  I didn't know that.  And then he made retainer
7  agreements because he's the attorney in the case for 30,
8  so that he could give 20 to the Center and keep 10 for
9  himself.  And the 20 percent that the Center was
10 supposed to get was minus expenses.
11         And that's when I started learning about the
12 percentage, which is the answer to your question.
13 Q.  Okay.  You mentioned David Efron.  Did you talk
14 to David Efron about the Berganzo complaint after he
15 took over?
16 A.  Only once.
17 Q.  And what was the substance of that
18 conversation?
19 A.  The substance of that conversation was that
20 I -- it was a conversation born out of frustration, I
21 believe.  I spent all these months working.  I was never
22 adequately compensated.  I drafted the Berganzo versus
23 Ambush complaint in Federal Court.
24         I learned -- I don't recall how I learned.  But
25 eventually I learned -- because what I was thinking is,

Page 52

1  as a typical attorney, I guess.  What I was thinking
2  was, hey, I made this complaint.  And I worked for these
3  clients.  David Efron took over.  And I heard that he
4  had won the case.  I don't recall how I learned about
5  it.  I don't know if -- how did I learn about it?
6  Probably -- I believe it was a friend of mine which also
7  practices in federal court like me, another litigator.
8          And he said -- yes.  Yes, I remember.  And he
9  told me, "You know what?  Efron won the case."
10         And, of course, my mentality is being referral
11 fees.  Referral fee.  So I did contact him.  I think it
12 was by -- I don't think it was by phone.  I think it was
13 an email exchange.  And I said --
14 Q.  Let me give you something to look at.
15 A.  Yeah.
16         (Whereupon the document was identified
17          and marked as Defendant's Exhibit JLP5.)
18 BY MS. DOBIN:
19 Q.  So, Mr. Lopez-Perez, the document that's been
20 marked as JLP5 was produced to us by Mr. Engelberg in
21 his document production.
22         Does this refresh your recollection as to what
23 happened -- I'm going to give you a minute to read
24 through that.
25 A.  Yes.  Thank you.

Page 53

1          THE COURT REPORTER: While he's reading through
2  that, I'm going to use the girls room, if that's okay?
3          MS. DOBIN: That's fine.
4          (Whereupon a short recess was taken.)
5
6
7             EXAMINATION RESUMED
8  BY MS. DOBIN:
9  Q.  Back on the record.
10         Mr. Lopez-Perez, you took the opportunity to
11 read this email.  Can you describe the circumstance
12 under which the email that's been marked JLP5 was sent?
13 A.  Yes.  I'm trying to chronologically organize
14 it.  I see that --
15 Q.  There's a very old portion of it --
16 A.  Yes.
17 Q.  -- from 2010.
18         I'm more interested in the things that happened
19 in June 2012.
20 A.  Yes.  In June 2012 -- in June 2012 -- June 26.
21 Okay.  I was keeping -- of course, it was my rabbi.  So
22 not only because of this, but because of my affinity and
23 my love for his family and him as well, I was always
24 calling from Los Angeles to Rabbi Zarchi.  And sometimes
25 we talk about the pending cases.

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 15 of 53
American Center for Civil Justice, Inc. vs.                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                              June 18, 2019

Page 54

1    Because I believed that they had found Efron
2    through his referral of my case to him. I learned that
3    later. So I knew that Efron was making -- was working
4    on what I left, so to speak, in Puerto Rico. And more
5    probable than not Mendel will know about it.
6    Q.   "Mendel" being Rabbi Zarchi?
7    A.   Yeah.
8         So I write an email to Zarchi saying, "What's
9    the status of the claims? Have we been compensated?"
10        And then I -- that's when I -- in that time
11   frame I learned that Efron had won the case. So I write
12   to him an email telling him --
13   Q.   I see on the first page it says, "David should
14   pay me the usual referral fee between attorneys."
15   That's at the bottom of the first page, No. 2. Right
16   here.
17   A.   Yes. Because I didn't know that he had won.
18   So I'm saying -- you know, because I knew he had
19   communications with Efron because he's a member of the
20   Jewish community.
21   Q.   David Efron is, as well?
22   A.   Yes. He's not religious. But he is a big
23   contributor to Chabad of Puerto Rico.
24   Q.   Rabbi Zarchi --
25   A.   Yeah. Because we started out in a rented

Page 55

1    rundown house. And the dream of the whole community and
2    Rabbi Zarchi was to build a very nice majestic synagogue
3    in Puerto Rico. The first of its kind. Which he even
4    told me he had a bunch of donors, of course. A lot of
5    fundraising. A lot of wealthy Puerto Rican Jews and
6    people from New York making big contributions.
7    Q.   And David Efron was one of those people?
8    A.   Oh, yes.
9    Q.   So do you think that -- do you know whether or
10   not David Efron took over the Berganzo case as a result
11   of his relationship with Rabbi Zarchi?
12   A.   Yes. Because, remember, just like when Perr
13   and Engelberg went to Puerto Rico the first time because
14   they didn't know anybody, an attorney that speaks
15   Spanish, preferably Jewish, and found me in my accent.
16   Most probably, this is speculative, they called Zarchi,
17   of course, because they didn't know Efron at the time.
18   And Zarchi said, "I got a lawyer for you. David Efron."
19   Q.   So Zarchi was surprised when you were told that
20   you were no longer going to work the cases anymore
21   during that meeting that you described in the hotel
22   lobby?
23   A.   Yes.
24   Q.   All right. So David Efron, was he identified
25   as the person who would take these cases over from you

Page 56

1    at that time?
2    A.   No. No. I learned about David Efron after I
3    was in Los Angeles.
4    Q.   Okay.
5    A.   Yeah.
6    Q.   So did you ever correspond with David Efron and
7    ask him for a referral fee for the money he got in
8    Berganzo?
9    A.   That's what I'm saying. I remember an email.
10   I remember an email. It was an email. Yes. I think it
11   was -- if my memory doesn't fail me, after June 29.
12        Because I didn't see anything happening in
13   terms of Zarchi, you know, intervening on my behalf to
14   see if -- you know, if Efron would give me at least a
15   referral fee.
16        And I found this email through the internet. I
17   sent him an email. "I'm Javier Lopez. As you will
18   know," something to that effect. I was the attorney
19   that was working with these claimants in Puerto Rico.
20   And because of professional and health reasons, I moved
21   to Los Angeles. It was like two years after I was in
22   Los Angeles I learned about this.
23        And I remember him answering me. And this is
24   the last communication I ever had with him. I know this
25   for a fact. I know that the email sort of said, "Hey,

Page 57

1    right now I cannot help you or even talk about this,
2    Javier. Because simply I haven't had one penny. I
3    don't have one penny from anybody. And the case is
4    being appealed."
5    Q.   Okay.
6    A.   "So that's why I don't have the money." That's
7    what he told me.
8    Q.   Did you ever follow the appeal or figure
9    anything else --
10   A.   No.
11   Q.   -- from there?
12   A.   No.
13   Q.   What about this email, JLP5?
14        It says, "The cases before the US Libya
15   Commission are 10 percent of what they get for us."
16        So did you ever get money relating to those
17   claims that you put in?
18   A.   Never.
19   Q.   Now, the email that's at the very end of this
20   email chain is from 2010. May of 2010.
21   A.   Uh-huh.
22   Q.   During that time, that's when you were actively
23   working with or on behalf of ACCJ; right?
24   A.   With Neal, yes.
25   Q.   So do you remember what this email was about

Case 1:15-cv-01237-EGS   Document 29-1   Filed 12/29/23   Page 16 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 58

1  from May 25, 2010?
2   A.  Yes.  Neal, Mr. Sher, I believe wanted a
3  complete -- and this was before what I call the coup
4  d'etat in the hotel with Sher.  I never met him before.
5  I didn't know him personally on this date.
6        He is, now that I think about it, just
7  preparing for the strike.  Because he's asking me here.
8  I want the status of all this.  That's basically what
9  this is.  This was like a month before they came to
10  Puerto Rico to take the cases away.
11   Q.  So this is the list of 14 claims that you had
12  put in front of the Commission that you had identified
13  through your efforts with the ACCJ?
14   A.  I believe so.  Yes.
15   Q.  Did you ever demand that the ACCJ pay you
16  because of those claims had generated funds or for any
17  other reason?
18   A.  I didn't know that they had been compensated.
19  I sort of gave up while I was in Los Angeles.  I was
20  already starting to work.
21        The only thing I could do there -- because I
22  wasn't a California licensed attorney -- was do
23  immigration law, which I did.  That kept me alive for
24  years.  I learned it on the go.
25        I was so busy in my life, I just forgot about

Page 59

1  all this matter.  Once I got the email from Efron that
2  the case was on appeal -- I even stopped talking with
3  Mendel Zarchi for years.
4        So I just -- no, I never told the ACCJ, hey,
5  which one of these -- for example, which one of these 14
6  cases have been settled with the Federal Claims
7  Commission?  I need my percentage.  You never paid me
8  for this.  I never did that.
9   Q.  Okay.
10   A.  No.
11   Q.  Have you ever spoken with Lourdes Morera?
12   A.  Who?
13   Q.  Lourdes Morera.
14   A.  I don't think so.
15   Q.  She's an attorney in Puerto Rico.
16   A.  I don't think so.
17        I remember there was a female attorney that --
18  I don't know if she was approached by the Center or not.
19  But I -- in all candor, this is one of the instances
20  where memory is a little bit blurry because it was sort
21  of fleeting.  Like one or two conversations with a
22  female attorney.  I believe it was concerning -- oh,
23  probably she was an attorney -- probably she was an
24  attorney in the Guzman state court case.
25   Q.  Okay.

Page 60

1   A.  It was a female, I believe, involved there.
2  She had to -- what they call declaratoria de
3  herederos --
4        THE COURT REPORTER:  Okay.  Time out.
5        THE WITNESS:  Declaratoria de --
6        THE COURT REPORTER:  I speak Spanish, but I
7  need some help here.
8        THE WITNESS:  Declaratoria.
9        THE COURT REPORTER:  Go on.
10        THE WITNESS:  De.
11        THE COURT REPORTER:  Yeah.
12        THE WITNESS:  Herederos.
13        THE COURT REPORTER:  That's the word I don't
14  know.
15        THE WITNESS:  Herederos, H-e-r-e-d-e-r-o-s.
16        THE COURT REPORTER:  Thank you.
17        THE WITNESS:  It's translated like an heirs
18  declaration.
19        MS. DOBIN:  Like heirs of the deceased in the
20  estate.
21        THE WITNESS:  I think she was involved in that.
22  I don't even remember the substance or the content of
23  the conversation.  But I believed it was related to the
24  Guzman case.
25  ///

Page 61

1  BY MS. DOBIN:
2   Q.  Now, you continued to stay in touch with
3  Lourdes Guzman?
4   A.  Yeah.
5   Q.  Even on a friendly basis, did you provide her
6  with just your opinion of what was happening in the
7  state court case involving all the heirs of the Guzman
8  estate?
9   A.  No.  She was just using me as her handkerchief
10  for her tears.  She would just tell me, "You know what
11  happened?  This family member is against me."  It was
12  all -- she will just call me to vent.  Family gossip.
13        Of course, you know, at the beginning
14  everything was concentrated on the sinister figure of
15  Joshua Ambush screwing everybody.  And it ended up her
16  having problems with the Center, I believe, or with
17  Efron or the family members.
18   Q.  Okay.  She expressed some displeasure with the
19  Center?
20   A.  Yes.  At the end she was tired of everything;
21  with the Center, with Efron, with her squabbles and
22  fights with other members of the family.  She just had
23  it at the end.  Yeah.
24   Q.  Do you ever hear about a settlement between
25  ACCJ and Joshua Ambush that happened in 2012 before you

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 17 of 53
American Center for Civil Justice, Inc. vs.                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                              June 18, 2019

Page 62

1    got the subpoena?
2         Did you ever hear about that settlement between
3    ACCJ and Joshua Ambush?
4    A.  They never told me there was a settlement in
5    this case.  Never.
6    Q.  So is it fair to say that for five years or
7    more you had not really thought about ACCJ before you
8    got the subpoena?
9    A.  More than five years.
10   Q.  Okay.
11        MS. DOBIN: I want to take a minute.  I might
12   be able to wrap this up.
13        (Whereupon a short recess was taken.)
14
15
16        EXAMINATION RESUMED
17   BY MS. DOBIN:
18   Q.  I have a few follow up questions and then I
19   will see if Mr. Neumann has any questions for you.
20        On Exhibit JLP5, which is the email, the very
21   end of the list which has the list of all the claims
22   that you had put in with the Federal Claims Commission,
23   at the urging, let's say of ACCJ.
24        No. 3 is Elba Delgado Gonzalez.  Do you
25   remember her?

Page 63

1    A.  Yes.  Well, I think so.  Yes.
2    Q.  Do you remember --
3    A.  I remember -- I used to remember her because
4    Delgado is my uncle's last name.  And I used to joke
5    about that.  Yeah.
6    Q.  Do you remember the nature of her claim?
7    A.  I wouldn't be honest if I will tell you that I
8    know it's either injury or death case.  I don't recall.
9         MR. NEUMANN: They all are; right?  One or the
10   other.
11        THE WITNESS: This particular one, I don't know
12   if it's specifically injury or death case.
13   BY MS. DOBIN:
14   Q.  So looking at this bottom.  You see starting at
15   No. 8.  These are all -- these all say "Estate of."  So
16   I would think that --
17   A.  Oh, yeah.  I got you.  Yeah.
18   Q.  Those would be the death cases; right?
19   A.  Logic.  Logic.
20   Q.  I'm trying.
21   A.  Yeah.
22   Q.  Does that help you at all?
23   A.  Yeah.  It must be an injury case.
24   Q.  Now, when you would take in one of these claims
25   based upon calls from either the article or the

Page 64

1    advertisement, I believe I asked you before.  But just
2    refresh my recollection.
3         Did you ask them whether or not they had
4    another lawyer handling the claim for them?
5    A.  They would volunteer that information.  Because
6    they were alarmed by the article and the advertisement.
7    So because of the -- can I digress for a minute?
8    Q.  Sure.
9    A.  I just now remember that I went to a radio show
10   and talked about -- yeah.
11   Q.  You're radio star?
12   A.  Yeah.  I went to a radio show.  And it was
13   because -- of course, the community -- the Jewish
14   community surrounding Chabad, they were all my friends.
15        During Shabbat, you know, in a Shabbat dinner,
16   you know, they would approach me.  The people are
17   fascinated by attorneys and the law and whatever.  And
18   they will ask me, "Hey, Javier, you know about the
19   Israel case?"
20        And the Lod Massacre, I mean, this is like a
21   national day of mourning for a lot of people in
22   Puerto Rico.  They were very interested.
23        So these three guys, they had a show.  But it
24   was sort of a Zionist radio program.  I believe it was
25   on Tuesday nights in a radio station covering the whole

Page 65

1    island in Puerto Rico.  And they knew about my
2    intervention in whatever nature it was with the victims
3    or the families.
4         They were very interested in me going to their
5    show, and I did.  And they just interviewed me.  Sort of
6    like, "We have Javier Lopez here.  He's an attorney.
7    He's involved in working with the victims and their
8    families in the cases."
9         And I was -- I remember, to be very honest,
10   during the show the Ambush thing didn't come up.  During
11   the show, it was like this is what happened.  And we are
12   pursuing claims for victims.
13   Q.  So it's great.  It's more federal claims, just
14   to be broad?
15   A.  Yeah.  At the end they said this is Javier
16   Lopez.  If you have a question or if you want to
17   consult, this is his phone number.  I don't know if I
18   got any clients from that show, specifically.
19        MR. NEUMANN: What was the time?  When did that
20   happen?
21        THE WITNESS: I think most of these claims were
22   already filed.  So it must have been probably summer of
23   2010.  Yeah.
24        But, again, most of them volunteered it.  Like,
25   you know, "I saw your ad," you know, licenciado, you

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 18 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                        June 18, 2019

Page 66

1  know, attorney. "I didn't know that Ambush did this to
2  us. I would like to see you." They will say it. I
3  wouldn't say, "Is Ambush your lawyer?" The answer is
4  "no."
5  BY MS. DOBIN:
6      Q.   So if they said that they didn't realize that
7  Ambush had done this, did you tell them they had to fire
8  Ambush in order to retain you in order for you to help
9  them?
10     A.   Let me recall. I will tell them -- I will tell
11  them would you like -- either they will say we would
12  like to speak to you, or I will say, "Would you like to
13  meet me?" And I would -- of course, I would -- I must
14  have told them, "If you want us to represent you, you
15  will have to sign a document or send a letter to or
16  communicate with Mr. Ambush that he's no longer your
17  attorney."
18     Q.   Except for the fact that you weren't having
19  them sign a retainer letter with you or ACCJ. So why
20  was that necessary?
21     A.   Well, first of all, once I knew that Ambush was
22  the attorney, then Engelberg will instruct me to -- he
23  will come so we could go to the family, sign the power
24  of attorney to the Center, to Engelberg, and also sign
25  the agreement.

Page 67

1      Q.   Were you at all concerned about the rules of
2  professional conduct that say that lawyers are not
3  supposed to talk to clients who have counsel?
4      A.   The thing is that at the time I thought that
5  what Ambush was doing was a scheme, and that it was
6  illegal, that it was not ethical, you know, stealing
7  money from clients.
8          I did not approach the client directly at the
9  beginning to lure him out. I put an advertisement. And
10  they would call me saying that they wanted to see me.
11  And then trying to comply with the rules of ethical
12  conduct, I said you have to let him know that he's no
13  longer your attorney, and then we will sign the power of
14  attorney and an agreement with the Center.
15     Q.   Did you follow up to make sure that that
16  happened, that they did actually fire Mr. Ambush?
17     A.   To be honest, I probably just assumed it, if
18  they were allowing me to file a claim for them.
19     Q.   So did you foresee a circumstance under which
20  Mr. Ambush and you, for example, or Neal Sher or David
21  Efron would be representing the same client?
22     A.   Yeah. I envisioned it.
23     Q.   Did you do anything to protect against that?
24     A.   No. I guess I let -- I was going to let ACCJ
25  handle that issue.

Page 68

1      Q.   Knowing that ACCJ didn't want Joshua Ambush
2  involved in this process, you were going to let ACCJ
3  handle the issue?
4      A.   Okay. This was my train of thought. Probably
5  wrong, but this is what I thought.
6          At the beginning this guy has this scheme.
7  He's screwing up these Puerto Rican victims and their
8  families. That's illegal. I'm going to make an
9  advertisement. I'm going to stop this injustice under
10  the instructions of Engelberg. I was going to be
11  instrumental in helping these people, according to their
12  theory of facts.
13         I'm going to put the ad. They will call me.
14  Like I said, I was -- at this point when I started
15  receiving calls, I didn't have any idea of their
16  agreements with Joshua Ambush. They will tell me.
17  Because I didn't know anybody or where they lived.
18         "I'm one of the persons that signed an
19  agreement with Ambush."
20         I said, "Well, he was not supposed to, you
21  know, take away -- to get any monies from your claim if
22  it was already resolved or if it was pending. You have
23  to be careful because any agreement that you will make
24  with Ambush, that money belongs to the Center because
25  Ambush is getting paid by the Center." That was my

Page 69

1  impression.
2      Q.   Even though you weren't getting paid by the
3  Center, you still believed that Ambush was?
4      A.   Yes. That he had been paid. That he had been
5  paid by the Center.
6      Q.   And that's what you were told?
7      A.   Yeah.
8      Q.   Okay. Now, as far as payment goes, you got
9  this referral through Rabbi Zarchi.
10         Were you obligated to give him any money as a
11  result of -- you know, even sort of an understanding as
12  a result of your relationship, you got the opportunity,
13  although it dissolved, but the opportunity to get money
14  through these large numbers of claims, did you owe money
15  to Rabbi Zarchi as a result of that?
16     A.   I didn't owe him any money.
17     Q.   Or the Chabad?
18     A.   Yeah. I wasn't -- I didn't owe Chabad or him
19  any money. The thing is that as a good Chabadnik, I
20  wanted to help the synagogue in what I said. Remember
21  when I said at the beginning about the efforts to raise
22  funds and money? For me that was a sacred duty. So I
23  know that I -- before leaving Los Angeles...
24     Q.   Leaving for Los Angeles or leaving Los Angeles?
25     A.   For Los Angeles.

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 19 of 53
American Center for Civil Justice, Inc. vs.                          JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                          June 18, 2019

Page 70

1    Q.  Okay.
2    A.  Before I was leaving for Los Angeles -- because
3  I left cases pending that, I guess, Neal Sher was taking
4  care of at this point.
5        But the Center promised -- I pledged any
6  recovery that I would have, if any, and that shows my
7  eye toward his relationship.  I just didn't want to
8  know -- have anything to do with them anymore.
9        And I said whatever I recover, I want -- it was
10  like a unilateral declaration of my will.  You know, it
11  was like an agreement within the parties.  I said
12  whatever I recover, if anything, I give it to Rabbi
13  Zarchi.  I want these moneys to be given to Chabad of
14  Puerto Rico.
15    Q.  So you assigned your right to payment --
16    A.  Yes.
17    Q.  -- to Chabad?
18    A.  In the Federal Commission cases.
19    Q.  Okay.  Do you know whether or not the Chabad
20  got paid?
21    A.  I just learned that they did.  I didn't know.
22  I didn't know at all.  I actually told the rabbi about
23  it.
24    Q.  Did he confirm that they got paid?
25    A.  Yes.  I said I cannot believe that through my

Page 71

1  efforts, you know, me and, derivatively, the Lopez
2  family contributed close to $25,000 to the building
3  fund.
4        I spent in Puerto Rico a year and a half ago,
5  like six months because of the case.  And he never told
6  me, and it struck me as odd.  He never told me.  The
7  synagogue was already built and inaugurated.
8        I went to Puerto Rico.  I spent six months
9  there.  I met them.  He never told me.  And then when I
10  confronted him by text like two weeks ago, I said,
11  "Mandey, I cannot believe that."
12        And then he said, "Okay.  Yes, we did receive
13  it.  I just forgot to tell you.  Don't worry.  In the
14  dedication wall of donors we're going to put the
15  Lopez-Perez family."
16        I said, "Okay."
17    Q.  Did he tell you how much they got?
18    A.  I told him I sent -- I told him -- they told
19  me.  They didn't say who.  They told me, "You received
20  close to $25,000" out of my efforts.
21    Q.  Right.
22    A.  So I told him, yeah.  And he confirmed.  He
23  said yes.  But we were going to put a plaque with your
24  family name in the donor thing.
25    Q.  Have you determined whether, to your mind, that

Page 72

1  $25,000 is adequate compensation for the work that you
2  did?
3    A.  Oh, no.  Not at all.  Not at all.
4    Q.  Okay.
5    A.  I'm so ignorant about subsequent proceedings
6  and results.  I don't know how much the Center got, if
7  anything, for each case that was eventually compensated
8  for.
9    Q.  Of the 14?
10    A.  Yeah.  I don't know the amounts.  I don't know
11  which one was won.  I don't know which one was
12  dismissed.  I don't know how much they got.  I don't
13  know how much the clients -- the claimants got or the
14  Center.
15        It was much more.  It has to be much more.
16  Because, I mean, it was millions of dollars involved.
17  Millions.
18    Q.  Do you believe that ACCJ should pay you on an
19  hourly basis for the work you did or give you a portion,
20  some kind contingent fee on the money that they
21  recovered?
22    A.  I believe that -- you know, Sister Counsel, at
23  the beginning, like I said, I billed them by the hour
24  just one invoice in this important matter of dealing
25  with millions and millions of dollars.  I was so naive.

Page 73

1  Probably $100 an hour or something like that.  I don't
2  know.
3        And they were like -- they raised hell.  I
4  don't know the rationale.  But they said, "Don't you
5  ever, ever in the rest of your life dare to send me an
6  invoice invoicing the American Center for Civil Justice.
7  Ever."
8        So when the relationship was turning so sour, I
9  was thinking you know what?  It looks like with Chabad,
10  you know what?  I should be compensated with a
11  percentage of each case.  And then I was so despondent
12  after years past, like I said.
13    Q.  Right.
14    A.  That I just -- until now that I know that
15  Javier Lopez contributed $25,000 to Chabad of Puerto
16  Rico.  I didn't even know.  But it should have been a
17  lot more.  It should have been a lot more.
18        MS. DOBIN:  All right.  I have no further
19  questions.
20        Mr. Neumann, do you have any questions for
21  Mr. Lopez-Perez?
22        MR. NEUMANN:  Yes, I do.  I have a few.
23  ///
24  ///
25  ///

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 20 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

Page 74

1    **EXAMINATION**
2    **BY MR. NEUMANN:**
3    Q.  I have a few.
4        You got served a subpoena around February or
5    March of this year; is that right, to appear?
6    **A.  Two or three months ago.  Yeah.**
7    Q.  Prior to getting the subpoena, did you have any
8    conversations with Mr. Ambush?
9    **A.  No.**
10   Q.  Nobody told you to expect a subpoena?  It just
11   arrived without you expecting it?
12   **A.  Yeah.  It just arrived.  Yeah.  I was**
13   **surprised.**
14   Q.  Okay.  And after you being served with the
15   subpoena, did you have any conversations with
16   Mr. Ambush?
17   **A.  After the subpoena?**
18   Q.  Prior to today and after the subpoena.
19   **A.  Yes.  We met -- we met approximately three**
20   **weeks ago.**
21   Q.  Where was that?
22   **A.  In my house in Washington State.**
23   Q.  Did you have any conversations with him prior
24   to that meeting?
25   **A.  Not prior to that meeting.  I tell you, they**

Page 75

1    were trying to contact me.  And, again, I was out of the
2    picture with radiation therapy.  And sometimes I
3    couldn't even answer the phone because I couldn't talk.
4        So I wrote an email to Mr. Sosa in Puerto Rico
5    saying that I was sorry that I couldn't comply with the
6    subpoena right now.  I wasn't, you know, hiding or
7    anything like that.  But, you know, hopefully I will get
8    better.
9        Then I had -- then they said about the, you
10   know, if I could send them some emails or documents.
11   They will study and see if they could assist me and not
12   having to come to the deposition.
13       And then Mr. Ambush contacted me and asked me
14   if we could talk.  I said sure.  And specifically we met
15   the day before yesterday and yesterday.
16   Q.  Okay.  So let me back up.
17       You met about three weeks ago, you said;
18   correct?
19   **A.  Yes.**
20   Q.  Okay.
21   **A.  Yeah, yeah, yeah.  Yes.**
22   Q.  And that was your first meeting with
23   Mr. Ambush?
24   **A.  Yes.**
25   Q.  And that was at your home?

Page 76

1    **A.  Yeah.**
2    Q.  Okay.  So how long did that meeting take place?
3    How long did that meeting last?
4    **A.  Half a day.**
5    Q.  "Half a day."  All right.
6    **A.  Yeah.**
7    Q.  What did Mr. Ambush tell you?
8    **A.  Basically he was asking me the same questions**
9    **that Sister Counsel is asking me, you know, background.**
10   **How do we meet?  How did I meet Perr?  And then he gave**
11   **me his version of events.**
12   Q.  What was his version of events?
13       MS. DOBIN: Objection.  Calls for hearsay.
14       Go ahead.
15       MR. NEUMANN: He's a party.  He's sitting right
16   here.
17       THE WITNESS: Basically, the gist of the
18   conversation was a clarification about the main issue
19   that I believed that he was wrong about at the time.
20   That it was about 20 percent.  And that he could never,
21   ever, ever take any additional percentage from the
22   clients in terms of what I stated before, which is that
23   they were his clients.  He's the attorney.  The Center
24   is not an attorney.  They're not attorneys.
25       He signed them.  He worked for them until they

Page 77

1    reached a settlement.  And they reached a retainer
2    agreement.  There was nothing that prohibited him having
3    a retainer agreement for 30 percent so that he could
4    give 20 to the Center after expenses and keep 10.
5        Because as a matter of fact, in the case -- and
6    I saw this.  This is not him telling me.  I read it.  In
7    the case -- I believe it was ACCJ versus Ambush in D.C.
8    I read the order from the judge.  I don't know if it was
9    Friedman, if I remember correctly.
10       He told the attorneys for the ACCJ, I don't
11   see -- as a matter of fact, he denied a preliminary
12   injunction because he didn't find anything wrong.  The
13   judge was even surprised that the Center got their 20
14   percent.  And they were still trying to prevent Ambush
15   from getting his part of the retainer agreement that he
16   reached as an attorney with his clients.
17       And that was the gist of the conversation.  And
18   then I said okay.  So you have 30 percent.  20 for the
19   Center.  They're satisfied.  And 10 for you.  That made
20   sense to me.
21   **BY MR. NEUMANN:**
22   Q.  Did you tell him that you had not been paid by
23   the Center?
24   **A.  I told him that day to pay me a very small**
25   **amount as compared to the work that I did.**

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 21 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

---

Page 78

1  Q.  Not as much as he thought you were entitled to?

2  **A.  I think they gave me in a period of -- from**
3  **2009 to 2010, probably $7,000.**

4  Q.  Which was much less than what you thought you
5  were entitled to; correct?

6  **A.  Hourly, of course.  And then when they didn't**
7  **pay me by the hour because they didn't want me to**
8  **invoice them.  For my efforts, yeah.  Quantum meruit, I**
9  **guess.**

10  **THE COURT REPORTER:** I'm sorry.  For your
11  efforts what?

12  **THE WITNESS:** Quantum.  I spell it for you.
13  Q-u-a-n-t-u-m.

14  **THE COURT REPORTER:** Quantum?

15  **THE WITNESS:** Yeah.  Meruit, m-e-r-u-i-t.

16  **THE COURT REPORTER:** Thank you.

17  BY MR. NEUMANN:

18  Q.  Did Mr. Ambush -- how did he respond to that,
19  your not being paid?

20  **A.  He said the same thing to me.**

21  Q.  Did he suggest that perhaps you should sue him
22  or file a claim in the bankruptcy case?

23  **A.  He didn't suggest it.  After speaking to him, I**
24  **was speaking to be my wife.  I said, "You know what?  I**
25  **should file the claim."**

---

Page 79

1  Q.  Are you going to do that?

2  **A.  I haven't decided yet.**

3  Q.  When did you first find out about the
4  bankruptcy case?  Was it when --

5  **A.  When I was served with the subpoena.**

6  Q.  When you were with the subpoena.  All right.

7  Did Mr. Ambush say anything negative about the
8  ACCJ in the course of your first conversation?

9  **A.  Well, if you could call negative his**
10  **allegations as filed in a court of law.  Those were the**
11  **exact -- but from Mr. Joshua Ambush, I have never, ever,**
12  **ever heard a curse or personal opinion -- negative**
13  **opinion about anybody.**

14  **He just says, you know, "It was unjust.  I did**
15  **my work.  They didn't pay me.  I reached agreements with**
16  **the clients.  I compensated the Center.  Yes.  And they**
17  **destroyed my life."  That's it.**

18  Q.  Did Mr. Ambush pay for your plane fare to get
19  down here today?

20  **A.  Yes.**

21  Q.  Are you staying over night?  Did he pay for
22  your hotel?

23  **A.  Yes.**

24  Q.  Did he pay you anything else?

25  **A.  No.**

---

Page 80

1  Q.  So after that, that first meeting that lasted
2  about half a day, then you -- how many more meetings
3  were there prior to today?

4  **A.  The day before yesterday and yesterday.**

5  Q.  Okay.  So let's start with the day before
6  yesterday.

7  Who else was at the meeting?

8  **A.  Only the two of us.  Mr. Ambush and myself.**

9  Q.  When did that happen?  Or where did that
10  happen?

11  **A.  It happened in Los Angeles in the hotel lobby**
12  **where I was staying.**

13  Q.  Okay.  And what was said at that meeting?

14  **A.  He just -- he just -- it was sort of a document**
15  **review.  He would just -- whatever he was telling me**
16  **about the claimant and Center agreement and about the**
17  **settlement in the ACCJ versus Ambush case with**
18  **Judge Friedman, he would -- it was intense.  I was**
19  **reading documents for two days.**

20  **He said, "Here is the settlement."  Because**
21  **I've never seen these documents in my life.  This is the**
22  **settlement agreement.  This is what Judge Friedman said**
23  **that he told the Center.  That they didn't have to**
24  **approach at all any of the people that had been**
25  **compensated or were to be compensated in the federal**

---

Page 81

1  case.  This is the document that shows this.

2  **And I spent -- as a matter of fact, I was**
3  **reading his complaint that I think was -- I don't know**
4  **if it was dismissed or not.  I'm not familiar**
5  **procedurally.  He's complaining it's the ACCJ, the other**
6  **Center related entities.  The complaint contained a**
7  **recall cause of action.  And I think the complaint was**
8  **dismissed, I believe.  I don't know.**

9  **But he gave me background of things that I**
10  **never heard about before.  I was reading the complaint**
11  **last night at midnight.  I read so much.  I basically**
12  **conducted a document review for 48 hours.**

13  Q.  It sounds like you did a lot of work.

14  **A.  Just reading.**

15  Q.  And you're not getting compensated for all that
16  work?

17  **A.  No.**

18  Q.  Do you have any arrangements to get compensated
19  for your appearance today or preparation for your
20  testimony?

21  **A.  No.**

22  Q.  You seem to do a lot of work where you don't
23  get compensated.

24  **MS. DOBIN:** I was thinking the same thing.  I
25  feel bad.

---

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 22 of 53

American Center for Civil Justice, Inc. vs.                              JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                           June 18, 2019

Page 82

1    **THE WITNESS:** Well, no.  I'm --
2  **BY MR. NEUMANN:**
3    Q.  That's not a question.
4    **A.  But I got a free trip to Los Angeles to see my**
5  **friends.**
6    Q.  Okay.  Then you -- how about Miss Dobin?  When
7  is the first time you spoke to Miss Dobin?
8    **A.  Today.**
9    Q.  "Today."  Here before we started?
10    **A.  Yeah.  Mostly social.**
11    Q.  Okay.
12    **A.  Introduction stuff.**
13    Q.  When is the last time, to the best of your
14  recollection, that you spoke to Michael Engelberg?
15    **A.  That day at the Hampton Inn with Neal Sher and**
16  **Rabbi Perr when I rushed to my office to gladly give**
17  **them the files back.**
18    Q.  And that was in 2010?
19    **A.  Yeah.**
20    Q.  Okay.  And same question for Eliezer Perr?
21    **A.  Same.**
22    Q.  Same thing?
23    **A.  Same situation.  Same day.**
24    Q.  And same with Neal Sher?
25    **A.  Yes.**

Page 83

1    Q.  Was Jed Perr at that meeting?
2    **A.  Who?**
3    Q.  Yedidiah Perr?
4    **A.  No.  Not the son.**
5    Q.  Did you ever talk to the son at all?
6    **A.  Never met any of the sons.**
7    **MS. DOBIN:** You still use handwritten notes.
8    **THE WITNESS:** I do the same.
9    **MR. NEUMANN:** All right.  I have nothing
10  further.  Thank you for your time.
11    **THE WITNESS:** Thank you, sir.
12    **MR. NEUMANN:** And your hard work.
13    **MS. DOBIN:** We're done.  Thank you.
14    **THE COURT REPORTER:** Do you enter into a
15  stipulation?  How do you handle this?  This is Federal
16  Court.  So remind me again?
17    **MR. NEUMANN:** We don't do anything.
18    **MS. DOBIN:** We don't do anything.
19    **THE COURT REPORTER:** So that means the original
20  goes to you, Ms. Dobin?
21    **MR. NEUMANN:** Right.
22    **MS. DOBIN:** If he wants his own copy, he can
23  pay for it.
24    **MR. NEUMANN:** Yes.  I do.
25    **THE COURT REPORTER:** You want your own copy.

Page 84

1  Wonderful.
2    (The deposition was concluded at 11:32 a.m.)
3    -oOo-

Page 85

1                    ERRATA PAGE
2  PAGE    LINE   CHANGES MADE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 23 of 53

American Center for Civil Justice, Inc. vs.                                      JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                        June 18, 2019

Page 86

1                    WITNESS'S CERTIFICATE

2

3

4          I, the undersigned, declare under penalty of

5    perjury that I have read the foregoing transcript, and I

6    have made any corrections, additions, or deletions that

7    I was desirous of making; that the foregoing is a true

8    and correct transcript of my testimony contained

9    therein.

10         Executed this _____ day of _____,

11   at _____, _____.
                    (City)                  (State)

12

13

14

15                    _____

16                        Javier Lopez-Perez

17

18

19

20

21

22

23

24

25

Page 87

1                    REPORTER'S CERTIFICATE

2    STATE OF CALIFORNIA       )
                               )  SS
3    COUNTY OF LOS ANGELES     )

4

5

6          I, CYNTHIA L. VARELA, a Certified Shorthand

7    Reporter, No. 5917 do hereby certify:

8          That the foregoing proceedings were taken

9    before me at the time and place therein set forth, at

10   which time the witness, JAVIER LOPEZ-PEREZ, was put

11   under oath by me;

12         That the testimony of the witness and all

13   objections made at the time of the examination were

14   recorded stenographically by me and were thereafter

15   transcribed;

16         I further certify that I am neither counsel

17   for nor related to any party to said action.

18         Dated this 9th day of July 2019.

19

20

21

22                    _____

23                    Cynthia L. Varela, CSR No. 5917

24

25

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 24 of 53

American Center for Civil Justice, Inc. vs.                                JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                              June 18, 2019

**$**

**$10,000 (1)**
19:24
**$100 (1)**
73:1
**$25,000 (4)**
71:2,20;72:1;73:15
**$3,000 (4)**
16:18;17:21,24;18:5
**$4 (1)**
40:12
**$7,000 (3)**
18:3;19:24;78:3

**/**

**/// (6)**
19:25;23:25;60:25;
73:23,24,25

**A**

**able (1)**
62:12
**abreast (4)**
41:8;42:15;46:19;
47:6
**accent (1)**
55:15
**accept (1)**
14:22
**ACCJ (62)**
4:21;6:10;9:14;10:8;
12:17,17;13:5,7,10,16,
19;15:18;16:15,16;
18:2,25;19:8,8;21:7;
23:16,24;12:26:9;
27:24;28:3,7,9,17;29:2,
18;30:7;36:3;37:17;
38:2;39:14,18,20,24;
40:2;45:15;47:1;49:16,
17,22;50:15;57:23;
58:13,15;59:4;61:25;
62:3,7,23;66:19;67:24;
68:1,2;72:18;77:7,10;
79:8;80:17;81:5
**according (3)**
14:17;32:5;68:11
**accounts (1)**
33:19
**accurate (4)**
32:8,10,12;47:21
**action (4)**
29:10,12;32:2;81:7
**actively (2)**
41:1;57:22
**actually (2)**
67:16;70:22
**ad (8)**
15:15,17;17:11;
18:21;24:20;26:2;

65:25;68:13
**adamant (1)**
18:17
**additional (3)**
32:3,4;76:21
**adequate (1)**
72:1
**adequately (2)**
34:20;51:22
**administrative (1)**
30:4
**admissible (1)**
20:14
**ads (1)**
19:6
**advertisement (15)**
14:25;15:8,19;16:6,
14,21;17:6;21:5;27:2,
23;29:14;64:1,6;67:9;
68:9
**affinity (1)**
53:22
**afterthought (1)**
33:9
**again (7)**
5:4;9:12;34:20;
37:17;65:24;75:1;
83:16
**against (7)**
4:17;19:19;23:10;
29:11;31:10;61:11;
67:23
**agent (4)**
18:2;20:7;24:17;
34:10
**aggressive (1)**
44:2
**ago (10)**
12:6;48:11,11;49:6,
13;71:4,10;74:6,20;
75:17
**agree (1)**
20:11
**agreed (1)**
32:5
**agreement (24)**
13:4,20;14:4;28:12,
14;30:7;32:6;36:19;
37:19;39:10;40:6,12,
13;41:3;66:25;67:14;
68:19,23;70:11;77:2,3,
15;80:16,22
**agreement' (1)**
32:3
**agreements (9)**
28:18;29:3;32:14;
33:1,4;49:8;51:7;
68:16;79:15
**ahead (3)**
20:11;21:19;76:14
**Airport (1)**
9:24
**alarmed (1)**

64:6
**alive (1)**
58:23
**allegations (4)**
47:20;50:13,21;
79:10
**alleged (1)**
31:13
**allegedly (1)**
30:7
**allow (1)**
10:23
**allowing (1)**
67:18
**although (1)**
69:13
**always (4)**
43:8;45:6;47:4;
53:23
**Ambush (72)**
4:17;13:14;14:14;
23:5,10,16,19;25:11,
14,16,24,25;26:4;27:3,
7,18,20;28:5;30:6,24;
31:10,24;33:1,5,10,17;
37:1,24;40:7,8,13;
41:22;47:2,8;48:3;
50:4,15,22;51:2,23;
61:15,25;62:3;65:10;
66:1,3,7,8,16,21;67:5,
16,20;68:1,16,19,24,
25;69:3;74:8,16;75:13,
23;76:7;77:7,14;78:18;
79:7,11,18;80:8,17
**Ambush's (3)**
28:2,7;41:20
**American (3)**
4:17;15:10;73:6
**among (1)**
46:13
**amount (2)**
6:7;77:25
**amounts (2)**
31:1;72:10
**and/or (1)**
25:4
**Andrea (2)**
4:16;20:15
**Angeles (16)**
19:4;34:13;40:22;
50:1;53:24;56:3,21,22;
58:19;69:23,24,24,25;
70:2;80:11;82:4
**angles (1)**
50:20
**Antonetti (1)**
7:21
**A-n-t-o-n-e-t-t-i (1)**
7:21
**anymore (3)**
45:6;55:20;70:8
**appeal (2)**
57:8;59:2

**appealed (1)**
57:4
**appear (1)**
74:5
**appearance (1)**
81:19
**appearing (1)**
5:1
**appears (1)**
19:8
**appellate (2)**
8:22;9:13
**appreciate (1)**
10:22
**approach (4)**
10:8;64:16;67:8;
80:24
**approached (2)**
32:21;59:18
**approximately (1)**
74:19
**April (2)**
19:2;22:10
**area (1)**
46:20
**argue (1)**
20:12
**argument (1)**
43:18
**Aria's (1)**
41:19
**Around (6)**
16:19;19:4;23:23;
34:5;49:5;74:4
**arranged (1)**
22:19
**arrangements (1)**
81:18
**arranging (2)**
23:1;24:24
**arrived (2)**
74:11,12
**arriving (1)**
9:24
**article (15)**
21:17,24;22:2,12,15,
24;23:2,8,22;24:9,20;
26:3;27:2;63:25;64:6
**asserting (1)**
29:12
**assigned (1)**
70:15
**assist (1)**
75:11
**assistance (1)**
9:21
**associate (1)**
8:6
**associates (2)**
9:2,4
**assume (1)**
5:16
**assumed (1)**

67:17
**attachments (1)**
49:18
**attorney (57)**
5:7,16;8:12,14;
11:12;13:1,2,4,7,14,22,
24;25:7;27:12,13;
33:10,15;36:8,11,13,
15,16,24;37:7,9,12,16;
38:6;15;41:23;42:24;
46:16;49:7;50:4,4,6,
10;51:7;52:1;55:14;
56:18;58:22;59:15,17,
22,23,24;65:6;66:1,17,
22,24;67:13,14;76:23,
24;77:16
**attorney/client (2)**
19:7;20:13
**attorneys (12)**
11:9;15:3,5;20:22;
26:9;27:15;33:9;49:5;
54:14;64:17;76:24;
77:10
**attorney's (1)**
31:1;33:16
**August (2)**
34:6,9
**author (1)**
23:8
**authority (1)**
38:10
**authorized (1)**
37:9
**average (1)**
18:23
**Aviv (1)**
9:24
**award (1)**
30:21,22;40:11
**awarded (1)**
31:1
**awards (1)**
14:2
**aware (2)**
28:2,5
**away (2)**
58:10;68:21

**B**

**back (8)**
5:4;17:4;18:19;
20:11;25:8;53:9;75:16;
82:17
**background (2)**
76:9;81:9
**Backtracking (1)**
42:22
**bad (1)**
81:25
**bankruptcy (6)**
4:18,19;48:18;50:12;
78:22;79:4

Case 1:15-cv-01237-EGS   Document 29-1   Filed 12/29/23   Page 25 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                      June 18, 2019

**baptized (1)**
  8:16
**based (3)**
  14:24;40:4;63:25
**basically (15)**
  8:21;13:23,24;14:2;
  15:1;35:24;36:7,9,10,
  13;49:21;58:8;76:8,17;
  81:11
**basis (5)**
  33:11;39:23;40:11;
  61:5;72:19
**bat (4)**
  44:4,4;48:20;49:4
**battery (1)**
  9:25
**beach (2)**
  46:21,22
**became (3)**
  45:21;46:3,5
**become (1)**
  21:10
**becoming (1)**
  9:4
**begin (1)**
  39:11
**beginning (13)**
  17:13;18:13;32:21;
  34:6;37:1;45:21;49:3;
  51:1;61:13;67:9;68:6;
  69:21;72:23
**behalf (4)**
  4:7;37:11;56:13;
  57:23
**behest (1)**
  30:17
**believing (1)**
  36:25
**belonged (3)**
  26:5;30:8,9
**belongs (1)**
  68:24
**Berganzo (16)**
  30:21,22;33:22;39:9,
  13,14,19,25;40:3,20;
  47:20;50:3;51:14,22;
  55:10;56:8
**Besides (1)**
  24:14
**best (5)**
  5:3;12:15;25:19;
  27:4;82:13
**better (1)**
  75:8
**beyond (1)**
  29:10
**big (2)**
  54:22;55:6
**biggest (1)**
  8:15
**bill (1)**
  17:16
**billed (1)**

**billing (1)**
  18:15
**bind (1)**
  41:1
**biology (1)**
  7:8
**bit (4)**
  6:19;35:7;44:2;
  59:20
**blurry (1)**
  59:20
**bona (1)**
  18:15
**born (1)**
  51:20
**both (5)**
  17:1;19:9;25:12;
  30:3;39:15
**bother (1)**
  5:4
**bothering (1)**
  44:22
**bottom (2)**
  54:15;63:14
**boy (1)**
  7:1
**bring (1)**
  45:3
**broad (1)**
  65:14
**broke (1)**
  46:13
**Bronx (1)**
  44:13
**brought (3)**
  33:21;44:13;45:10
**build (1)**
  55:2
**building (1)**
  71:2
**built (1)**
  71:7
**bunch (2)**
  9:22;55:4
**business (2)**
  5:5;11:2
**busy (1)**
  58:25

**C**

**CALIFORNIA (3)**
  4:1;20:10;58:22
**call (21)**
  11:3;18:1;21:15;
  25:1;26:2,22;27:22;
  28:21;38:23;39:4,5;
  41:19,24;42:12;43:19;
  58:3;60:2;61:12;67:10;
  68:13;79:9
**called (13)**
  4:7;7:21;12:17;

25:18;26:6,20;28:12;
  29:14,19;30:14;41:21;
  42:25;55:16
**calling (3)**
  44:22,22;53:24
**calls (18)**
  16:20;17:1,3,4,6,11;
  18:23;21:6;24:23;25:4,
  9,13;28:16;34:25;35:3;
  63:25;68:15;76:13
**came (6)**
  21:6;28:5,21;30:3;
  39:2;58:9
**can (18)**
  4:22;5:22;6:22;
  14:21;17:16;20:11;
  26:8;28:4,22,22;31:21;
  48:8;49:5,14,18;53:11;
  64:7;83:22
**cancer (2)**
  48:1;49:1
**candor (1)**
  59:19
**car (1)**
  43:7
**care (2)**
  36:11;70:4
**careful (1)**
  68:23
**Carolina (1)**
  45:9
**case (47)**
  8:18;29:17,20;30:16;
  33:16;46:7,10,11,12,
  15,16,17;47:3,7,24,25;
  48:18;50:3,15,21,23,
  23;51:7;52:4,9;54:2,
  11;55:10;57:3;59:2,24;
  60:24;61:7;62:5;63:8,
  12,23;64:19;71:5;72:7;
  73:11;77:5,7;78:22;
  79:4;80:17;81:1
**Casello (2)**
  4:22,23
**cases (31)**
  8:21;9:21;11:19;
  12:23,25;14:3;27:8,8;
  29:19;30:3,4;33:10,11;
  35:2;42:2;44:5,5,6,21,
  24,25;53:25;55:20,25;
  57:14;58:10;59:6;
  63:18;65:8;70:3,18
**categorically (1)**
  27:19
**cause (1)**
  81:7
**cease (1)**
  27:7
**ceased (1)**
  34:17
**Center (57)**
  4:17;14:5;15:10;
  22:16,22;28:12,13,18;

29:3;32:1,6,16,23;33:4,
  5,6,8,17;34:8,9,9,11;
  35:17;37:3;40:5,6,12,
  15,16;41:2;45:5;51:5,
  8,9;59:18;61:16,19,21;
  66:24;67:14;68:24,25;
  69:3,5;70:5;72:6,14;
  73:6;76:23;77:4,13,19,
  23;79:16;80:16,23;
  81:6
**Center's (1)**
  44:6
**Chabad (11)**
  9:18;10:17;54:23;
  64:14;69:17,18;70:13,
  17,19;73:9,15
**Chabadnik (1)**
  69:19
**chain (1)**
  57:20
**charge (7)**
  24:16;33:15;35:25;
  36:2,2,4,14
**charger (1)**
  10:1
**charging (2)**
  13:8,8
**check (2)**
  16:16;17:20
**checks (1)**
  32:18
**chemistry (1)**
  7:8
**chronologically (1)**
  53:13
**circumstance (2)**
  53:11;67:19
**Civil (3)**
  4:18;15:10;73:6
**claim (14)**
  4:17;36:8,11;37:10;
  38:24;39:24;41:20,21;
  63:6;64:4;67:18;68:21;
  78:22,25
**Claimant (8)**
  28:12,13,18;29:3;
  40:5,11;45:19;80:16
**claimants (16)**
  13:6;14:2;15:2,2;
  28:16,17;29:2;30:9;
  32:15,23;33:1,4;36:6;
  39:3;56:19;72:13
**claims (45)**
  23:10;26:11,20,21;
  27:15,16,17;29:10,12,
  13;30:4;34:25;35:1,15,
  15,22,22;36:2,4,14,20,
  20,24;37:10,15,23;
  38:10,11,22,23,25;
  41:1,13;54:9;57:17;
  58:11,16;59:6;62:21,
  22;63:24;65:12,13,21;
  69:14

**clarification (1)**
  76:18
**clarify (2)**
  26:10;42:22
**clause (1)**
  32:15
**clauses (1)**
  49:8
**clear (1)**
  6:7
**clerk (2)**
  7:19;8:1
**client (7)**
  17:16;20:19;38:17;
  41:10;44:23;67:8,21
**clients (22)**
  26:7,8,25;27:10;
  28:2;37:2,3,5,8,9;
  41:21;42:11;45:7;52:3;
  65:18;67:3,7;72:13;
  76:22,23;77:16;79:16
**close (6)**
  35:19;43:24,24;
  46:22;71:2,20
**college (2)**
  7:4,5
**Columbia (1)**
  50:17
**comfortable (1)**
  6:11
**coming (1)**
  14:18
**comment (1)**
  44:7
**Commission (24)**
  26:11,13,17,20,21;
  27:16;29:13;30:5;
  35:16,23;36:17,21;
  37:10,15,23;38:11,24;
  39:1;41:13;57:15;
  58:12;59:7;62:22;
  70:18
**Commonwealth (1)**
  5:13
**communicate (1)**
  66:16
**communicated (1)**
  35:9
**communication (3)**
  20:13;36:12;56:24
**communications (1)**
  54:19
**community (5)**
  11:12;54:20;55:1;
  64:13,14
**compared (1)**
  77:25
**compensate (7)**
  13:4,5;37:4,18;41:4;
  42:12;44:25
**compensated (18)**
  13:1,10;32:19;33:7,
  12;34:21,22;51:22;

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 26 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                    June 18, 2019

54:9;58:18;72:7;73:10;
79:16;80:25,25;81:15,
18,23
**compensating (1)**
41:2
**compensation (5)**
12:21;30:2;35:12;
36:19;72:1
**complaining (1)**
81:5
**complaint (17)**
30:17,23;31:7,11,13,
20;33:24;39:11,20;
40:3;51:14,23;52:2;
81:3,6,7,10
**complete (1)**
58:3
**Completely (1)**
31:16
**comply (2)**
67:11;75:5
**computer (2)**
49:10,12
**concentrated (1)**
61:14
**concerned (1)**
67:1
**concerning (1)**
59:22
**concluded (1)**
84:2
**condition (1)**
34:7
**conduct (2)**
67:2,12
**conducted (1)**
81:12
**confirm (1)**
70:24
**confirmed (1)**
71:22
**conflict (1)**
18:8
**confronted (1)**
71:10
**consider (2)**
19:1;48:23
**considered (1)**
37:16
**consistent (1)**
22:7
**constantly (1)**
44:22
**consult (1)**
65:17
**contact (5)**
15:14;21:12;30:15;
52:11;75:1
**contacted (2)**
47:15;75:13
**contained (1)**
81:6
**contended (1)**

14:7
**content (1)**
60:22
**contingency (2)**
33:11,16
**contingent (2)**
13:9;72:20
**continued (1)**
61:2
**contractual (1)**
40:14
**contrary (1)**
30:6
**contravention (1)**
14:4
**contributed (2)**
71:2;73:15
**contributions (1)**
55:6
**contributor (1)**
54:23
**controlled (1)**
40:11
**conversation (8)**
37:13;51:18,19,20;
60:23;76:18;77:17;
79:8
**conversations (4)**
59:21;74:8,15,23
**coordinate (1)**
35:18
**coordinating (2)**
36:4;48:4
**copy (3)**
16:6;83:22,25
**copyright (2)**
8:18,19
**Cordova (1)**
7:22
**cords (1)**
49:1
**corrected (1)**
46:1
**correctly (1)**
77:9
**correspond (1)**
56:6
**corroborate (1)**
32:18
**corrupt (1)**
25:6
**couch (1)**
6:11
**Counsel (6)**
6:10;10:21;33:25;
67:3;72:22;76:9
**coup (1)**
58:3
**couple (4)**
19:3;34:14;46:23;
51:2
**course (19)**
11:11;15:20;23:14;

32:15;33:8,14;35:4;
37:3;39:16;50:10;
52:10;53:21;55:4,17;
61:13;64:13;66:13;
78:6;79:8
**Court (49)**
4:8,19;5:20;9:25;
10:3,18,21,25;12:24;
23:18,20;26:14;28:21;
29:1,20;30:3,18;31:2,9,
9;35:4;41:12,14,16;
46:10,11,12;50:3,6,8;
51:23;52:7;53:1;59:24;
60:4,6,9,11,13,16;61:7;
78:10,14,16;79:10;
83:14,16,19,25
**cousin (2)**
22:13,25
**covered (1)**
7:23
**covering (1)**
64:25
**CPU (1)**
49:11
**crusade (1)**
25:5
**curious (1)**
36:24
**currently (1)**
5:9
**curse (1)**
79:12

**D**

**dare (2)**
27:19;73:5
**date (3)**
22:2;48:14;58:5
**davening (1)**
11:3
**David (14)**
50:5,7;51:13,14;
52:3;54:13,21;55:7,10,
18,24;56:2,6;67:20
**day (20)**
12:9;18:22,23,24;
34:24;35:9;42:16;43:2,
20;46:6;64:21;75:15;
76:4,5;77:24;80:2,4,5;
82:15,23
**days (2)**
51:2;80:19
**DC (2)**
35:17;77:7
**de (3)**
60:2,5,10
**deal (2)**
20:14;26:17
**dealing (3)**
17:11;35:5;72:24
**dealt (1)**
5:17

**death (3)**
63:8,12,18
**deceased (1)**
60:19
**December (2)**
22:3;31:25
**decided (1)**
79:2
**decision (1)**
9:6
**declaration (2)**
60:18;70:10
**declaratoria (3)**
60:2,5,8
**dedication (1)**
71:14
**Defendant (2)**
4:7;31:24
**Defendants' (1)**
24:2
**Defendant's (4)**
16:2;21:21;31:5;
52:17
**Definitely (1)**
17:9
**degree (1)**
7:7
**Delgado (2)**
62:24;63:4
**demand (1)**
58:15
**demanded (1)**
32:2
**denied (1)**
77:11
**Department (8)**
8:2,7,15,22;26:12,15,
16;35:19
**depending (1)**
18:11
**depo (1)**
48:23
**deposition (5)**
4:20;5:17;44:12;
75:12;84:2
**derivatively (1)**
71:1
**describe (1)**
53:11
**described (1)**
55:21
**designed (1)**
15:19
**despondent (1)**
73:11
**destroyed (1)**
79:17
**detailed (1)**
49:24
**d'etat (1)**
58:4
**determined (1)**
71:25

**developed (1)**
46:18
**developments (2)**
41:9;42:15
**Dia (4)**
15:11;22:14,25;
24:10
**dictated (3)**
49:7,8,9
**difficult (1)**
6:16
**difficulties (1)**
5:2
**digress (1)**
64:7
**dinner (1)**
64:15
**diplomatic (1)**
29:24
**direct (1)**
21:1
**directed (1)**
15:1
**directly (3)**
36:23;37:5;67:8
**director (1)**
22:18
**directors (1)**
22:14
**disbursed (1)**
19:23
**disclosing (1)**
32:1
**discontent (1)**
27:3
**discovery (1)**
8:19
**discuss (4)**
12:13;31:22;36:18;
46:15
**discussing (1)**
16:7
**dismissed (3)**
72:12;81:4,8
**disparaging (1)**
44:7
**displeasure (1)**
61:18
**dissolved (1)**
69:13
**distribution (1)**
8:21
**District (6)**
4:19;30:18,19;31:9,
9;50:17
**diversity (1)**
8:20
**division (2)**
8:22;26:16
**DOBIN (47)**
4:13,16,24;8:3;10:7,
24;11:15;15:24;16:3;
19:9,12;20:1,16,19;

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 27 of 53
American Center for Civil Justice, Inc. vs.
Joshua M. Ambush
JAVIER LOPEZ-PEREZ
June 18, 2019

21:3,19,22;23:21;24:3;
26:13,19;28:24;29:9;
31:3,6;42:3;48:12;
50:16;52:18;53:3,8;
60:19;61:1;62:11,17;
63:13;66:5;73:18;
76:13;81:24;82:6,7;
83:7,13,18,20,22
**docket (1)**
50:12
**document (16)**
16:1;21:20;24:1,7;
31:4;36:10;42:24,25;
50:15;52:16,19,21;
66:15;80:14;81:1,12
**documents (6)**
38:25;48:22;49:13;
75:10;80:19,21
**dollars (2)**
72:16,25
**Domenech (2)**
46:15,16
**done (2)**
66:7;83:13
**donor (1)**
71:24
**donors (2)**
55:4;71:14
**down (3)**
5:22;44:3;79:19
**Dr (1)**
39:4
**draft (1)**
22:20
**drafted (10)**
15:20;30:17,23;31:8,
11;32:7;33:19;39:19;
49:6;51:22
**dream (1)**
55:1
**drop (1)**
37:14
**drunk (2)**
44:9,9
**duly (1)**
4:8
**dump (1)**
8:18
**during (11)**
12:9,13;31:25;37:13;
42:14;51:1;55:21;
57:22;64:15;65:10,10
**duty (1)**
69:22

**E**

**easier (1)**
10:23
**eastern (1)**
35:18
**effect (1)**
56:18

**effort (1)**
29:25
**efforts (10)**
34:10,17;35:14;37:2;
58:13;69:21;71:1,20;
78:8,11
**Efron (23)**
50:5,7;51:13,14;
52:3,9;54:1,3,11,19,21;
55:7,10,17,18,24;56:2,
6,14;59:1;61:17,21;
67:21
**E-f-r-o-n (1)**
50:7
**eight (2)**
27:15;34:24
**either (6)**
12:23;39:10,11;63:8,
25;66:11
**EL (4)**
4:1;15:11;22:14;
24:10
**Elba (1)**
62:24
**Elie (1)**
47:16
**Eliezer (1)**
82:20
**else (6)**
19:14;24:12,22;57:9;
79:24;80:7
**email (21)**
15:13;18:19,22;
52:13;53:11,12;54:8,
12;56:9,10,10,16,17,
25;57:13,19,20,25;
59:1;62:20;75:4
**emails (5)**
17:1;34:25;49:14,17;
75:10
**embezzled (1)**
30:25
**embezzling (1)**
13:7
**employee (1)**
33:6
**encounter (1)**
49:22
**encounters (1)**
14:9
**end (8)**
11:3;34:21;37:14;
57:19;61:20,23;62:21;
65:15
**ended (3)**
8:8;50:14;61:15
**engaged (1)**
35:14
**Engelberg (39)**
11:7;12:2;15:16,22;
17:5;18:8;21:15;22:23;
23:12,17,18;24:14,24;
25:2;27:12;30:17;

31:15;34:18;35:3;
37:13;38:13;39:4,8;
42:19,24;43:1,14,18;
44:1;47:6,16;49:7,9;
52:20;55:13;66:22,24;
68:10;82:14
**Engelberg's (1)**
27:1
**English (2)**
23:22;24:9
**enough (1)**
5:23
**enter (1)**
83:14
**entities (1)**
81:6
**entitled (3)**
39:24;78:1,5
**entity (3)**
4:21;12:17;18:15
**envisioned (1)**
67:22
**escape (1)**
44:19
**espoused (1)**
29:18
**establish (2)**
9:6;29:23
**estate (6)**
46:10,11,13;60:20;
61:8;63:15
**estates (1)**
32:4
**estimate (1)**
16:24
**estimation (2)**
6:6,8
**ethical (2)**
67:6,11
**even (11)**
44:12;55:3;57:1;
59:2;60:22;61:5;69:2,
11;73:16;75:3;77:13
**events (6)**
14:18,23;23:15,19;
76:11,12
**eventually (7)**
11:25;24:25;33:25;
42:12;45:19;51:25;
72:7
**everybody (2)**
24:25;61:15
**ex (1)**
32:3
**exact (2)**
16:24;79:11
**exactly (5)**
25:20;37:6;38:1;
44:8;46:11
**EXAMINATION (6)**
4:12;10:6;29:8;53:7;
62:16;74:1
**examined (1)**

4:9
**example (3)**
38:23;59:5;67:20
**exceed (1)**
19:24
**except (3)**
34:8;43:3;66:18
**exchange (1)**
52:13
**executed (1)**
37:12
**execution (1)**
32:2
**exhibit (7)**
15:25;16:2;21:21;
24:2;31:5;52:17;62:20
**exhibits (1)**
50:13
**expect (1)**
74:10
**expecting (1)**
74:11
**expenses (1)**
19:13,20;51:10;77:4
**explained (2)**
48:17,25
**explore (1)**
49:18
**expressed (1)**
61:18
**eye (1)**
70:7

**F**

**fact (12)**
12:22;28:2;32:19,22;
36:5;42:11;43:6;56:25;
66:18;77:5,11;81:2
**facto (1)**
32:3
**facts (6)**
6:3;14:11;23:17;
31:13,14;68:12
**factual (2)**
12:12;29:18
**fail (1)**
56:11
**fair (1)**
62:6
**familiar (2)**
50:19;81:4
**families (14)**
12:20;13:3,22;14:7;
15:2,4,13;25:4,6;
30:10;42:23;65:3,8;
68:8
**family (24)**
22:21;30:11,12,13,
14,20,21,22;41:19;
42:13,25;43:11;45:24,
25;46:21;53:23;61:11,
12,17,22;66:23;71:2,

15,24
**far (2)**
33:3;69:8
**fare (1)**
79:18
**fascinated (1)**
64:17
**fast (1)**
5:23
**father (1)**
25:22
**February (2)**
48:13;74:4
**fed (1)**
22:16
**federal (26)**
8:18;9:13;26:20,21;
27:16;29:13,20;30:4,
18;35:15,22;36:20;
37:10,15,23;38:10;
41:13;50:10;51:23;
52:7;59:6;62:22;65:13;
70:18;80:25;83:15
**fee (6)**
13:9;52:11;54:14;
56:7,15;72:20
**feel (1)**
81:25
**fees (5)**
13:6;31:1;32:5;
33:16;52:11
**fell (1)**
8:23
**felt (1)**
21:10
**female (3)**
59:17,22;60:1
**few (3)**
62:18;73:22;74:3
**fide (1)**
18:15
**fielding (1)**
21:6
**fights (1)**
61:22
**figure (3)**
20:18;57:8;61:14
**file (6)**
34:25;35:15;49:15;
67:18;78:22,25
**filed (12)**
26:9,11;27:9,15;
31:12;35:1,21;36:2,20,
24;65:22;79:10
**files (5)**
14:15;44:6;45:3,10;
82:17
**filing (1)**
31:9
**finally (1)**
42:19
**find (2)**
77:12;79:3

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 28 of 53
American Center for Civil Justice, Inc. vs.                              JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                        June 18, 2019

**fine (1)**
53:3
**finish (2)**
40:20;50:3
**finished (2)**
12:24;50:5
**fire (3)**
8:17;66:7;67:16
**firm (7)**
7:21;8:5,7,16;9:3;
48:3,4
**firms (1)**
8:15
**first (22)**
4:8,25;7:18,19,20;
9:14,15,16;18:7;28:13;
31:15;48:18;54:13,15;
55:3,13;66:21;75:22;
79:3,8;80:1;82:7
**five (4)**
45:15;46:3;62:6,9
**fleeting (1)**
59:21
**fly (1)**
43:1
**folks (1)**
20:21
**follow (3)**
57:8;62:18;67:15
**following (1)**
24:16
**follows (1)**
4:9
**fooled (1)**
15:4
**foreign (3)**
15:3,5,5
**foresee (1)**
67:19
**forgot (2)**
58:25;71:13
**form (1)**
12:20
**formal (1)**
13:20
**forth (1)**
18:19
**found (3)**
54:1;55:15;56:16
**four (2)**
34:22;48:11
**frame (2)**
48:8;54:11
**frames (1)**
22:5
**Frankie (1)**
29:20
**free (2)**
17:22;82:4
**French (1)**
23:4
**Friedman (3)**
77:9;80:18,22

**friend (3)**
45:21;49:12;52:6
**friendly (1)**
61:5
**friends (4)**
34:13;46:3;64:14;
82:5
**friendship (1)**
46:19
**front (1)**
58:12
**fruit (1)**
40:8
**frustration (1)**
51:20
**full (1)**
26:22
**fund (1)**
71:3
**fundraising (1)**
55:5
**funds (3)**
33:18;58:16;69:22
**funny (1)**
37:24
**further (2)**
73:18;83:10
**furtherance (1)**
14:15
**future (1)**
15:2

**G**

**gained (1)**
28:3
**gave (9)**
15:12,12;16:16;
17:20;45:10;58:19;
76:10;78:2;81:9
**generated (2)**
17:6;58:16
**gentleman (1)**
11:6
**girls (1)**
53:2
**gist (2)**
76:17;77:17
**given (4)**
14:2;15:23;16:4;
70:13
**giving (2)**
6:6;19:20
**gladly (1)**
82:16
**Gmail (1)**
49:15
**goes (2)**
69:8;83:20
**Goldman (1)**
7:21
**Gonzalez (1)**
62:24

**Good (7)**
4:14,15;17:14,16;
23:5;47:5;69:19
**gossip (1)**
61:12
**government (3)**
29:23,25;30:1
**governs (1)**
40:13
**graduate (1)**
7:16
**graduated (2)**
7:17;8:4
**great (2)**
9:3;65:13
**guess (6)**
6:5;11:8;52:1;67:24;
70:3;78:9
**guy (1)**
68:6
**guys (1)**
64:23
**Guzman (13)**
30:11,12,13,14,20;
45:23,23,25;46:13;
59:24;60:24;61:3,7

**H**

**half (6)**
45:4;49:20;71:4;
76:4,5;80:2
**Hampton (2)**
43:23;82:15
**handed (1)**
24:4
**handing (1)**
21:23
**handkerchief (1)**
61:9
**handle (1)**
67:25;68:3;83:15
**handling (1)**
64:4
**handwritten (1)**
83:7
**hanging (2)**
39:7;50:11
**happen (4)**
21:8;65:20;80:9,10
**happened (13)**
12:1,6,7;17:8;34:4;
49:5;52:23;53:18;
61:11,25;65:11;67:16;
80:11
**happening (3)**
41:10;56:12;61:6
**happens (1)**
22:14
**happy (1)**
44:2
**harbored (1)**
42:10

**hard (1)**
83:12
**hardly (1)**
49:3
**healing (1)**
5:5
**health (1)**
56:20
**hear (2)**
61:24;62:2
**heard (5)**
23:16;45:11;52:3;
79:12;81:10
**hearsay (1)**
76:13
**heated (1)**
43:18
**heavy (1)**
39:1
**heirs (4)**
46:13;60:17,19;61:7
**held (1)**
33:5
**hell (1)**
73:3
**help (8)**
10:14,22;49:14;57:1;
60:7;63:22;66:8;69:20
**helping (4)**
12:19;24:18;37:2;
68:11
**herederos (3)**
60:3,12,15
**H-e-r-e-d-e-r-o-s (1)**
60:15
**Hey (5)**
22:25;52:2;56:25;
59:4;64:18
**hiding (2)**
14:15;75:6
**high (2)**
6:20,21
**himself (2)**
6:11;51:9
**hired (1)**
12:25
**home (3)**
5:2;47:23;75:25
**honest (3)**
63:7;65:9;67:17
**honored (1)**
51:5
**hopefully (1)**
75:7
**hotel (5)**
45:4;55:21;58:4;
79:22;80:11
**hour (8)**
18:10,15;35:4;45:4;
49:21;72:23;73:1;78:7
**hourly (3)**
17:16;72:19;78:6
**hours (2)**

34:24;81:12
**house (3)**
46:20;55:1;74:22
**huh-uh (1)**
5:25
**hurt (1)**
25:22

**I**

**idea (3)**
15:15;27:1;68:15
**identified (9)**
13:17;16:1;21:20;
23:6;24:1;31:4;52:16;
55:24;58:12
**identify (2)**
13:11;15:6
**ignorant (1)**
72:5
**illegal (3)**
13:25;67:6;68:8
**imagine (1)**
17:2
**immediately (1)**
39:7
**immigration (1)**
58:23
**important (2)**
28:22;72:24
**impression (1)**
69:1
**inaugurated (1)**
71:7
**Inc (1)**
4:18
**include (1)**
17:1
**included (1)**
49:17
**independent (3)**
14:10;23:9;31:17
**influence (1)**
6:15
**information (3)**
14:24;39:3;64:5
**informed (2)**
17:9;41:23
**initial (5)**
12:7,11;14:9;18:5,6
**initially (2)**
32:22;47:22
**injunction (1)**
77:12
**injury (3)**
63:8,12,23
**injustice (3)**
13:2,16;68:9
**Inn (2)**
43:23;82:15
**insisted (1)**
42:9
**instances (1)**

Case 1:15-cv-01237-EGS     Document 29-1     Filed 12/29/23     Page 29 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                              June 18, 2019

59:19
**Instead (2)**
13:6;15:7
**instruct (1)**
66:22
**instructions (2)**
24:17;68:10
**instrumental (2)**
21:7;68:11
**intense (1)**
80:18
**intensive (1)**
49:1
**intent (1)**
42:10
**Interamerican (1)**
7:14
**interested (8)**
11:19;21:9;22:17,23;
24:25;53:18;64:22;
65:4
**internal (1)**
34:7
**international (1)**
11:21
**internet (1)**
56:16
**intervening (1)**
56:13
**intervention (1)**
65:2
**interview (1)**
22:19
**interviewed (2)**
23:2;65:5
**into (4)**
31:21;35:24;49:18;
83:14
**introduce (1)**
49:25
**introduced (1)**
12:18
**introduction (2)**
12:11;82:12
**investigation (3)**
14:11;23:9;31:17
**invoice (8)**
18:6,9,17;20:2,3;
72:24;73:6;78:8
**invoicing (1)**
73:6
**involved (7)**
35:2;46:14;60:1,21;
65:7;68:2;72:16
**involving (2)**
23:19;61:7
**IOTA (1)**
33:19
**Isla (1)**
43:23
**island (2)**
10:20;65:1
**Israel (2)**

9:22;64:19
**issue (6)**
17:9;18:10;43:18;
67:25;68:3;76:18
**issues (1)**
47:1
**Italian (1)**
7:24

**J**

**JAVIER (9)**
4:6;11:13;20:21;
56:17;57:2;64:18;65:6,
15;73:15
**Jed (2)**
47:16;83:1
**Jersey (3)**
4:19;48:19;49:5
**Jew (5)**
7:24;11:11;14:19,21;
44:13
**Jewish (6)**
7:1;11:1,12;54:20;
55:15;64:13
**Jews (1)**
55:5
**JLP1 (2)**
16:2,5
**JLP2 (2)**
21:21,24
**JLP3 (2)**
24:2,5
**JLP4 (5)**
31:3,5,11;34:1;39:20
**JLP5 (5)**
52:17,20;53:12;
57:13;62:20
**job (4)**
5:21;7:18,19;10:22
**John (2)**
6:25;7:1
**joke (1)**
63:4
**Joshua (11)**
4:16;13:14;23:16;
25:11;47:2;61:15,25;
62:3;68:1,16;79:11
**Juan (4)**
6:22,24;7:22;22:18
**J-u-a-n (1)**
6:24
**judge (4)**
77:8,13;80:18,22
**July (1)**
19:5
**jumping (1)**
50:23
**JUNE (7)**
4:2;19:5;53:19,20,
20,20;56:11
**jurisdiction (1)**
8:20

**Justice (8)**
4:18;12:20;15:10;
26:12,15,17;35:19;
73:6

**K**

**keep (7)**
17:9;42:2;44:21,24;
46:19;51:8;77:4
**keeping (5)**
14:4;41:8;42:10;
51:4;53:21
**kept (3)**
42:15;46:24;47:6;
58:23
**killed (1)**
9:23
**kind (5)**
8:11;20:21;42:9;
55:3;72:20
**kinds (1)**
5:25
**knew (7)**
22:18;38:6;43:16;
54:3,18;65:1;66:21
**Knowing (1)**
68:1
**known (1)**
33:21

**L**

**lack (1)**
35:12
**large (1)**
69:14
**largely (1)**
28:3
**last (7)**
11:6;43:12;56:24;
63:4;76:3;81:11;82:13
**lasted (1)**
80:1
**later (4)**
20:14;33:13;42:7;
54:3
**law (21)**
7:10,13,14,15,18,19,
19,20,21;8:1,4,8,16,21;
9:3,13;11:21;48:4;
58:23;64:17;79:10
**lawsuit (2)**
34:1;40:4
**lawyer (3)**
55:18;64:4;66:3
**lawyers (1)**
67:2
**lay (1)**
39:24
**learn (1)**
8:19;9:14;52:5
**learned (13)**

33:13;48:18;50:25;
51:24,24,25;52:4;54:2,
11;56:2,22;58:24;
70:21
**learning (2)**
47:22;51:11
**least (1)**
56:14
**leave (2)**
9:1;40:21
**leaving (5)**
34:23;69:23,24,24;
70:2
**left (8)**
9:2;19:2,3;34:18;
49:25;50:1;54:4;70:3
**legal (3)**
13:15,18;27:7
**less (2)**
16:18;78:4
**letter (8)**
27:6;37:8;38:2,3,7;
39:10;66:15,19
**letters (2)**
36:6;49:6
**Libya (6)**
26:11,13;29:23;30:1;
32:2;57:14
**Libyan (1)**
29:22
**licenciado (1)**
65:25
**license (1)**
5:9
**licensed (1)**
58:22
**lieu (1)**
48:21
**life (4)**
58:25;73:5;79:17;
80:21
**line (3)**
20:20;29:19;44:17
**list (4)**
14:6;58:11;62:21,21
**Litigation (6)**
8:1,7,14,22;9:13;
40:20
**litigator (1)**
52:7
**little (5)**
6:19;17:8;35:7;44:2;
59:20
**live (1)**
43:24
**lived (2)**
46:22;68:17
**lobby (3)**
43:25;55:22;80:11
**located (1)**
14:13
**Lod (8)**
9:22,24;11:19;25:10,

13,22;26:18;64:20
**Logic (2)**
63:19,19
**long (9)**
5:2;8:16,24;41:15,
16,18;46:2;76:2,3
**longer (4)**
33:25;55:20;66:16;
67:13
**look (2)**
44:1;52:14
**looked (2)**
44:2;50:11
**looking (4)**
9:20;10:14;50:14;
63:14
**looks (1)**
73:9
**Lopez (7)**
11:13;20:22;56:17;
64:4;71:16,17;73:18
**LOPEZ-PEREZ (10)**
4:6,14;16:4;21:23;
24:4;31:7;52:19;53:10;
71:15;73:21
**Los (16)**
19:4;34:13;40:22;
50:1;53:24;56:3,21,22;
58:19;69:23,24,24,25;
70:2;80:11;82:4
**lot (3)**
9:6;11:20;14:13;
17:23;21:11;34:11;
55:4,5;64:21;73:17,17;
81:13,22
**Lourdes (5)**
30:14;45:23;59:11,
13;61:3
**love (1)**
53:23
**lovely (1)**
5:20,21
**low (1)**
9:25
**lure (1)**
67:9
**lying (1)**
14:22

**M**

**main (2)**
30:15;76:18
**mainland (1)**
12:25
**majestic (1)**
55:2
**makes (2)**
10:22;40:10
**making (6)**
6:10;34:12,16;35:14;
54:3;55:6
**Mandey (1)**

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 30 of 53

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

71:11
**many (5)**
9:2;16:9,23;21:12;
80:2
**March (1)**
74:5
**mark (3)**
15:24;21:19;23:24
**marked (10)**
16:2,5;21:21,24;
24:2,5;31:5;52:17,20;
53:12
**Massacre (7)**
9:22;11:19;25:10,14,
23;26:18;64:20
**matter (10)**
17:20;21:9;35:5;
36:5;43:6;59:1;72:24;
77:5,11;81:2
**May (2)**
57:20;58:1
**mean (3)**
38:9;64:20;72:16
**means (2)**
31:24;83:19
**media (1)**
21:11
**medical (1)**
34:7
**meet (9)**
11:14,17,23;12:8;
25:2;26:5;66:13;76:10,
10
**meeting (17)**
12:4,5,7,7,14;24:25;
31:15;55:21;74:24,25;
75:22;76:2,3;80:1,7,
13;83:1
**meetings (1)**
80:2
**member (2)**
54:19;61:11
**members (2)**
61:17,22
**memory (2)**
56:11;59:20
**Mendel (4)**
9:18;54:5,6;59:3
**Mendez (1)**
22:19
**mentality (1)**
52:10
**mentioned (2)**
15:9;51:13
**merely (1)**
33:6
**meruit (2)**
78:8,15
**m-e-r-u-i-t (1)**
78:15
**Messrs (1)**
17:5
**met (16)**

11:25;12:2;23:14;
42:19;46:18,20,23;
49:24;51:2;58:4;71:9;
74:19,19;75:14,17;
83:6
**Michael (2)**
47:16;82:14
**midnight (1)**
81:11
**might (1)**
62:11
**million (1)**
40:12
**millions (4)**
72:16,17,25,25
**mind (1)**
71:25
**mine (3)**
22:13;49:12;52:6
**minor (1)**
7:8
**minus (1)**
51:10
**minute (7)**
25:8;35:1;44:11,16;
52:23;62:11;64:7
**misled (1)**
14:8
**Miss (1)**
82:6,7
**mission (1)**
12:19
**mobility (1)**
9:3
**money (24)**
17:15,23;19:20;26:4;
30:3;34:12;39:13,14;
40:9,17;45:6;51:4;
56:7;57:6,16;67:7;
68:24;69:10,13,14,16,
19,22;72:20
**moneys (1)**
70:13
**monies (4)**
30:1,8,24;68:21
**month (4)**
18:24;19:1;23:1;
58:9
**months (12)**
18:1;19:3,23;34:15,
22,23;48:11,11;51:21;
71:5,8;74:6
**more (16)**
6:19;13:8;16:18;
20:23;21:10;39:2;
53:18;54:4;62:7,9;
65:13;72:15,15;73:17,
17;80:2
**Morera (2)**
59:11,13
**morning (5)**
4:14,15;12:9;43:9,10
**most (4)**

27:21;55:16;65:21,
24
**Mostly (1)**
82:10
**mourning (1)**
64:21
**moved (1)**
56:20
**much (15)**
10:23;13:18;16:17;
34:8,12;41:7;71:17;
72:6,12,13,15,15;78:1,
4;81:11
**must (3)**
63:23;65:22;66:13
**mute (1)**
4:22
**myself (2)**
24:17;80:8

**N**

**naive (1)**
72:25
**name (13)**
4:16;6:24;11:5,6;
13:11;15:6;23:6;26:22;
27:12;35:19;48:2;63:4;
71:24
**named (3)**
6:21;50:5,6
**names (1)**
14:7
**narrated (1)**
49:21
**national (1)**
64:21
**nature (4)**
26:1;40:4;63:6;65:2
**Neal (12)**
35:20,23;42:20;
43:14;44:1;47:16;
57:24;58:2;67:20;70:3;
82:15,24
**necessary (1)**
66:20
**need (5)**
5:23;17:22;48:23;
59:7;60:7
**needed (4)**
11:25;13:21;38:6,24
**negative (3)**
79:7,9,12
**neither (1)**
38:17
**Neumann (27)**
6:10;7:23;19:6,11,
14,16,19;20:5,9,17,24;
48:8;62:19;63:9;65:19;
73:20,22;74:2;76:15;
77:21;78:17;82:2;83:9,
12,17,21,24
**New (7)**

4:19;28:17;29:2;
41:8;48:19;49:5;55:6
**newspaper (8)**
15:1,11;16:9;21:6,
16;22:15;26:2;27:2
**next (4)**
12:1,9;43:2;45:15
**Nice (2)**
7:1;55:2
**night (2)**
79:21;81:11
**nights (1)**
64:25
**nobody (2)**
24:15;74:10
**note (1)**
20:25
**notes (1)**
83:7
**notify (1)**
48:24
**Nuevo (4)**
15:11;22:14,25;
24:10
**number (2)**
15:12;65:17
**numbers (1)**
69:14
**numeral (1)**
6:25

**O**

**objection (4)**
6:12;20:18,25;76:13
**obligated (1)**
69:10
**occupied (2)**
34:10,11
**odd (2)**
35:21;71:6
**off (5)**
28:22;44:3,4;48:20;
49:4
**offered (2)**
8:6;34:13
**office (6)**
24:15;37:14;45:2,9;
49:11;82:16
**old (2)**
49:11;53:15
**once (6)**
15:12;16:12;29:22;
51:16;59:1;66:21
**one (34)**
5:22,24;8:15;19:16;
20:23;22:13;24:19;
28:11,18;29:4,17;31:8;
35:4,9;39:3;41:22;
42:16;46:5,19;50:17;
55:7;57:2,3;59:5,5,19,
21;63:9,11,24;68:18;
72:11,11,24

ongoing (1)
46:25
**only (15)**
5:22,24;10:17,18,19;
11:11,18;19:16;24:18;
33:3;49:13;51:16;
53:22;58:21;80:8
**oOo- (1)**
84:3
**opened (2)**
9:11;26:16
**opinion (3)**
61:6;79:12,13
**opportunity (4)**
17:14;53:10;69:12,
13
**order (4)**
39:10;66:8,8;77:8
**organize (1)**
53:13
**original (3)**
18:6;40:5;83:19
**orthodox (2)**
10:19;14:19
**Otherwise (3)**
20:17;38:9;47:12
**out (17)**
6:13;13:22;15:4;
17:5,21;20:18;21:17;
42:7;44:16;46:13;
51:20;54:25;60:4;67:9;
71:20;75:1;79:3
**over (7)**
32:5;34:14;51:15;
52:3;55:10,25;79:21
**owe (3)**
69:14,16,18
**own (6)**
9:7,11;17:21;26:7;
83:22,25

**P**

**Pacer (2)**
50:11,23
**packet (1)**
37:15
**page (2)**
54:13,15
**paid (18)**
14:25;15:17;17:10;
18:3;30:1;32:1,4,23;
36:22;59:7;68:25;69:2,
4,5;70:20,24;77:22;
78:19
**Papa (1)**
6:21
**P-a-p-a (1)**
6:24
**paper (3)**
15:15,17;22:24
**paragraph (1)**
31:20

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 31 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                                      June 18, 2019

**part (4)**
27:5;29:17,25;77:15
**particular (6)**
29:17;30:10,16;
41:10;45:19;63:11
**parties (1)**
70:11
**partners (1)**
9:5
**party (1)**
76:15
**past (2)**
34:22;73:12
**pay (19)**
13:7;16:14,16;17:21,
23;18:10;37:20;40:7;
42:4;54:14;58:15;
72:18;77:24;78:7;
79:15,18,21,24;83:23
**paying (8)**
19:8,11,12,14,16;
34:11;45:6;51:5
**payment (4)**
30:9;32:16;69:8;
70:15
**payments (1)**
18:11
**pending (4)**
12:23;53:25;68:22;
70:3
**penny (2)**
57:2,3
**people (20)**
10:13;14:13,20;
16:23;21:12;26:6;27:1,
22;29:13;33:5;35:11,
15,19;49:9;55:6,7;
64:16,21;68:11;80:24
**per (2)**
18:23;48:22
**percent (23)**
28:9;32:4,5,16,22;
33:15,17;37:20;39:17,
21,24;40:3,5,6,15,17;
51:5,9;57:15;76:20;
77:3,14,18
**percentage (4)**
51:12;59:7;73:11;
76:21
**Perez (1)**
22:19
**performed (1)**
32:2
**perhaps (1)**
78:21
**period (1)**
78:2
**periodic (1)**
18:11
**periodically (1)**
19:21
**permission (1)**
49:8

**Perr (21)**
11:6;12:2;15:22;
17:5;18:8;23:13;24:14;
31:15;34:17;42:19;
43:14,25;47:5,16,16;
55:12;76:10;82:16,20;
83:1,3
**person (6)**
5:22,24;9:20;13:11;
44:8;55:25
**personal (1)**
79:12
**personally (3)**
25:2;42:19;58:5
**personnel (1)**
24:18
**persons (1)**
68:18
**philosophy (1)**
7:9
**phone (12)**
15:12;17:11;21:6;
24:23;25:3;28:16;
34:25;39:7;49:23;
52:12;65:17;75:3
**phonetic (2)**
15:6;29:20
**physical (1)**
5:1
**pick (1)**
43:10
**picture (3)**
35:24;42:8;75:2
**pilgrims (1)**
9:23
**place (6)**
9:11;12:4;16:14;
28:19;29:4;76:2
**placed (2)**
16:9;24:20
**placement (1)**
18:20
**placing (2)**
17:10;21:5
**plaintiff (1)**
50:22
**plane (1)**
79:18
**plaque (1)**
71:23
**pleadings (1)**
51:3
**Please (5)**
6:5,7,12;28:23;40:1
**pledged (1)**
70:5
**plug (1)**
10:1
**point (3)**
28:11;68:14;70:4
**poison (1)**
40:9
**Pope (2)**

6:25;7:1
**portion (3)**
30:8;53:15;72:19
**position (2)**
8:6;20:25
**possible (1)**
21:13
**post (1)**
32:3
**power (8)**
27:11,12;37:8,12;
38:15;42:23;66:23;
67:13
**powers (1)**
49:7
**practical (1)**
20:9
**practice (2)**
5:10;9:7
**practices (1)**
52:7
**practitioner (1)**
17:15
**praying (1)**
11:3
**precisely (1)**
12:8
**preferably (1)**
55:15
**preliminary (2)**
49:23;77:11
**preparation (1)**
81:19
**preparing (1)**
58:7
**presented (1)**
14:11
**pressure (2)**
21:11;35:11
**prevent (1)**
77:14
**previously (1)**
27:20
**prior (6)**
34:22;74:7,18,23,25;
80:3
**privileged (1)**
20:13
**probable (1)**
54:5
**Probably (25)**
16:12,25;19:5,24;
21:17;25:23;27:15;
34:23;35:4,17;37:1;
39:17;41:22;43:17;
48:13,22;52:6;55:16;
59:23,23;65:22;67:17;
68:4;73:1;78:3
**problem (2)**
18:14;36:1
**problems (2)**
6:13;61:16
**procedural (1)**

47:7
**procedurally (1)**
81:5
**proceedings (1)**
72:5
**proceeds (2)**
33:18;40:3
**process (3)**
5:17;39:1;68:2
**produce (1)**
48:21
**produced (1)**
52:20
**production (1)**
52:21
**productive (1)**
5:3
**professional (2)**
56:20;67:2
**program (1)**
64:24
**progress (1)**
18:20
**prohibited (1)**
77:2
**project (1)**
24:13
**promised (1)**
70:5
**proposed (3)**
14:12,17,25
**protect (1)**
67:23
**provide (3)**
13:15;14:6;61:5
**provided (1)**
14:24
**public (1)**
21:10
**published (9)**
15:11;22:12,15,21,
24;23:2,3;24:10,21
**Puerto (54)**
5:13;7:6,15,22,24;
8:15;9:18,20,22;10:13,
17;11:2,9,10,11,20;
13:3,22;14:14,20;
17:19;18:2;19:3;20:8;
21:16;24:17;30:18,19;
31:10,12,25;35:14;
42:16;43:4,8;44:13,23;
48:4;54:4,23;55:3,5,
13;56:19;58:10;59:15;
64:22;65:1;68:7;70:14;
71:4,8;73:15;75:4
**purported (1)**
14:16
**purporting (1)**
9:10
**purpose (1)**
10:16
**purposes (2)**
4:20;37:16

**pursued (2)**
27:17,18
**pursuing (1)**
29:10;65:12
**put (11)**
4:22;15:15,17;33:18;
57:17;58:12;62:22;
67:9;68:13;71:14,23

---

**Q**

**Quantum (3)**
78:8,12,14
**Q-u-a-n-t-u-m (1)**
78:13
**quite (1)**
6:11
**quote (1)**
31:23
**quotes (1)**
25:11

---

**R**

**Rabbi (35)**
9:18,19;10:8;11:5,6,
7,16;12:2;14:19,19,21,
22;23:13;31:15;35:10,
10;43:3,13,15;49:24;
53:21,24;54:6,24;55:2,
11;69:9,15;70:12,22;
82:16
**radiation (2)**
49:2;75:2
**radio (5)**
64:9,11,12,24,25
**raise (1)**
69:21
**raised (1)**
73:3
**rate (1)**
18:6
**rather (1)**
28:22
**rationale (1)**
73:4
**reach (3)**
13:22;15:4;17:4
**reached (6)**
29:21,23;77:1,1,16;
79:15
**reaction (1)**
18:16
**read (6)**
31:21;52:23;53:11;
77:6,8;81:11
**reading (9)**
7:10;23:5;50:20,23;
53:1;80:19;81:3,10,14
**ready (1)**
40:21
**realize (5)**

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 32 of 53
American Center for Civil Justice, Inc. vs.                JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                  June 18, 2019

33:8;40:16;42:7;
47:19;66:6
**really (3)**
16:13;20:20;62:7
**reason (2)**
46:7;58:17
**reasons (1)**
56:20
**recall (12)**
12:15;15:8;29:17;
30:6;43:15;44:8;49:20;
51:24;52:4;63:8;66:10;
81:7
**recalling (1)**
36:5
**receive (1)**
71:12
**received (4)**
18:23;35:3;47:23;
71:19
**receiving (6)**
24:23;25:3;28:15;
35:11;49:1;68:15
**recess (4)**
10:2;28:25;53:4;
62:13
**recollect (1)**
13:23
**recollection (7)**
12:16;22:4;25:20;
27:4;52:22;64:2;82:14
**recommends (1)**
14:20
**record (11)**
5:18;21:1;28:22;
31:21;33:10;34:1;
36:15,16;46:12;48:9;
53:9
**recover (4)**
30:23;40:12;70:9,12
**recovered (4)**
39:25;40:8,10;72:21
**recovery (3)**
28:10;32:24;70:6
**recreated (1)**
49:15
**refer (2)**
4:20;46:14
**reference (1)**
31:8
**referral (7)**
52:10,11;54:2,14;
56:7,15;69:9
**refresh (3)**
22:4;52:22;64:2
**regarding (1)**
17:8
**reimbursing (1)**
19:19
**rejected (1)**
20:2
**related (11)**
7:18,19;9:21;11:18,

19;46:7,8,9;49:17;
60:23;81:6
**relating (2)**
47:1;57:16
**relation (1)**
15:9
**relations (1)**
29:24
**relationship (14)**
18:24;19:7;27:23;
28:3,7;34:17;40:14;
43:15;47:1,2;55:11;
69:12;70:7;73:8
**relieved (1)**
45:11
**religious (4)**
11:2;14:21;44:12;
54:22
**remember (30)**
10:9;12:11;16:13;
17:19;18:4;30:10;
35:13;36:7,12;46:5,6;
47:3;48:19;52:8;55:12;
56:9,10,23;57:25;
59:17;60:22;62:25;
63:2,3,3,6;64:9;65:9;
69:20;77:9
**remind (1)**
83:16
**rented (1)**
54:25
**repeat (3)**
10:23;28:4;40:1
**report (1)**
17:7
**Reporter (33)**
4:8;5:20;9:25;10:3,
18,21,25;21:15;22:18;
23:18,20;26:14;28:21;
29:1;31:2;41:12,14,16;
50:6,8;53:1;60:4,6,9,
11,13,16;78:10,14,16;
83:14,19,25
**reporting (1)**
17:11
**represent (3)**
4:16;28:6;66:14
**representation (1)**
27:8
**representative (2)**
30:14;35:16
**representatives (1)**
12:17
**represented (6)**
25:14,16,24,25;
27:20;34:1
**representing (1)**
67:21
**required (1)**
41:3
**research (1)**
50:14
**reserve (2)**

20:12,25
**resolved (2)**
14:3;68:22
**respond (1)**
78:18
**response (3)**
27:25;38:8,12
**responsible (1)**
38:21
**rest (1)**
73:5
**result (9)**
13:16;16:20;27:22;
28:6;29:14;55:10;
69:11,12,15
**results (1)**
72:6
**RESUMED (4)**
10:6;29:8;53:7;
62:16
**retain (1)**
66:8
**retained (1)**
13:19
**retainer (14)**
13:20;18:5;32:3,25;
37:8,19;38:2,3,7;51:6;
66:19;77:1,3,15
**retainment (1)**
39:10
**retrospect (1)**
36:25
**return (1)**
8:5
**review (2)**
80:15;81:12
**Rican (9)**
7:24;11:9,11,20;
31:3,12;44:13;55:5;
68:7
**Rico (45)**
5:13;7:6,15,22;8:16;
9:19,20,22;10:14,17;
11:2,10;14:14,20;
17:19;18:2;19:3;20:8;
21:16;24:17;30:18,19;
31:10,12,25;35:14;
42:16;43:4,8;44:23;
48:4;54:4,23;55:3,13;
56:19;58:10;59:15;
64:22;65:1;70:14;71:4,
8;73:16;75:4
**Right (33)**
7:2,12;10:11;12:13;
13:23;33:15;37:22;
40:9;41:6,18;44:3,4;
45:3;48:16,20;49:4;
54:15;55:24;57:1,23;
63:9,18;70:15;71:21;
73:13,18;74:5;75:6;
76:5,15;79:6;83:9,21
**rightfully (1)**
26:4

**rights (1)**
20:12
**Roberts (1)**
15:6
**Roman (1)**
6:24
**room (1)**
53:2
**rough (1)**
16:24
**route (1)**
44:19
**rules (2)**
67:1,11
**rundown (1)**
55:1
**rushed (1)**
82:16

## S

**sacred (1)**
69:22
**same (22)**
31:14;40:13,14;
41:25;42:13,13;43:20;
47:4,13;49:23;51:3;
67:21;76:8;78:20;
81:24;82:20,21,22,23,
23,24;83:8
**San (1)**
7:22
**sat (1)**
44:3
**satisfied (1)**
77:19
**save (2)**
13:24;25:5
**saw (9)**
26:2,3;44:19;50:12,
21;51:2,4;65:25;77:6
**saying (8)**
36:7,13;44:16;54:8,
18;56:9;67:10;75:5
**scenario (1)**
12:12
**schedules (1)**
47:7
**scheme (3)**
14:16;67:5;68:6
**school (10)**
6:20,21,21;7:10,13,
14,15,20;8:4,9
**screwing (2)**
61:15;68:7
**seaboard (1)**
35:18
**Seattle (1)**
49:2
**second (1)**
12:6
**seeing (1)**
50:20

**seem (1)**
81:22
**seems (1)**
5:21
**SEGUNDO (1)**
4:1
**send (7)**
18:5;28:17;29:2;
37:15;66:15;73:5;
75:10
**sending (2)**
27:6;49:14
**senior (1)**
9:4
**sense (3)**
40:10;50:25;77:20
**sent (4)**
36:6;53:12;56:17;
71:18
**served (5)**
48:10,15;74:4,14;
79:5
**service (1)**
8:16
**services (4)**
12:9;13:16,18;20:21
**settled (1)**
59:6
**settlement (8)**
29:21;61:24;62:2,4;
77:1;80:17,20,22
**settlements (1)**
33:18
**seven (3)**
19:23;27:15;35:3
**Shabbat (2)**
64:15,15
**shared (2)**
46:23;49:11
**Sher (14)**
35:20,23,23;42:20;
43:14;44:1,1;47:17;
58:2,4;67:20;70:3;
82:15,24
**short (4)**
10:2;28:25;53:4;
62:13
**show (8)**
28:12;64:9,12,23;
65:5,10,11,18
**showed (4)**
42:16,18;43:13,21
**shown (1)**
32:25
**shows (2)**
70:6;81:1
**shul (1)**
11:4
**sick (2)**
45:7;48:25
**sign (11)**
28:17;29:2;35:15;
42:23,24;43:11;66:15,

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 33 of 53
American Center for Civil Justice, Inc. vs.
Joshua M. Ambush
JAVIER LOPEZ-PEREZ
June 18, 2019

19,23,24;67:13

**signed (5)**
26:25;27:11;49:9;
68:18;76:25

**simply (1)**
57:2

**sinister (1)**
61:14

**Sister (2)**
72:22;76:9

**sitting (1)**
76:15

**situation (1)**
21:12;82:23

**six (4)**
23:4;34:23;71:5,8

**small (1)**
77:24

**social (1)**
82:10

**socially (1)**
46:23

**solo (1)**
17:14

**someone (1)**
38:7

**Sometimes (3)**
17:22;53:24;75:2

**somewhere (1)**
23:23

**son (2)**
83:4,5

**sons (1)**
83:6

**soon (1)**
42:25

**sorry (2)**
75:5;78:10

**sort (19)**
13:8;14:1;18:5,7;
21:16;22:21;30:13;
35:16,23;36:5;40:25,
25;56:25;58:19;59:20;
64:24;65:5;69:11;
80:14

**Sosa (5)**
48:6,7,14,25;75:4

**sounds (2)**
19:12;81:13

**sour (2)**
35:7;73:8

**span (1)**
50:1

**Spanish (3)**
15:21;55:15;60:6

**speak (8)**
5:23;8:17;47:7;49:3,
3;54:4;60:6;66:12

**speaking (5)**
5:22,24;48:19;78:23,
24

**speaks (1)**
55:14

**specialize (1)**
9:11

**Specially (1)**
47:5

**specifically (6)**
11:24;31:23;43:22;
63:12;65:18;75:14

**specifying (1)**
32:15

**speculation (1)**
11:8

**speculative (1)**
55:16

**spell (2)**
6:22;78:12

**spending (1)**
17:23

**spent (5)**
17:10;51:21;71:4,8;
81:2

**spoke (8)**
9:19;11:7;48:2,7,17;
49:20;82:7,14

**spoken (1)**
59:11

**spokesman (1)**
45:23

**Spokeswoman (2)**
45:25;46:1

**squabbles (1)**
61:21

**stand (1)**
46:1

**standard (1)**
14:19

**standing (1)**
20:18

**star (1)**
64:11

**start (1)**
80:5

**started (15)**
17:19;19:6;24:23,24;
25:3;28:15;35:7;42:8,
9;50:19,19;51:11;
54:25;68:14;82:9

**starting (3)**
7:20;58:20;63:14

**state (8)**
5:12,18;9:12;27:19;
46:12;59:24;61:7;
74:22

**stated (1)**
76:22

**statement (3)**
12:19;32:7,13

**States (6)**
4:19;29:21,22,24;
30:1;35:17

**station (1)**
64:25

**status (2)**
54:9;58:8

**stay (3)**
9:4;45:14;61:2

**staying (2)**
79:21;80:12

**steal (1)**
45:7

**stealing (2)**
14:1;67:6

**step (1)**
25:8

**still (9)**
5:9;7:10;32:10;
36:15;44:13;47:5;69:3;
77:14;83:7

**stipulation (1)**
83:15

**stole (1)**
47:9

**stop (1)**
68:9

**stopped (2)**
34:16;59:2

**story (5)**
15:21,22;21:17;
22:16,20

**strange (2)**
18:13,16

**strategy (1)**
21:14

**Strike (5)**
28:1;29:11;33:24;
34:15;58:7

**struck (3)**
18:13;35:21;71:6

**study (1)**
75:11

**stuff (1)**
82:12

**submit (2)**
37:10;38:10

**subpoena (18)**
47:23;48:5,10,15,21,
22;50:10;62:1,8;74:4,
7,10,15,17,18;75:6;
79:5,6

**subsequent (1)**
72:5

**subsequently (1)**
51:1

**substance (4)**
6:15;51:17,19;60:22

**successful (1)**
39:13

**sudden (1)**
42:17

**sue (1)**
78:21

**suggest (2)**
78:21,23

**suggested (1)**
21:14

**suit (2)**
33:22;47:20

**summary (3)**
15:22;49:21,22

**summer (4)**
19:4;22:10;45:12;
65:22

**supposed (7)**
13:6,9;30:24,25;
51:10;67:3;68:20

**supposedly (1)**
14:14

**Sure (10)**
4:23;5:23;11:13,22;
16:11;25:20;28:24;
64:8;67:15;75:14

**surprised (3)**
55:19;74:13;77:13

**surrounding (1)**
64:14

**suspect (1)**
45:7

**suspicion (1)**
42:9

**suspicious (1)**
42:1

**sworn (1)**
4:8

**synagogue (10)**
10:19;11:4,7;12:11,
12;43:24;46:22;55:2;
69:20;71:7

---

**T**

---

**talk (12)**
12:8;15:7;45:18;
46:25;47:8;51:13;
53:25;57:1;67:3;75:3,
14;83:5

**talked (2)**
47:3;64:10

**talking (3)**
22:5;40:19;59:2

**tears (1)**
61:10

**Tel (1)**
9:24

**telephone (1)**
22:19

**telling (9)**
10:15,16;27:7;33:13;
35:10,24;54:12;77:6;
80:15

**ten (1)**
12:6

**terms (5)**
13:19;21:11;47:5;
56:13;76:22

**terror (4)**
10:14;28:6,10;38:4

**terrorism (1)**
12:19

**terrorists (1)**
9:23

**testified (2)**
4:9;21:25

**testimony (2)**
22:7;81:20

**theory (2)**
29:18;68:12

**therapy (2)**
49:2;75:2

**thin (1)**
20:20

**thinking (6)**
36:25;42:1;51:25;
52:1;73:9;81:24

**though (3)**
38:6;44:12;69:2

**thought (11)**
17:13;18:14;37:17;
44:24;47:13;62:7;67:4;
68:4,5;78:1,4

**three (8)**
18:4;43:7;48:11,11;
64:23;74:6,19;75:17

**throughout (1)**
19:23

**times (5)**
16:10;18:22;41:25;
42:13;46:24

**tired (2)**
45:8;61:20

**today (9)**
5:1;6:17;41:24;
74:18;79:19;80:3;
81:19;82:8,9

**together (1)**
17:20

**told (28)**
9:17;11:14;12:22;
22:16;23:15;31:14;
38:13;52:9;55:4,19;
57:7;59:4;62:4;66:14;
69:6;70:22;71:5,6,9,18,
18,18,19,22;74:10;
77:10,24;80:23

**tomorrow (1)**
43:9

**took (17)**
9:6;14:18;23:1,11,
12;24:16;26:8,9;30:7;
34:24;41:15,16,18;
51:15;52:3;53:10;
55:10

**total (1)**
19:22

**touch (4)**
45:14;46:2,24;61:2

**toward (1)**
70:7

**towards (3)**
8:21;34:10,17

**Trademark (1)**
8:20

**train (1)**
68:4

Case 1:15-cv-01237-EGS    Document 29-1    Filed 12/29/23    Page 34 of 53
American Center for Civil Justice, Inc. vs.                                    JAVIER LOPEZ-PEREZ
Joshua M. Ambush                                                              June 18, 2019

**translated (1)**
60:17
**translation (2)**
23:22;24:9
**traveled (1)**
31:24
**treatment (2)**
34:6;48:1
**tree (1)**
40:9
**trick (1)**
6:2
**tried (1)**
36:9
**trip (1)**
82:4
**trips (2)**
43:6,7
**true (4)**
5:19;7:25;14:18,22
**truly (1)**
10:22
**trying (11)**
6:2,3;13:23;15:3;
27:3;36:12;53:13;
63:20;67:11;75:1;
77:14
**TUESDAY (2)**
4:2;64:25
**Turning (2)**
31:20;73:8
**twice (1)**
16:12
**two (10)**
6:13;41:22;43:7;
48:11;56:21;59:21;
71:10;74:6;80:8,19
**typical (1)**
52:1

**U**

**uncle's (1)**
63:4
**under (5)**
6:15;38:9;53:12;
67:19;68:9
**Understood (1)**
21:4
**undertake (1)**
14:10
**unilateral (1)**
70:10
**United (4)**
4:18;29:22,24;30:1
**University (2)**
7:5,15
**unjust (1)**
79:14
**up (22)**
6:2;8:8;11:3;23:14;
27:17;39:7;42:16,18;
43:10,13,21;44:13;

**50:**11,14;58:19;61:15;
62:12,18;65:10;67:15;
68:7;75:16
**updated (1)**
38:24
**upon (5)**
14:24;32:5;47:22,22;
63:25
**upward (1)**
9:3
**urging (1)**
62:23
**use (2)**
53:2;83:7
**used (4)**
17:21;30:2;63:3,4
**using (1)**
61:9
**usual (1)**
54:14
**usually (1)**
17:17

**V**

**vaguely (1)**
36:7
**validity (1)**
23:9
**vent (1)**
61:12
**verbal (4)**
5:25;27:25;38:8,12
**verbatim (2)**
15:21;23:17
**Verde (1)**
43:23
**version (6)**
14:18,22;23:15;
32:18;76:11,12
**versus (5)**
50:4,15;51:22;77:7;
80:17
**victim (3)**
25:22;39:4,5
**victims (26)**
10:14;11:21;12:19;
13:3;15:4,13;25:4,5,6,
9,10,10,13;26:17;28:6,
10;30:2;36:20;38:3,15,
19;39:17;65:2,7,12;
68:7
**visit (2)**
42:23;43:1
**vocal (1)**
49:1
**volunteer (1)**
64:5
**volunteered (1)**
65:24

**W**

**wait (9)**
6:12;35:1;43:5;
44:11,16,18,18,19;45:4
**walking (1)**
20:20
**wall (1)**
71:14
**wants (1)**
83:22
**warning (1)**
15:3
**Washington (4)**
36:13,25;47:23;
74:22
**way (2)**
5:2;49:13
**ways (1)**
19:10
**wealthy (1)**
55:5
**week (1)**
42:14
**weeks (3)**
71:10;74:20;75:17
**weren't (2)**
66:18;69:2
**What's (4)**
7:7;16:4;41:23;54:8
**Whereupon (9)**
10:2;16:1;21:20;
24:1;28:25;31:4;52:16;
53:4;62:13
**Whoa (5)**
11:22;44:18,18,18;
50:24
**whole (2)**
55:1;64:25
**wholeheartedly (1)**
33:2
**whose (2)**
11:6;15:15
**wife (2)**
46:23;78:24
**wild (1)**
18:8
**within (1)**
70:11
**without (2)**
9:4;31:25;74:11
**witness (31)**
4:7;7:25;10:19;11:1;
19:15,18,22;20:7;
23:19;26:15;41:13,15,
18;48:10;50:7;9;60:5,
8,10,12,15,17,21;
63:11;65:21;76:17;
78:12,15;82:1;83:8,11
**won (5)**
52:4,9;54:11,17;
72:11
**Wonderful (1)**
84:1
**word (3)**

23:11,12;60:13
**work (19)**
6:13;8:11,24;13:5,5;
20:15;24:12;32:1;35:2;
55:20;58:20;72:1,19;
77:25;79:15;81:13,16,
22;83:12
**worked (5)**
8:25;18:1;22:21;
52:2;76:25
**working (12)**
17:20;20:5;24:19;
34:7,16,24;40:25;
51:21;54:3;56:19;
57:23;65:7
**worry (2)**
17:18;71:13
**wrap (1)**
62:12
**write (2)**
54:8,11
**wrong (3)**
68:5;76:19;77:12
**wrote (1)**
75:4

**X**

**XXIII (3)**
6:22,25,25

**Y**

**year (4)**
7:20;10:9;71:4;74:5
**years (15)**
9:5,5;12:6;23:4;
45:15;46:3;49:6,11,12;
56:21;58:24;59:3;62:6,
9;73:12
**Yedidiah (1)**
83:3
**yesterday (6)**
41:23;75:15,15;80:4,
4,6
**York (1)**
55:6

**Z**

**Zarchi (22)**
9:18;11:8;35:10,10;
43:13,22;44:15;49:24;
53:24;54:6,8,24;55:2,
11,16,18,19;56:13;
59:3;69:9,15;70:13
**Zionist (1)**
64:24

**1**

**10 (9)**
32:4;37:20;49:6,11,

12;51:8;57:15;77:4,19
**11 (1)**
16:25
**11:32 (1)**
84:2
**12 (1)**
16:25
**14 (3)**
58:11;59:5;72:9
**15 (1)**
18:23
**18 (1)**
4:2
**1972 (1)**
9:21
**1997 (1)**
7:17

**2**

**2 (1)**
54:15
**20 (23)**
18:23;28:9;32:5,16,
22;33:17;39:17,21,24;
40:2,5,6,15,17;41:25;
42:13;51:5,8,9;76:20;
77:4,13,18
**2000 (1)**
34:5
**2006 (3)**
8:25;9:8,11
**2008 (1)**
31:25
**2009 (7)**
9:16;10:10,11;19:2;
22:3,10;78:3
**2010 (14)**
19:4,5;22:10;34:6,9;
45:12,15;53:17;57:20,
20;58:1;65:23;78:3;
82:18
**2012 (5)**
47:15;53:19,20,20;
61:25
**2015 (1)**
45:16
**2019 (1)**
4:2
**24 (1)**
22:3
**25 (3)**
18:22;26:7;58:1
**26 (1)**
53:20
**29 (1)**
56:11

**3**

**3 (1)**
62:24
**30 (4)**

American Center for Civil Justice, Inc. vs.
Joshua M. Ambush

JAVIER LOPEZ-PEREZ
June 18, 2019

18:22;51:7;77:3,18
**32 (1)**
  31:20
**33 (1)**
  33:15

---

### 4

**4 (1)**
  31:2
**48 (1)**
  81:12

---

### 8

**8 (1)**
  63:15

---

### 9

**9:12 (1)**
  4:3
**94 (1)**
  8:25

# ATENCION RECLAMANTES

## VICTIMAS MASACRE AEROPUERTO DE LOD, ISRAEL

### Mayo 30, 1972

## CASO FEDERAL FRANQUI v. SYRIA

Corte para el Distrito Federal de Columbia, Washington, D.C., Caso Núm. 06-0374

Usted podría ser el objeto de un esquema de cobro indebido de honorarios de abogado por parte de abogados de Washington y Maryland.

Si usted es parte en la transacción a la que se llegó con el gobierno de Libia y ha sido abordado por abogados de afuera que le proponen acuerdos nuevos para el pago de honorarios adicionales, favor de comunicarse inmediatamente.

**Usted no tiene que pagar más de lo que acordó originalmente.**

Lcdo. Javier López-Pérez

(787) 453-5999

lopezperezlaw@gmail.com







EXHIBIT

JLPI

Lopez-Perez

Case 1:09-cv-00233-PLF-DAR    Document 72-11    Filed 05/03/10    Page 2 of 4

EL NUEVO DÍA

JUEVES, 24 DE DICIEMBRE DE 2009

**⬤ Puerto Rico Hoy**

# 'Engañan' a víctimas de Masacre de Lod

**legan que letrado**
**s confiscó millones**

POR OSMAN PÉREZ MÉNDEZ

. DRAMA que han vivido decenas de
milias desde que se vieran afectadas
or la Masacre de Lod en Israel en el
972 se niega a terminar; ahora se alega
ue un grupo de ellas ha sido víctima de
n fraude orquestado por un abogado
ue se suponía trabajaba en su favor.
Según López Pérez, representan-
te en Puerto Rico de la organización
entro Americano para la Justicia Civil,
l abogado Joshua Ambush, quien tra-
ajaba para ellos y representaba a diez
e las familias boricuas afectadas por la
masacre decidió a finales del 2008 ac-
uar por cuenta propia, en violación de
etica de su profesión.
Según López Pérez, Ambush ya se ha-
ía apropiado de unos $4 millones que
btendrían a nombre de los herederos de
os muertos del atentado te-
oista ocurrido en el aeropuerto de

Tel Aviv el 30 de mayo de 1972.
"Ese ataque fue una carnicería, que
afectó a mucha gente en Puerto Rico. Y
ahora este señor (Ambush), al enterarse
de que iban a pagarle a estas familias, de
la manera más inescrupulosa se apropia
del dinero del dolor ajeno", dijo con
evidente disgusto el abogado López.
El ataque al que se refiere López, fue
perpetrado por tres miembros del Ejér-
cito Rojo Japonés quienes dispararon
contra personas que estaban en un sa-
lón de espera, entre ellos un grupo de
peregrinos boricuas. Los atacantes con-
taron con apoyo del Frente Popular pa-
ra la Liberación de Palestina, así como
por Siria, Libia y otros países.
El ataque cobró la vida de 26 personas,
16 de ellas puertorriqueñas. Unas 80 per-
sonas resultaron heridas. En el 2002 el
Centro hizo un acuerdo con cinco fa-
milias boricuas que habían muerto en la
masacre, y otras cinco de boricuas que
habían resultado heridos, para entablar
un caso contra Siria y Libia, entre otros.
"El centro se comprometió con estas
familias, que eran gente humildes, a pa-
gar por todos los gastos del litigio. Las



REFERENCE
se refiere a la Ma-
sacre de Lod, que
ocurrió en el aero-
puerto de Tel
Aviv en 1972.
El ataque a los pere-
grinos puertorri-
queños.

familias se comprometieron a ceder el
20 por ciento de lo que se recuperara",
explicó López. "en (agosto de) el 2008
el gobierno de Libia decidió restablecer
relaciones diplomáticas con Estados
Unidos y todo cambió. Como parte de
su esfuerzo, Libia decidió destinar unos
fondos ($1,800 millones) para llegar a
acuerdos", dijo López.

El abogado explicó que en el caso de la
demanda de las 10 familias boricuas,
cada familia de un fallecido recibiría
$10 millones y cada lesionado recibiría
$3 millones. Según López, fue entonces
cuando Ambush decidió por su cuenta
venir a Puerto Rico en diciembre de
2008 e inducir a las familias a cambiar
los términos de los acuerdos, para exi-
girles un 10 por ciento adicional.
La familia de uno de los heridos se
rehusó a pactar. Para enero de este año, el
Departamento de Estado comenzó a de-
sembolsar las sumas compensatorias. Se-
gún el Centro, Ambush hizo que los pa-
gos correspondientes a cuatro de las fa-
milias de víctimas mortales fueran co-
locados en cuentas bajo su control. Ade-
más, habría exigido que otros $2 millones
que estaban en el registro de la corte.
Al momento, ya el Centro radicó una
demanda contra Ambush por sus ac-
ciones. También varias familias han co-
menzado un proceso por fraude contra
Ambush luego de saber que fueron en-
gañadas.
"Estas familias han sido objeto de en-
gaños y hasta amenazas por parte de ese
abogado", advirtió López, dejando sa-
ber que los afectados no tienen ninguna
obligación de aceptar peticiones de
Ambush.

JLP2



EXHIBIT
JLP2
Lopez-Perez

TRANSLATION FROM THE SPANISH

**16 Puerto Rico Today**

**EL NUEVO DIA**
THURSDAY 24 DEC 2009

# Victims of Lod Massacre Were Allegedly Defrauded
## They Claim Their Attorney Took Millions From Them
BY OSMÁN PÉREZ MÉNDEZ
operez@elnuevodia.com

**THE ANGUISH** that dozens of families have endured since they were afflicted by the Lod massacre in 1972 simply refuses to end. Now it has been claimed that some of them became victims of a swindle perpetrated by an attorney who was supposedly working on their behalf.

According to Javier López Pérez, representative in Puerto Rico of the American Center for Civil Justice (an organization), the attorney Joshua Ambush, who worked for them and represented ten of the Puerto Rican families that suffered the consequences of the massacre, decided toward the end of 2008 to take action on his own, in breach of the ethical code that governs his profession.

According to Pérez López, Ambush had already embezzled some $4 million that were meant for the heirs of four of the victims who perished in the terrorist attack, which took place at Tel Aviv airport on May 30, 1972.

"That attack was a slaughter that greatly harmed many people in Puerto Rico. And now this gentleman (Ambush), when he found out that that were going to pay these families, ruthlessly seized the money meant to relieve people's pain," declared attorney López with evident indignation.

The attack López was referring to was perpetrated by three members of the Japanese Red Army, who opened fire on people in a waiting area. Among them were several Puerto Rican pilgrims. The attackers enjoyed the support of the Popular Front for the Liberation of Palestine, and also that of Syria, Libya and other countries.

26 people died in the attack, of whom 16 were Puerto Ricans. Some 80 people were injured in the incident.  In 2002 the Center made an agreement with five Puerto Rican families that had died in the massacre [sic] , and another five [families] of Puerto Ricans who had been wounded, in order to bring legal action against Syria and Libya, among others.

"The center [sic] promised these families, who were poor people, that it would pay for all expenses of these lawsuits. The families undertook to pay 20 per cent of whatever was recovered," López explained.

"In (August of) 2008 the Libyan government decided to renew diplomatic relations with the United States, and everything changed. As part of its effort, Libya decided to appropriate some funds ($1.8 billion) to reach an agreement," López stated.

The attorney expressly stated that in the case of the lawsuit brought by the 10 Puerto Rican families, each family of a deceased victim would receive $10 million and each injured person would receive $3 million. According to López, that was when Ambush decided on his own to come to Puerto Rico in December 2008 and persuade the victims' families to amend the terms of the agreements, thus obtaining an additional 10 per cent. The family of one of the injured refused to make a deal. In January of that year the Department of State started distributing the indemnity money. According to the Center, Ambush arranged for the payments that were owed to four of the families of deceased victims to be made to

JLP3



EXHIBIT
JLP3
Lopez. Perez
PENGAD 800-631-6989

TRANSLATION FROM THE SPANISH

accounts that he controlled.  Furthermore he allegedly demanded an additional $2 million that were held
by the Court register [not clear what is meant by "register"; perhaps "clerk's office"].
At present the Center has already brought legal action against Ambush for his deeds. Also several
families brought fraud charges against Ambush once they learnt that they had been deceived.
"These families have been the victims of that lawyer's deceit and even his threats," López stated, and he
announced that the victims are under no obligation to accept Ambush's motions/petitions.

*[photograph caption:]*

16 Puerto Ricans died in the Lod massacre that took place at the Israeli airport of Tel Aviv in 1972. The
attack was committed by terrorists of several different nationalities.

3.2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE ESTATE OF ANGEL BERGANZO COLON represented by Efrain and Ruben Berganzo; THE ESTATE OF ANTONIO RODRIGUEZ MORALES represented by Noemi Rodriguez Robles, Eliezer Rodriguez Robles, Angel M. Rodriguez Robles, Maria M. Rodriguez Robles and Ruth D. Rodriguez Robles<br><br>Plaintiffs<br><br>v.<br><br>JOSHUA M. AMBUSH<br><br>Defendant | CIVIL NO. 10-1044 (GAG)<br><br>DECLARATORY    JUDGMENT    OF NULLITY    OF    FEE    AGREEMENT OBTAINED    THROUGH MISREPRESENTATION AND DURESS; COLLECTION OF MONIES; DAMAGES<br><br>JURY TRIAL REQUESTED |

RECEIPT # 186920
AMOUNT: $350.00

JAN 2 5 2010

CASHIER'S SIGNATURE

**COMPLAINT**

TO THE HONORABLE COURT:

COME NOW Plaintiffs through the undersigned attorney, and very respectfully state and pray as follows:

## I. INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiffs, claimants in the recently settled case styled *Franqui et al. v. Syria et al.*, Case No. 1:06-cv-00374 (RBW) (hereinafter the "Lybia action") before the United States District Court for the District of Columbia, file this cause of action for the recovery of TWO MILLION DOLLARS ($2,000,000.00) in attorney's fees wrongfully paid to defendant Joshua M. Ambush ("Mr. Ambush") by the appearing Estates.

2.      In a nutshell, Plaintiffs, who are lay persons from humble Puerto Rican families affected by the Lod Airport Massacre of May 30, 1972 (hereinafter the "Lod Massacre") in Tel Aviv, Israel, were led to believe by Mr. Ambush, through misrepresentations and nondisclosure by him and/or his agents, on the need to sign a certain additional "retainer agreement" for fees in

JPL4


EXHIBIT
JLP 4
Lopez-Perez

excess of what the Estate's members had originally agreed to pay the American Center for Civil Justice (hereinafter the "Center"), who had retained and was paying Mr. Ambush his legal fees for representing the Estates in the Lybia action, a fact unbeknownst to plaintiffs.

3.        This is an action for a declaratory judgment on the nullity of the retainer agreement fraudulently executed under Mr. Ambush's and/or his agents' misrepresentations, collection of monies and damages suffered as a result of Defendant's actions.

4.        This action is bought forth to insure that the Defendant returns the wrongfully obtained attorney's fees and seeks an award for damages in tort.

## II.  JURISDICTION AND VENUE

5.        The Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and to obtain the costs of suit, including reasonable attorney's fees.

6.        Venue is proper in the instant case as all claims arise from events that have occurred and are occurring within the jurisdiction of this Court.

## III.  PARTIES TO THE ACTION

7.        Plaintiff Efrain Berganzo is a member of the Estate of Angel Berganzo Colon, a claimant in the Lybia action. His address is P.O. Box 2043, Manati, Puerto Rico  00674, and his telephone number (787) 209-0679.

8.        Plaintiff Ruben Berganzo is a member of the Estate of Angel Berganzo Colon, a claimant in the Lybia action. His address is 1206 Weston, San Antonio, Texas 78251.

9.        Plaintiff Noemi Rodriguez Robles is a member of the Estate of Antonio Rodriguez Morales, a claimant in the Lybia action. Her address is Urb. Ocean Front, Calle Pacifico #3461, Vega Baja, Puerto Rico  00693.

10.        Plaintiff Eliezer Rodriguez Robles is a member of the Estate of Antonio Rodriguez Morales, a claimant in the Lybia action.  His address is HC-33, Buzon 5242, Marismilla, Dorado, Puerto Rico 00646.

11.    Plaintiff Angel M. Rodriguez Robles is a member of the Estate of Antonio Rodriguez Morales, a claimant in the Lybia action. He lives in Barceloneta, Puerto Rico.

12.    Plaintiff Ruth D. Rodriguez is a member of the Estate of Antonio Rodriguez Morales, a claimant in the Lybia action. Her address is 923 Edgewater Cir., Eustis, Florida 32726.

13.    Plaintiff Maria M. Rodriguez Robles is a member of the Estate of Antonio Rodriguez Morales, a claimant in the Lybia action. Her address is Apartado 1292, Manati, Puerto Rico.

14.    Defendant Joshua M. Ambush is an attorney and member of the Maryland and District of Columbia bars whose office is located at 1726 Reierstown Road, Suite 206, in Baltimore, Maryland.

## IV. FACTS IN SUPPORT OF THE COMPLAINT

15.    The Lod Massacre took place in the State of Israel on May 30, 1972. In that attack, Japanese Red Army terrorists opened heavy fire on a group of more than 150 Puerto Rican Americans arriving in the Lod Airport on a pilgrimage trip to Israel. Twenty-four people were killed and around 70 were wounded in the Massacre.

16.    Angel Berganzo Colon and Antonio Rodriguez Morales were among those killed in the Massacre.

17.    By information and / or belief, on or around 2001 the Center engaged defendant to help pursue litigation on behalf of the victims of the Lod Massacre. Defendant was retained by the Center to, *inter alia,* travel to Puerto Rico to negotiate agreements between the Center and the Puerto Rican victims of the Lod Massacre.

18.    Mr. Ambush in turn utilized his alleged "distant cousin", Mr. Leopoldo Garcia ("Mr. Garcia"), to assist the Center in finding potential claimants. The Center paid Mr. Garcia $1,500.00 for locating the Lybia action claimants.

4.3

19.    Acting as attorney for the Center, defendant and/or the agent Mr. Garcia signed with each Lybia action claimant, to include plaintiffs, a Claimant and Center Agreement (hereinafter the "Center Agreement").

20.    According to the Center Agreement, in consideration for the Center's provision of all expenses, costs, legal fees and disbursements necessary to pursue the Lybia litigation, and "[i]n further consideration of the ongoing efforts and services of the Center to assist other victims of oppression and to deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes", the claimants pledged to pay the Center 20% of the net proceeds to be recovered from the litigation.

21.    Specifically, the Center Agreement stressed that "the total in the aggregate, including legal fees, expenditures and pledges is **not** to exceed 20% of the Claimants' recovery from the Litigation." (Emphasis in the original).

22.    On June 11, 2002, Plaintiff Efrain Berganzo Cruz, son of decedent Angel Berganzo Colon, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

23.    On July 23, 2002, Plaintiff Maria M. Rodriguez Robles, daughter of decedent Antonio Rodriguez Morales, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

24.    On July 23, 2002, Plaintiff Eliezer Rodriguez Robles, son of decedent Antonio Rodriguez Morales, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

25.     On July 23, 2002, Plaintiff Angel M. Rodriguez Robles, son of decedent Antonio Rodriguez Morales, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

26.     On July 23, 2002, Plaintiff Ruth D. Rodriguez Robles, daughter of decedent Antonio Rodriguez Morales, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

27.     On July 23, 2002, Plaintiff Noemi Rodriguez Robles, daughter of decedent Antonio Rodriguez Morales, executed a Center Agreement with the Center through Mr. Garcia, acting as its representative, whereby the Center would undertake to secure counsel to commence litigation on the Rodriguez Estate's behalf.

28.     On april 21, 2006, defendant filed the complaint in the Lybia action, styled *Franqui v. Syria*, No. 1:06-cv-00374 (RBW), in the United States District Court for the District of Columbia. On March 28, 2008, defendant filed an amended complaint.

29.     On August 14, 2008, Lybia entered into an agreement (the "Claims Settlement Agreement") whereby it would establish a fund in the amoun of $1.8 billion dollars, to be administered by the United States Department of State, to compensate victims of terrorist acts sponsored by Lybia.

30.     The appearing plaintiffs were entitled to $10 million dollars for each Estate.

31.     Suddenly thereafter defendant, who seldomly if ever communicated with plaintiffs during the years that the Lybia action was pending, traveled to Puerto Rico and/or started communicating with the plaintiffs.

32.     Specifically, defendant traveled to Puerto Rico during December of 2008 and, without disclosing that the Center had paid him for his work perfomed in the Lybia action,

4.5

demanded the execution of an additional "retainer agreement" *ex post facto*, where the Estates would have to pay him an additional 10% in fees over the 20% agreed upon according to the Center Agreement.

33.    Defendant not only did not disclose that the Center had paid him his legal fees for the work perfomed in the Lybia action, but expressed that the Center had not done anything on the Estates' behalf as per the Center Agreement.  Defendant also misrepresented to plaintiffs that payment of the compensation to the Estate was contingent on their signature of the additional retainer agreement.

34.    Under said misrepresentations, and under duress due to the dire financial condition of plaintiffs, on December 15, 2008, co-plaintiffs Noemi, Angel M., Ruth D., Eliezer, and Maria M. Rodriguez Robles, executed a "Retainer Agreement" retroactive to July 23, 2002, where the Rodriguez Estate agreed to authorize Mr. Ambush to terminate certain powers of attorney granted to the Center's Michael Engelberg to act on its behalf, and to pay defendant an additional 10% of whatever could be recovered pursuant to the Claims Settlement Agreement. This represented a payment of one million dollars per estate.

35.    Under said misrepresentations, and under duress due to the dire financial condition of plaintiffs, on December 15, 2008, co-plaintiff Efrain Berganzo Cruz executed a "Retainer Agreement" retroactive to July 23, 2002, where the Berganzo Estate agreed to authorize Mr. Ambush to terminate certain powers of attorney granted to the Center's Michael Engelberg to act on its behalf, and to pay defendant an additional 10% of whatever could be recovered pursuant to the Claims Settlement Agreement.  This represented a payment of one million dollars per estate.

36.    In fact, when questioned by a member of the Berganzo Estate about the additional 10% fee payment, defendant represented that (i) he was the originator of the idea that culminated in the Lybia action, and that (ii) he was not "protected or included" in the Center Agreement

although he was the "lead attorney". Defendant also advised the Berganzo Estate member not to discuss these matters with anybody else.

37.     Because of defendant's omissions and misrepresentations, the appearing plaintiffs believed that signing the additional retainer agreement was a necessary and proper act necessary for receiving the compensation stemming from the Lybia action. Plaintiffs were never told that the signing of the additional retainer agreement was not necessary in order to receive the awarded compensation.

38.     The appearing Estates were compensated with $10 million dollars each. Of said amount, the Estates received $7 million dollars after the originally agreed 20% was paid to the Center, and one million additional dollars retained by Mr. Ambush by virtue of the additional retainer agreement.

39.     Plaintiffs were alerted about the fact that the execution of the additional retainer agreement was not necessary for receiving compensation through a newspaper advertisement published by the Center through attorney Javier Lopez acting as an agent of the Center, in the El Nuevo Dia newspaper.

40.     Through said agent the plaintiffs were informed of a certain ongoing litigation before the United States District Court for the District of Columbia styled *American Center for Civil Justice v. Joshua M. Ambush, Esq.*, Case No. 1:09-cv-00233 (PLF) where the Center is seeking declaratory judgment and damages for, *inter alia*, the execution of the additional retainer agreements herein described.

41.     Upon examining the underlying facts supporting said complaint, plaintiffs became cognizant and realized that the appearing Estates were led to sign the additional retainer agreement without having the information necessary to reach a reasonable decision on the necessity and legality of the additional retainer agreement.

4.7

## V. FIRST CLAIM FOR RELIEF
## DECLARATORY JUDGMENT ON NULLITY OF ADDITIONAL RETAINER AGREEMENT

41.    The averments contained in paragraphs 1 through 40 of this Complaint are incorporated herein by reference.

42.    Article 1207 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3372, provides that "[t]he contracting parties can establish the agreements, clauses and conditions that they deem convenient, as long as they are not against the laws, the morals, or the public order." (Translation supplied).

43.    Article 1217 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3404, provides that the consent of a party to a contract will be null if it was given through mistake, violence, intimidation or deceit.

44.    Article 1221 of the Puerto Rico Civil Code provides that deceit is configured "when with words or insidious machinations of one of the contracting parties, the other is induced to celebrate an agreement that, without them, would not have done." (Translation supplied).

45.    Plaintiffs signed the additional retainer agreement believing *inter alia* that its execution was a condition precedent for payment of the compensation stemming from the Lybia action, when it was not.

46.    In addition, plaintiffs signed the additional retainer agreement without full disclosure by Mr. Ambush that he was compensated by the Center for his work on behalf of the Estates, and that he was an agent acting for the Center.

47.    Plaintiffs would not have signed the additional retainer agreement if the Estates had been afforded all the necessary information as stated above.

48.    Plaintiffs signed the additional retainer agreements under deceit and duress.

4. 8

49.     Plaintiffs request a declaratory judgment from the Honorable Court declaring the

nullity of the additional retainer agreement, and the return of the $2 million dollars

## II. SECOND CLAIM FOR RELIEF
## COLLECTION OF MONIES AND DAMAGES

50.     The averments contained in paragraphs 1 through 49 of this Complaint are

incorporated herein by reference.

51.     The nullity of the additional retainer agreement obliges defendant to effect

restitution of the amounts obtained through the additional retainer agreement, plus interest.

Article 1255 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3514.

52.     In addition, since defendant acted deceitfully in the performance of his

obligations, damages should be awarded.  Article 1054 of the Puerto Rico Civil Code, 31

L.P.R.A. § 3018; Article 1060 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3024.

WHEREFORE Plaintiffs very respectfully requests the entry of judgment in its favor as

follows:

(a)     In connection with the First Claim for Relief, a declaration that the additional
retainer agreement is null, as it was executed through deceit, and the corresponding return to the
Estates of $1 million dollars per Estate;

(b)     In connection with the Second Claim for Relief, the award of damages to include
interest on the amounts obtained by defendant through said deceit;

(c)     For such other and further relief that this Honorable Court may deem just in
addition to the costs and disbursements of this action.

In San Juan, Puerto Rico, this 25th day of January, 2010.

Javier López-Pérez
USDC-PR #221212
The Hato Rey Center Suite 440
268 Ponce de León Ave.
San Juan, Puerto Rico 00918
Tel. (787) 754-1391 / Fax (787) 754-6019
lopezperezlaw@gmail.com

4.9

| | |
|---|---|
| **To:** | michael@centerforciviljustice.org[michael@centerforciviljustice.org] |
| **From:** | Neal Sher |
| **Sent:** | Mon 7/2/2012 5:37:48 PM (UTC-04:00) |
| **Subject:** | Fwd: Cases at the FCSC |

Sent from my iPhone

Begin forwarded message:

**From:** E Perr <ez@acenter.us>
**Date:** July 2, 2012 11:55:08 AM EDT
**To:** Neal Sher <nealsher@gmail.com>
**Subject: Fwd: FW: Cases at the FCSC**

s

---------- Forwarded message ----------
From: Rabbi Mendel Zarchi <chabadpr@gmail.com>
Date: Mon, Jul 2, 2012 at 10:55 AM
Subject: FW: Cases at the FCSC
To: E Perr <ez@acenter.us>

Rabbi Peer;
Greetings from Javier. See below.

Kol Tuv!
Mendel

-----Original Message-----
From: Javier Lopez-Perez [mailto:lopezperezlaw@gmail.com]
Sent: Friday, June 29, 2012 1:51 PM
To: Rabbi@chabadpr.com
Subject: Re: Cases at the FCSC

That is not true. As you know, they were paying me for my efforts at
finding potential claimants. That's why they used my name in newspaper
advertisements. I even went to the radio program to advertise their efforts
and seek claimants.

1. The cases before the US Lybia commission are 10% of what they get for
us. I need you to send me a copy of that agreement executed before I left.

2. The Berganzo case was mine; in the event the plaintiffs and David get
paid, David should pay me the usual referral fee between attorneys. Of
course, Chabad PR will share in my fees. I need your relationship with
David to assist in this matter and make clear to him that I am claiming the
referral fee. It's only fair. I drafted the complaint, contracted with and
interviewed the clients, got them to sign an agreement with me as
contingency, and built strategy.

3. When the Center gets paid for the Guzman case (the money is in PR and I
understand that David is litigating the fees for the Center) I need to get



paid for my efforts in getting Lourdes Guzman and her side of the family to challenge Ambush's agreement. I spent more than 100 hours in this case, and finally the case is being litigated. Without me, they would never have made contact with Lourdes Guzman. I translated docuents, interviewed Lourdes, drafted letters to Ambush for her to sign, and got her to sign an agreement with the ACCJ. In any event, if David is litigating representing the Center, then if and when he wins the Center should pay me 10% of what they get out of the Guzman case. This would be a great victory for the Center, impossible without my efforts. Lourdes is a witness and I contacted her yesterday.

Feel free to copy this e-mail to the Center and David in good faith.
The fact that I had to leave to LA to better myself should not be an excuse to deal unfairly with me. I am very well now, Baruch Has-em, and will go with this matter to the utmost consequences.

I pray for your well-being and that of your mishpacha, close and extended.
I am donning R"T tefillin and putting mezuzas in beitim yehudim across LA.

A gutten shabbes.

On Fri, Jun 29, 2012 at 8:17 AM, Rabbi Mendel Zarchi <chabadpr@gmail.com> wrote:

> in the past they mentioned, that the fees they paid you was for the
>
> Guzman case....
>
> A gutten Shabbos
>
> On Tue, Jun 26, 2012 at 3:19 PM, Javier Lopez-Perez
>
> <lopezperezlaw@gmail.com> wrote:
>
>> B"H
>>
>> Dear Rabbi Mendel:
>>
>> The case that we were trying to link to a
>>
>> death is the Estate of Ramon Figueroa Viera, who was wounded in the
>>
>> intestines and died years later of cancer of the intestine. The
>>
>> bullet was never taken out so we obtained expert's opinion that
>>
>> bullet caused the tumor.
>>
>> Now, there was another case (Guzman) which you can mention that it

5.2

was I who got the Guzman's to compensate the ICCJ for $1M. The
Guzman case was pending payment of $3M and it was I who got the
family to change the compensation agreement from the attorney to the
ACCJ.

Inquire about the status of the Guzman matter. It would be only fair
that we should get at least 33% of that million, if the ACCJ gets it.
I spent many days, weeks and months working with the Guzman case to
change it to the ACCJ.

Let me know what transpires.

p.d. B'ezrat Ha-hem I'll see you soon.

Yechezkel Tzvi Ben-Avraham Avinu


---------- Forwarded message ----------

From: Neal Sher <nealsher@gmail.com>

Date: Tue, May 25, 2010 at 8:00 AM

Subject: Cases at the FCSC

To: "Lopez Perez, Javier" <lopezperezlaw@gmail.com>

Cc: "Engelberg, Dr. Michael" <accj@optonline.net>, "Neal (Gmail) Sher"
<nealsher@gmail.com>, E Perr <ez@acenter.us>


Javier,

As a follow up to our conversation yesterday regarding cases to be
filed at the FCSC. My records identify the following cases, including
those already submitted. Please confirm that this is consistent with
your records and what the status is of the ones to be filed.

5.3

2. Roul Maldonado Lopez

3. Elba Delgado Gonzalez

4. Sonia Ortiz Delgado

5. Olga Alcaide Vega

6. Micaela Cortis

7. Luis G. Castro Rodriguez

8. Estate of Herminio Ortiz Martinez

9. Estate of Luis Conde Maldonado

10. Estate of Juanita Lopez Moyeno

11. Estate of Ramon Figueroa Viera

12. Estate of Alicia Estrella Matos

13. Estate of Jamie Enrique Valle Arroyo

14. Estate of Esther Gonzalez Arias

Thanks

Neal

--

Law Offices

Neal M. Sher

646-201-8841

nealsher@gmail.com

5.4

WARNING! This electronic mail transmission is intended only for the addressee. It contains information from the law offices of Neal M. Sher which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination, distribution, or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic mail transmission is received in error, please notify Neal M. Sher  immediately at 646-201-8841

5.5